## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
                                       :
**SAMANTHA JANSSON,**                   :          **Civil Action No.**
                   **Plaintiff,**       :
                                       :          **3:16-cv-00260 (CSH)**
**v.**                                  :
                                       :
**STAMFORD HEALTH, INC.  d/b/a**        :
**STAMFORD HOSPITAL, STAMFORD**         :
**HOSPITAL, STAMFORD ANESTHESIOLOGY**   :
**SERVICES, P.C., VANTAGEPOINT LLC d/b/a** :
**VANTAGEPOINT HEALTHCARE ADVISORS,**   :
**MICHAEL COADY, SHARON KIELY,**        :
**SAL MANCINO AND THERESA BOWLING**     :
                   **Defendants.**      :          **JUNE 29, 2016**
_____

## MEMORANDUM OF LAW IN
## SUPPORT OF PLAINTIFF'S MOTION FOR
## LEAVE TO AMEND COMPLAINT

Plaintiff, Samantha Jansson, hereby submits this Memorandum of Law in support of her

Motion for Leave to Amend Complaint. For the reasons that follow, the Motion should be

granted.

### I.        INTRODUCTION

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, Plaintiff moves to amend her

Complaint in the form attached as *__Exhibit A__*. Plaintiff by way of this amendment seeks to clarify

her allegations regarding her disabilities, her speech regarding safety and the role of the

Defendant VantagePoint LLC d/b/a VantagePoint HealthCare Advisors ("VantagePoint").

Plaintiff has also modified the complaint by adding an introductory paragraph and a paragraph

identifying the Court's jurisdiction, consistent with federal pleading practice. As this case was

1

originally filed in state court, the original Complaint was in the form of a Connecticut state court complaint.

By way of the amendment, Plaintiff seeks to clarify the allegations in Count One in support of her claim under Connecticut General Statutes § 31-51q. Specifically, Plaintiff amends the Complaint with the addition of paragraphs 28 and 29, and amendments to paragraph 33 in the proposed Amended Complaint, regarding the safety implications of hiring inexperienced anesthesiologists. Plaintiff also amends paragraphs 53 and 54 in the original Complaint, which are now paragraphs 58 and 59 in the Amended Complaint, to further clarify that her medical conditions resulting in disabilities are chronic and permanent in nature. Plaintiff is simply clarifying the extent of the medical conditions which give rise to her disability claims under federal and state law. Finally, Plaintiff has added a sentence to paragraph 9 of the Complaint, which is now paragraph 10 of the Amended Complaint, to allege the role of the Defendant VantagePoint.

## II.    DISCUSSION

Rule 15 of the Federal Rules of Civil Procedure "has been construed broadly regarding the allowance of an amendment of pleadings. The decision of whether to allow an amendment lies solely within the discretion of the trial court, and such discretion should be employed in conjunction with the 'liberalizing spirit of the Federal Rules.'"  *United States v. Continental Ill. Nat'l Bank and Trust Co.*, 889 F.2d 1248, 1254 (2d Cir. 1989) (citing Fed. R. Civ. P. 1).  The result of such liberal allowance is that a plaintiff should be allowed to test its claim on the merits if the facts upon which it relies provide a proper basis for relief.  *In re Smith*, 204 B.R. 358, 360 (Bkrtcy E.D.N.Y. 1997).

"The courts of the Second Circuit have held that in order to deny leave to amend a

pleading, a showing other than mere delay on the part of the movant is required." *See Rachman Bag Co. v. Liberty Mutual Ins. Co.*, 46 F.3d 230, 234-35 (2d Cir. 1995); *State Teachers Retirement Bd v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). This additional showing beyond mere delay can include bad faith of the movant or undue prejudice to the party opposing the motion for leave to amend. The opponent of the motion for leave to amend has the burden of establishing one of these additional factors." *In re Smith*, 204 B.R. 358, 360-61 (Bkrtcy E.D.N.Y. 1997). *See also Phillips v. Kidder, Peabody & Co.*, No. 87 Civ. 4936, 1994 WL 570072 *4 (S.D.N.Y. Oct. 13, 1994).

In accordance with these principles, courts have permitted plaintiffs to amend pleadings where the additional claims incorporated into the amended complaint were based on the same facts and transactions, did not require significant delays of a trial or the expansion of discovery, and where no dispositive motions had yet been filed. *See In re Smith*, 204 B.R. at 361-62; *Union Carbide Corp. v. Siemens Westinghouse Power Corp.*, No. 99 Civ. 12003, 2002 WL 31387269 *3 (S.D.N.Y. Oct. 23, 2002).

Here, there is no valid reason to deny Plaintiff's Motion for Leave to Amend the Complaint. Plaintiff has not added any new claims. The parties have not yet commenced discovery. Since Plaintiff seeks to amend the Complaint before discovery, Defendants cannot show that they would be impaired in their ability to defend this case if the amendment were allowed.

**III.     CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests that the Court grant Plaintiff leave to amend the Complaint.

PLAINTIFF

By:     /s/ Heena Kapadia 11869
           Heena Kapadia (ct11869)
           Law Office of Heena Kapadia
           2750 Whitney Avenue
           Hamden, CT 06518
           Phone: 203-188-8006
           Fax:    203-281-7887
           hkapadia@heenakapadialaw.com

## **CERTIFICATION**

I hereby certify that on June 29, 2016, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ Heena Kapadia 11869
Heena Kapadia

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

——————————————————— :
SAMANTHA JANSSON,                         :        Civil Action No.
          Plaintiff                       :
                                          :        3:16-cv-00260 (CSH)
     v.                                   :
                                          :
STAMFORD HEALTH, INC.                     :
d/b/a STAMFORD HOSPITAL,                  :
THE STAMFORD HOSPITAL,                    :
STAMFORD ANESTHESIOLOGY                   :
SERVICES, P.C.,                           :
VANTAGEPOINT LLC d/b/a                    :
VANTAGEPOINT HEALTHCARE                   :
ADVISORS,  MICHAEL COADY,                 :
SHARON KIELY, SAL                         :
MANCINO AND THERESA BOWLING :              JUNE 29, 2016
          Defendants.                     :
———————————————————:

<u>AMENDED COMPLAINT</u>

**I.    INTRODUCTION**

1.    This is an action to redress claims of gender discrimination, disability

discrimination, retaliation, aiding and abetting, and interference in violation of Title VII of the

Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Americans

with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Family and Medical Leave Act 29

U.S.C. § 2601 *et seq.* ("FMLA"), the Connecticut Fair Employment Practices Act ("CFEPA"),

C.G.S. § 46a-60 *et seq*. and the Connecticut General Statutes § 31-51q.

**II.    PARTIES**

2.    Plaintiff, Samantha Jansson, resides at 361 North Street, Greenwich Connecticut.

3.      Defendant, Stamford Health, Inc., d/b/a Stamford Hospital, is a Connecticut Corporation with a principal place of business located at 30 Shelburne Road, Stamford, Connecticut, d/b/a Stamford Hospital.

4.      Defendant, The Stamford Hospital, is a Connecticut Corporation doing business in the State of Connecticut  (Defendants, Stamford Health, Inc., d/b/a Stamford Hospital and The Stamford Hospital, are referred to herein collectively as "Stamford Hospital").  Stamford Hospital employed Plaintiff at all relevant times hereto.

5.      Defendant, Dr. Michael A. Coady ("Coady"), is an individual who resides at 6 Woodley Rd, Darien, Connecticut.  Defendant Coady is the Chief of Cardiac Surgery at Stamford Hospital and has been since March 1, 2010.

6.      Defendant, Sal Mancino ("Mancino"), is an individual who resides at 1015 Old Post Rd, Mamaroneck, New York. Mr. Mancino was at all times relevant hereto the head of Stamford Hospital Human Resources.

7.      Defendant, Sharon Kiely ("Kiely"), is an individual who resides at 22 Wilson Avenue, Norwalk, Connecticut.  Defendant Kiely was at all times relevant hereto the Chief Medical Officer for Stamford Hospital.

8.      Defendant, Stamford Anesthesiology Services, P.C. (referred to hereinafter as "SAS"), is a Connecticut professional corporation located at 1055 Washington Boulevard #440, Stamford, Connecticut.

9.      Defendant, Theresa Bowling ("Bowling"), is an individual who resides at 627 Laurel Rd, New Canaan, Connecticut. At all times relevant hereto she was an officer of SAS.

2

10.     Defendant, VantagePoint LLC, d/b/a VantagePoint HealthCare Advisors (referred to hereinafter as "VantagePoint"), is a Connecticut limited liability corporation located at 9 Washington Avenue, Hamden, Connecticut.  At all times relevant hereto VantagePoint was involved in providing HR and management services to SAS and Stamford Hospital.

## III.     JURISDICTION

11.     On February 16, 2016, Defendant Stamford Hospital filed a Notice of Removal from Connecticut Superior Court, Judicial District of Fairfield because Plaintiff asserted causes of action under federal law. Jurisdiction is based on the existence of a federal question pursuant to 28 U.S.C. § 1332.  Supplemental jurisdiction over Plaintiff's state law claims is based on 28 U.S.C. § 1364.

## IV.     STATEMENT OF CLAIMS

**COUNT ONE - CONN. GEN. STATS. § 31-51q** (STAMFORD HOSPITAL and SAS)

12.     Plaintiff realleges and incorporates by reference paragraphs 1 through 11 as if fully set forth herein.

13.     Plaintiff is an anesthesiologist and has been so for over 31 years. She is Board Certified in Anesthesiology and Echocardiography.

14.     In the fall of 2007, Dr. Craig Smith, Chairman of Columbia-Presbyterian Cardiothoracic Surgery Department, recruited Plaintiff to apply for the position of Director of Cardiac Anesthesiology at Stamford Hospital. Columbia-Presbyterian sponsors the cardiac surgery program at Stamford Hospital.

15.     Plaintiff underwent a rigorous interview process with employees of Stamford Hospital including Stamford Hospital Chief of Cardiology (Steven Horowitz), Stamford Hospital Chief Medical Officer (John Rodis), Stamford Hospital Chief of Cardiac Surgery (Li Poa), Stamford Hospital Executive VP and Chief Operating Officer, Kathy Silard, as well as representatives of SAS including its President, Merrill Jaffe.

16.     Plaintiff was advised during the interview process that in order to be hired as the Director of Cardiac Anesthesiology at Stamford Hospital she had to live within thirty minutes of the Hospital located on Shelburne Road in Stamford, Connecticut.

17.     Plaintiff was invited to join Stamford Hospital at the conclusion of the interview process.

18.     Plaintiff began working for Stamford Hospital in or around November, 2007.

19.     Plaintiff signed an agreement with Defendant SAS setting forth terms of the employment with it and Stamford Hospital. Stamford Hospital also agreed in writing to provide Plaintiff a severance in the event of a separation from Stamford Hospital.

20.     At all relevant times hereto, Defendants Stamford Hospital and SAS were the Plaintiff's employers.

21.     Plaintiff's experience in anesthesiology includes general and cardiac anesthesiology and critical care medicine. Prior to coming to Stamford Hospital, she worked at New York Hospital of Queens for seven years and Columbia-Presbyterian Medical Center for sixteen years.

22.     For the first two years at Stamford Hospital, Plaintiff functioned as a general and a cardiac anesthesiologist and administered general anesthetics for orthopedic/neurosurgical/gynecologic/ENT/urologic cases, performed epidural anesthetics for vascular, orthopedic, and thoracic surgical procedures, and administered general anesthesia and insertion of invasive hemodynamic monitoring and the performance of transesophageal echocardiography for cardiac surgical cases.

23.     Ultimately, Columbia told Brian Grissler, Stamford Hospital CEO, that Plaintiff's experience was needed to develop the Stamford Hospital Heart and Vascular Institute programs. At the time, the program was still in its infancy.  Because of Columbia representatives' insistence, John Rodis, Stamford Hospital Chief Medical Officer, informed Plaintiff that as of September 1, 2009, she would focus on covering the cardiac surgical and catheterization lab cases and assist with the care of patients in the Cardiac Care Unit.

24.     From September 1, 2009 until September, 2014, Plaintiff covered the vast majority of cardiac surgical cases, cardiac catheterization lab (CL) procedures, and electrophysiology cases. Plaintiff also covered more than 80% of nighttime and weekend on-call cardiac OR responsibilities for Stamford Hospital.  For a significant portion of Plaintiff's employment, the only time Plaintiff was not on night and weekend call was when she was on vacation.

25.     From September 2009, Plaintiff also cared for patients having thoracic surgery and complex general surgical procedures. Whenever a patient scheduled for a non-cardiac surgical procedure specifically requested her, she rearranged her schedule when possible in order

to fulfill the request. These other areas included the gynecologic, urologic, and orthopedic operating rooms.

26.     Plaintiff's countless offers to cover non-cardiac cases when there were no cardiac cases scheduled were repeatedly refused by the partners of SAS. The SAS partners related that they did not want to turn over to Stamford Hospital any additional money Plaintiff earned doing non-cardiac cases. Apparently, when Plaintiff worked on non-cardiac cases, SAS contractually owed Stamford Hospital all of the revenue she generated.

**Plaintiff's Speech Regarding Safety Issues**

27.     In or around 2012, Defendant Bowling began recruiting individuals to work as cardiac anesthesiologists as part of the effort to grow the cardiac program.  Defendant Bowling was attempting to recruit individuals who were still doing their fellowship, which meant that they had little actual unsupervised work experience. At that time, Stamford Hospital cardiac program had limited cases and was not set up to provide the support necessary for the junior cardiac anesthesiologists. Plaintiff expressed concerns regarding hiring inexperienced cardiac anesthesiologists and the potential for patient care to suffer in the absence of proper procedures and time set aside for mentoring and support. Plaintiff expressed that the likelihood of an inexperienced graduate failing or having complications would be high in a community hospital environment where there was no in-house backup during night and weekend-end call.

28.     The safety issue was of particular concern because in September 2009 the Stamford hospital cardiac surgical program nearly collapsed due to poor surgical outcomes which led to the Chairman of Cardiac Surgery leaving Stamford Hospital.  For a period of seven

months, the cardiac program did not have a surgical chief. It was at this time that Columbia

Presbyterian, which has an affiliation with Stamford Hospital, sent its own surgeons to Stamford

Hospital to supervise the cardiac surgery. In order to avoid  poor outcomes during this time

period, The Columbia Presbyterian Chairman, Dr. Craig Smith, insisted on having Plaintiff, an

experienced anesthesiologist, cover not only the cardiac  operating room full time  but also be

involved in the care of the patients in the ICU. At that time, everyone involved agreed that it

would not be in the best interest of the newly started cardiac surgical program at Stamford

Hospital to hire inexperienced cardiac anesthesiologists. In addition, it was understood that the

low volume of cases would not allow for a junior anesthesiologist to gain enough experience and

solidify skills.

29.     In the discussions with Defendant Bowling, Plaintiff even showed her an article

from the New York Times discussing poor outcomes, including deaths, of patients at Long Island

Jewish Medical Center in Queens. The article stated that the New York State Health Department

was conducting an inquiry and one of the issues under investigation was the decision of the

Medical Center to hire and permit inexperienced anesthesiologists to handle the cases that

resulted in poor outcomes. It was reported in the article that many doctors had said that the

reorganization of the Medical Center's anesthesia department which involved replacing private

doctors with less-experienced physicians, had turned the hospital's operating and recovery rooms

into fertile grounds for trouble.

30.     These discussions were ongoing and in or around the beginning of 2014,

Defendant Bowling began recruiting inexperienced cardiac anesthesiologists without any proper

plan in place for training and supervision in order to maintain the highest standards for patient care.

31.     Even though Plaintiff was the Director of Cardiac Anesthesiology, Defendant Bowling did not inform Plaintiff of the plan to hire inexperienced anesthesiologists and attempted to exclude Plaintiff from the interview process for cardiac anesthesiologists.

32.     Plaintiff voiced her concerns again regarding safety.  In an email responding to an email from Defendant Bowling regarding hiring of inexperienced anesthesiologists, Plaintiff stated to Defendant Coady the following: "We need to talk about this and come up with a better plan. She thinks she can hire someone fresh out of training and do a few cases a year and that will be ok?  What kind of quality product are we going to achieve with that model?"

33.     In the late fall of 2013, Plaintiff was allowed to meet a cardiac anesthesiology candidate with two years of experience, who began working at Stamford Hospital around January 2014. Over the next several months, inexperienced anesthesiologist candidates were being brought into Stamford Hospital to interview for a cardiac position without the Plaintiff's knowledge or involvement.  One of the candidates considered for hire was Dr. Feng who had not even passed her general anesthesia board examination. In this time period, Defendant Bowling stated several times that it was also her intention to have the nighttime cardiac surgical cases covered by the general anesthesiologists, who have had no specialty training in the performance or interpretation of transesophageal echocardiography. Plaintiff was also particularly concerned because some years earlier when the Defendants staffed surgical cases with less experienced anesthesiologists, there were devastating consequences to patients. For example, several years

ago the Defendants had hired an anesthesiologist with little to no practical experience and due to the mistakes made by the anesthesiologist, the patient sustained an "anoxic encephalopathy" due to lack of oxygen resulting in permanent neurologic damage. In another case, the patient arrested under the care of a nurse anesthetist. The attending anesthesiologist was unavailable to assist with the resuscitation of the patient because he was taking care of another patient.

34.     On or around February 7, 2014, Plaintiff requested a meeting with Defendant Kiely, Chief Medical Officer for Stamford Hospital, to discuss the safety issue. Dr. Kiely's assistant informed Plaintiff that Dr. Kiely's schedule was booked for several weeks but that Dr. Kiely would speak to Plaintiff over the telephone. On February 7, 2014, Plaintiff expressed her concerns to Dr. Kiely regarding the plan for hiring junior cardiac anesthesiologists and the potential for compromising the safety for patients without proper resources and planning for training. Plaintiff referred to the specific level of experience of some of the candidates. Plaintiff reported to Defendant Kiely that junior candidates were brought in without Plaintiff's knowledge or input. Defendant Kiely recommended a meeting with Defendants Bowling and Coady and Bill Feng, the Cardiac Surgeon who is also Coady's partner.

35.     Plaintiff attempted to reach Defendant Bowling and finally spoke to her on February 18, 2014 to explain the purpose of the meeting.  Plaintiff stated that she had learned from the cardiac surgeons that Bowling had been interviewing candidates who were still in the residency program and that they needed to discuss the safety and quality of care issues that the candidates' potential employment would present. Defendant Bowling was resistant to having the

meeting but eventually agreed to meet. Defendant Bowling did not favorably receive Plaintiff's efforts to set up the meeting.

36.     On or about February 28, 2014, Plaintiff had a meeting with Defendants Bowling, Coady and Feng in the Cardiac Surgical Office at the Tully Center. Defendant Bowling admitted at the meeting that she was going to "hire several new graduates to do cardiac cases…as many as four to five more."  Plaintiff expressed concerns again about the safety of patients given that new graduates would not have necessary experience to function without proper support and supervision, and an inexperienced anesthesiologist could not acquire nor maintain the requisite skill sets in a low volume program if he is only doing 1-2 cases every 6 weeks.

37.     Defendants Coady and Dr. Feng largely stayed quiet during the meeting. Defendant Coady stated that "he and Bowling had met earlier in the week." Defendant Coady made the comment that he had to give the new anesthesiologist, Amy Crane "a spanking" because she allowed Dr. Shahid Rafiq to give her a break during the case when he was not the cardiac anesthesiologist.

38.     Plaintiff's concerns regarding the safety and quality issues were not favorably received.

### The Technician Complaint

39.     On December 19, 2013, a Cardiac Catheterization Lab technician, who had recently started working for Stamford Hospital, openly criticized Plaintiff for questioning a patient about his dishonestly related to illicit drug usage. This same technician had repeatedly

behaved in a disrespectful manner towards Plaintiff over the preceding several weeks since his hire.

40.     On December 19, 2013, Plaintiff related the technician's inappropriate conduct and criticism of her to Defendant Bowling.  Defendant Bowling's only response was that "The Cath Lab is a malignant environment."

41.     On or about December 20, 2013, Plaintiff met with Maggie Zurita from Stamford Hospital Risk Management in order to discuss the December 19th Catheterization Lab events. Plaintiff advised Ms. Zurita that the technician had stood outside a closed door and listened to a private pre-operative conversation between the Plaintiff and a patient scheduled for a procedure. When the Plaintiff opened the door to leave the room, the technician verbally criticized the Plaintiff.

42.     Ms. Zurita advised Plaintiff that she had acted appropriately and Ms. Zurita voiced her surprise that a technician, particularly one who was new to Stamford Hospital, had challenged Plaintiff.

43.     On January 2, 2014, Defendant Bowling informed Plaintiff that someone in the Catheterization Lab had filed a complaint against her and that Stamford Hospital's Human Resources ("HR") department would be doing an investigation.

44.     Plaintiff was subsequently advised that it was against Stamford Hospital policies and procedures to identify the individual who had made the complaint against her.

45.     On January 13, 2014, Plaintiff met with Defendant Bowling, Betty Ann Robustelli (SAS Vice Chairman), and Attorney Benjamin Albert (an employee of VantagePoint HealthCare

Advisors) in order to discuss the complaint.  Because of Plaintiff's previous negative experiences with the technician, she concluded that he had initiated the complaint, although no one confirmed this at the meeting.

46.     Defendant Bowling told Plaintiff at the meeting that she was accused of interrogating patients about their drug and alcohol use and under-medicating patients. Plaintiff explained that in order to keep the patients safe, she had no choice but to question the patients regarding potential drugs that may be present in their bloodstream.

47.     In response to these allegations, Plaintiff stated that she did question the patient on December 19, 2013 in private regarding his drug use when she learned that he had lied to her; that this was essential in order to safely care for the patient and prevent an undesirable drug interaction; and that administering anesthetics to a patient who has illicit drugs in his system could end up having a fatal result.

48.     Plaintiff was told that a further review of the matter would occur.

49.     On February 11, 2014, Plaintiff met with SAS partners, Defendant Bowling and Steven Finkel in order to receive an update about the investigation of the complaint. Attorney Benjamin Albert participated via phone. Plaintiff was told that the investigation was wrapping up and that the technician was "so crazy during his interview that Stamford Hospital Human Resources asked them to turn the tape recorder off." Attorney Albert said that the interview of the technician and other employees confirmed his inappropriate conduct toward Plaintiff.

50.     On or about February 25, 2014, Plaintiff was advised that she had to attend a meeting with Defendant Bowling on that same day. Coincidentally, this was in the same time period that Plaintiff was expressing concerns regarding patient safety issues.

51.     On February 25, 2014, Plaintiff met with Defendant Bowling, Attorney Benjamin Albert, and Defendant Kiely, in the Stamford Hospital Administration Suite.

52.     Plaintiff was handed a disciplinary memorandum which included a synopsis of the investigation. During this process, it became clear to Plaintiff that the investigation regarding the complaint by the technician had turned into a probe regarding Plaintiff's performance.

53.     Plaintiff was forced to sign the last page of the document without being given the opportunity to read the three-page document.

54.     Attorney Albert reviewed the disciplinary memorandum.  He said that the investigation revealed that there was no evidence to substantiate that Plaintiff had ever discriminated in the care of a patient or that she had ever-under-medicated a patient, and further that no patient had ever written a complaint or had verbalized that they felt they had been discriminated against or that they had been under-medicated.

55.     He further advised that there was no merit to the accusation that Plaintiff was making value judgments about patient alcohol and drug use.

56.     Attorney Albert then began to identify areas of concern regarding Plaintiff's performance. Somehow, the investigation of an unfounded complaint by a technician had turned into a personal probe regarding Plaintiff and her performance.

13

57.     Attorney Albert stated that there were allegations that Plaintiff was not appropriately engaged with patients when providing anesthesia care. He said that this perception was based on a report that she sometimes put her right foot up while sitting in the operating room while monitoring patients, that some individuals who worked in the Catheterization Lab felt that she sometimes spoke more loudly than necessary, and that she did not sit immediately adjacent to the patient's head while working in the Electrophysiology Lab.

58.     In response to these accusations, Plaintiff explained that following the induction of general anesthesia while she monitored the patient, she did sometimes elevate her right foot on a stool, and that she did so because she has severe mid-foot arthritis and swelling of her ankle. Plaintiff's symptoms in her feet began in her left ankle and foot in around 2009. Plaintiff's foot and ankle were swollen and she began to experience pain walking and standing. Plaintiff had an MRI in June of 2009 at Stamford Hospital which showed degenerative changes in the mid foot and findings that were representative of both acute and chronic tendonitis, and bony spurring within calcaneus with changes of medial core plantar fasciitis and peritendinous inflammation. These are chronic conditions which only worsen with time.  Plaintiff was required to take anti-inflammatory medications on an ongoing basis.  Over the course of the next two to three years, the symptoms spread to the right foot and eventually the symptoms in the right foot increased in severity than the symptoms in the left foot.  Plaintiff had prominent swelling and pain in her right ankle which made it difficult to walk and stand. Plaintiff consulted with an orthopaedic surgeon in or around 2012. The Plaintiff's MRI confirmed that Plaintiff had mid-foot arthritis which had caused changes in the bones of the right foot. Plaintiff's physician advised that the foot issues

would require chronic management and worsen with time. Plaintiff was prescribed an
orthopaedic boot for the right foot for management of the symptoms and sent to a podiatrist who
made custom orthotics for Plaintiff's shoes. Plaintiff was also required to have physical therapy
for her right foot. Plaintiff was advised by her physicians in 2012 to elevate her right foot as
much as possible in order to manage the symptoms and decrease foot swelling and pain which
would occur on an ongoing basis.

59.     In response to these accusations, Plaintiff further explained that she has partial
hearing loss. She explained that due to the noise in the operating room, the placement of surgical
masks over everyone's mouths, and the multiple sources of extraneous noise emanating from
machines and suction equipment, she sometimes finds it difficult to hear conversation.  As a
reaction to this challenging environment, she explained that she might sometimes speak louder
than she realized. Plaintiff was first evaluated and diagnosed with hearing loss and ringing in her
ears in March 2009 by a Stamford Hospital ENT. Plaintiff was advised that the hearing loss was
permanent and that she would have to take preventative measures her entire life in order to
prevent further damage to the ear.

60.     In response to these accusations, Plaintiff also explained that the Stamford
Hospital Radiation Safety Director had advised that her radiation exposure levels on her
monitoring badge had significantly increased within the past year. She was instructed to continue
to wear her lead gown and thyroid shield but also to stand as far away as possible from the point
of radiation emission and sit behind the clear lead mobile screen located in each cardiac
catheterization lab procedure suite. She always sat behind the lead shield that was positioned two

to four feet behind the patient's head. She was always in close proximity to the patient and in full view of the patient and the monitor screen.

61.     Defendant Bowling was openly annoyed by Plaintiff's explanations regarding her disabilities. Defendant Bowling stated at the meeting that Plaintiff would have to substantiate her disabilities/medical conditions in writing with documentation from her physicians.

62.     Plaintiff was also accused of using electronic devices in the operating room. In response to these allegations Plaintiff stated that she only used her cell phone to communicate to her colleagues via email and text messages about patient-related issues or updated assignments. This is the accepted mode of communication between the Department of Anesthesiology members as well as other medical and nursing staff.  She stated that the cell phones do not transmit telephone calls in the Catheterization Lab. She does not use an iPad at work. The accusations were false.

63.     Attorney Albert advised at the conclusion of the meeting that Plaintiff would be required to have an evaluation by and participate in counseling by the Physicians Wellness Services Program. This program is established to treat "disruptive" physicians and address performance issues related to depression, alcohol and drug abuse, and relationship problems. The program is not confidential and is designed so that all discussions between the Program and the physician are reported back to Stamford Hospital and SAS.

64.     Following this meeting, Plaintiff received another email from Attorney Albert dated March 4, 2014, directing her to enroll in the Physician Wellness Services Program.

16

65.     On March 5, 2014, Plaintiff wrote to Defendant Bowling and Attorney Albert raising her concern that she was being subjected to criticisms and disciplinary actions regarding her performance and being attacked personally because of her disabilities and efforts to accommodate them.

**Defendant Coady's False Statement**

66.     Coincidentally, On March 7, 2014, ten days after the SAS disciplinary memorandum was issued to Plaintiff, within days of the meeting with Defendants Bowling and Coady raising safety issues, and two days after Plaintiff raised her concerns regarding discrimination due to her disabilities, Defendant Coady sent Plaintiff an email, copying Defendant Bowling, falsely accusing Plaintiff of routinely using her phone during surgical procedures and not being properly engaged.

67.     Prior to this email accusation, Defendant Coady had never mentioned that he thought Plaintiff was distracted from patient care by her cell phone in the operating room or that he felt she was not 100% engaged in the case.

68.     It was clear that Coady was partnering with Bowling to effectuate Plaintiff's termination.

69.     On March 8, the day Plaintiff received the accusatory email from Defendant Coady, she spoke with his partner, Dr. William Feng, who was in the OR on the day in question. Dr. Feng expressed that he was upset that Defendant Coady would accuse Plaintiff of any wrongdoing and stated that her work was "impeccable."

70.     Since Defendant Coady's arrival at Stamford Hospital in March of 2010, Plaintiff has watched him engage in a pattern and practice of harassment, discrimination, and retaliation against women that is simply outrageous.

71.     Because Defendant Coady had a history of discriminating and harassing female employees, and the adverse consequences to them because of Defendant Coady, Plaintiff reported the false statement to Stamford Hospital's HR department. This was not the first time Plaintiff had raised concerns regarding Defendant Coady's behavior.  In the fall of 2013, when Defendant Bowling assumed leadership of SAS, Plaintiff reported to Defendant Bowling Plaintiff's concerns regarding Defendant Coady's language and treatment of Plaintiff and other female employees. Plaintiff reported to Defendant Bowling of an incident where Defendant Coady berated Plaintiff for not being willing to anesthetize sick cardiac surgical patients before he was physically present in the hospital after Plaintiff found out that he was lying about being at the Hospital.

72.     Plaintiff responded to Defendant Coady's false accusation in writing, later on March 7, copying Defendant Bowling. Plaintiff stated to Defendant Coady: "I have watched you for years, discriminate against women and harass them, and engage in inappropriate conduct directed to them. I have somehow become the next victim in a long line of women you have hurt."

73.     As a result of raising safety issues, an intense and committed campaign of retaliation against Plaintiff followed involving all of the Defendants that ultimately resulted in her termination. Defendants conspired with each other to effectuate Plaintiff's termination.

Defendants discriminated against Plaintiff due to her disabilities.  Defendants retaliated against Plaintiff due to raising concerns regarding her disabilities and gender.

**Escalating Retaliation**

74.     Plaintiff was instructed to meet with Bowling again on or about March 10, 2014.

75.     At the meeting, Defendant Bowling repeatedly badgered Plaintiff regarding participation in the Physician Wellness Services Program. Defendant Bowling threatened Plaintiff that if she did not participate in the Program, her employment would be terminated. When Plaintiff questioned Defendant Bowling as to what she had done to warrant this request, Defendant Bowling was unable to provide any justification. Defendant Bowling also falsely stated that the Program was confidential. Defendants were attempting to use the Program as a basis to justify terminating Plaintiff's employment.

76.     During the following weeks, Plaintiff was repeatedly harassed by Defendant Bowling and representatives of Defendant VantagePoint to provide letters of documentation from Plaintiff's personal physicians substantiating her disabilities.

77.     During the following weeks, Plaintiff was repeatedly harassed by Defendant Bowling and representatives of Defendant VantagePoint about participating in the Physician Wellness Services Program.

78.     When Plaintiff asked several times exactly what she was supposed to be seeing a therapist in the Physician Wellness Services Program for, she was never given specific reasons or an explanation.

19

79.     Because Plaintiff was threatened with termination, she finally agreed to consult a psychologist/life coach of her own choosing who would see her confidentially.

80.     For the next several weeks, Plaintiff was repeatedly harassed about giving Defendants the name of the therapist and about providing the dates when she was having sessions.

81.     Defendants were fully aware that due to her clinical responsibilities and the work/call schedule at Stamford Hospital, she had virtually no time for medical/personal appointments. Yet, they continued to badger her for dates of sessions.

82.     After Plaintiff was forced to disclose her medical issues, she made it clear to Respondents in writing on several occasions that she did not want her personal health information shared with anyone without her expressed written permission.  Defendants required Plaintiff to provide medical documentation substantiating her disabilities.

83.     On several occasions, Plaintiff expressed her concerns related to her privacy and asked how and where the information would be stored.

84.     On or about May 27,  2014, Plaintiff learned that Sue Prior (a VantagePoint consultant) acting on behalf of the Stamford Hospital Defendants and  Defendant SAS and against Plaintiff's expressed wishes, had independently contacted Stamford Hospital's Employee Health department and disclosed that Plaintiff had disabilities that required accommodations. Plaintiff never sought any accommodation. The disclosure constitutes a HIPAA violation.

85.     Defendants disclosed Plaintiff's personal health information under the guise of asking the Employee Health department to provide accommodations she had never asked for.

20

**Plaintiff's Report to HR Regarding Coady's Conduct**

86.     On or about March 7, 2014, Plaintiff reported to Stamford Hospital's HR department Defendant Coady's false statements regarding Plaintiff's performance during a surgical procedure on March 6, 2014.

87.     Plaintiff reported to Stamford Hospital's HR department her concerns of being Defendant Coady's next victim and his pattern and practice of discriminating and retaliating against women in the workplace.

88.     Defendant Coady refers to women as bitches, cunts, whores, and trailer tramps. He has made fun of female employees because of their religion, their ethnicity or race and their orthopedic disabilities. He has mocked a woman who was fighting breast cancer and accused her of shaving her hair off during chemotherapy in order to get attention. He regularly makes fun of women with Stamford Hospital senior administrative responsibilities joking that all they know how to do is to "dress up" and "go shopping." He repeatedly swears at women in the operating room. He has stated on more than one occasion that he is going to get this woman or that woman "fired and that they won't even know he was responsible."  He has also made racial comments regarding women such as "fat Puerto Rican." He was openly abusive to a pregnant employee referring to her as slow and ineffective and making her stand on her feet for hours without a break. He has referred to Plaintiff as a "fucking cunt," told her to get off her "fucking ass and move faster" in the operating room, and repeatedly called her a "fucking bitch" when he didn't approve of changes in the anesthesia on-call schedule.

89.     Plaintiff has never heard Defendant Coady speak in a sarcastic, derogatory, or foul manner about any male employee at Stamford Hospital or otherwise act in an abusive manner toward male employees.

90.     Plaintiff met with Evena Williams, in Stamford Hospital's HR department, on March 7, 2014.  Plaintiff reported the false statement by Defendant Coady directed to her and also expressed her concerns regarding Defendant Coady's inappropriate behavior with women in general.

91.     At this point, Stamford Hospital was in a lawsuit with Julia Mumm, one of the individuals who was a victim of Defendant Coady's discriminatory and retaliatory practices.

92.     Plaintiff was aware of Ms. Mumm's complaint and the fact that Ms. Mumm was not the first female who had complained to Stamford Hospital HR regarding Dr. Coady's outrageous conduct.

93.     At this time, Stamford Hospital was aware that Defendant Coady had referred to Plaintiff and other women as "cunts."  Nonetheless, Stamford Hospital HR protected Defendant Coady and swept Plaintiff's complaint under the rug as explained below.

94.     Plaintiff also reported to Stamford Hospital HR at this time her concerns regarding discrimination based on her disabilities.

95.     Stamford Hospital's HR representative, Evena Williams, stated that she would investigate Plaintiff's complaint.

96.     Obviously, there was some urgency to investigating the complaint since the accusations involved conduct during a particular procedure in the operating room and since

procedures are performed every day, it would be difficult for witnesses to recall specifics with respect to a single procedure.

97.    On March 14, 2014, a week after Plaintiff reported the matter to HR, she followed up with Ms. Williams. Ms. Williams had not even begun the investigation at this point.

98.    On March 28, 2014, three weeks after the complaint to HR, Plaintiff was asked to meet with Ms. Williams again. During this meeting, Ms. Williams suggested that Defendant's false accusation email was "not so bad." Plaintiff left the meeting feeling as if the meeting was for the purpose of Ms. Williams defending Defendant Coady. Ms. Williams admitted that she had not yet interviewed a single individual as part of her "investigation."

99.    As of April 3, 2014, Plaintiff learned that HR still had not conducted any interviews. Plaintiff was advised by Dr. Bill Feng, Defendant Coady's partner, that HR had not yet asked him a single question regarding the matter. Dr. Feng was in the operating room on March 6, 2014 during the procedure relied upon by Dr. Coady for his false statement. Plaintiff had advised Ms. Williams in the original March 7, 2014 report that Dr. Feng was in the OR the entire time.

100.    On April 7, 2014, Ms. Williams sent Plaintiff an email stating that she had not yet completed her interviews of witnesses. She also purported to summarize Plaintiff's conversations with her but the summaries were not accurate. Plaintiff continued to press for HR to conduct the interviews. Obviously, due to the number of surgical procedures that are performed, employees were not likely to remember a particular procedure weeks later. Nonetheless, HR waited several weeks to talk to anyone.

101.    As part of the "investigation," Plaintiff gave her hospital and personal cell phones to Ms. Williams to examine the text and email messages. Plaintiff encouraged Ms. Williams to check with Stamford Hospital's IT Department and verify that she had not been using the hospital cell phone during the time period of the procedure in question.

102.    Plaintiff also showed Ms. Williams the data usage report for March 6, 2014 on her personal cell phone. The records conclusively showed that she had not sent any emails or text messages while in the OR on March 6, 2014, as Defendant Coady claimed.

103.    During the first week of May 2014, Plaintiff received a USPS letter from Ms. Williams at her home stating that she had completed her investigation and that none of the employees present during the procedure could confirm or deny Defendant Coady's allegations. Ultimately she concluded that there was insufficient proof that Defendant Coady had made a false statement. Stamford Hospital's HR department completely ignored the data usage records.

104.    Stamford Hospital protected Defendant Coady and refused to acknowledge that he had directed a false accusation to Plaintiff and once again subjected a female employee to harassment.

105.    On May 22, 2014, Plaintiff emailed a response to Ms. Williams in which she disagreed with her conclusion and reminded her that she had ignored the usage data in her analysis which conclusively showed that Plaintiff had not done what Defendant Coady had accused her of doing. Plaintiff received no response.

106.    After Stamford Hospital advised Plaintiff that it had completed the investigation, she discussed the matter with Dr. Feng again. Dr. Feng told her the two to three questions that

Stamford Hospital HR asked him during his brief conversation with Evena Williams. It was absolutely clear that Stamford Hospital HR was not looking for the truth or conducting any meaningful investigation.

**Plaintiff Required To Relinquish Privileges**

107.    On or about the week of April 1, 2014, Plaintiff received an email from the SAS Business Office stating that she was required to sign a document acknowledging that she would relinquish her Medical Staff privileges at Stamford Hospital should she ever be terminated by SAS.

108.    Plaintiff was subjected to ongoing harassment from Dr. Bowling in the form of text messages, emails, and phone calls during which she demanded Plaintiff sign the document and stated that the directive for Plaintiff's signature originated from Defendant Kiely, Chief Medical Officer at Stamford Hospital.

109.    Because this document was in direct conflict with Plaintiff's original agreement with Stamford Hospital, she contacted Defendant Kiely. Plaintiff asked Defendant Kiely if she had made the request to sign the document. Defendant Kiely's email response neither denied nor confirmed that the request had originated from her.

**Plaintiff Removed As Call Schedule Coordinator and Other
Retaliatory Actions**

110.    On or about July 25, 2014, Plaintiff received an email from Defendant Bowling removing her as the call schedule coordinator.

25

111.    In or around this time, Plaintiff was required to work 11 to 12 hours in the operating room without a break or lunch.

112.    During this time, Defendant Bowling chastised Plaintiff for not responding to an email during the day when Defendant Bowling knew Plaintiff was in the operating room the entire work day.

113.    This was part and parcel of the continued retaliation.

### Plaintiff's FMLA Leave

114.    On August 14, 2014, while traveling abroad with her family, Plaintiff's daughter began to experience neurological symptoms including what appeared to be seizure activity. Plaintiff's family immediately returned to the United States and her daughter was emergently admitted to Stamford Hospital on Saturday evening, August 16, 2014, for stabilization and diagnostic test performance.

115.    Plaintiff returned to work as scheduled on Monday, August 18, 2014 and was assigned to an eleven-hour cardiac surgical procedure on a critically ill patient.  She was given no break or lunch during the entire case. That night she returned home exhausted. Her daughter was still not well and Plaintiff spent much of the night awake and involved in her care. The following morning Plaintiff was even more exhausted from lack of sleep. In order to be with her daughter while she was ill and because of her own emotional and physical exhaustion, Plaintiff took a day off on Tuesday, August 19, 2014. This was the first sick day Plaintiff had taken during her entire tenure with Stamford Hospital.

116.     Plaintiff called the Hospital at 5 a.m. and spoke to Dr. Richard Margolis, the in-house anesthesiologist for that night, and advised him that she was not well enough to come to work. Dr. Margolis told Plaintiff that Dr. Amy Crane was easily able to cover Defendant Coady's procedure for that day and that he would call her and let her know. Dr. Crane called Plaintiff from Stamford Hospital at approximately 6:15 a.m. to confirm coverage.

117.     This is the first day that Plaintiff had taken off as a medical or sick leave in the entirety of her eight years of employment with Stamford Hospital.

118.     Plaintiff returned to work on Wednesday, August 20, 2014 and was assigned to cases scheduled in the Cardiac Catheterization suite for the day.

**Retaliation for Taking a Day Off**

119.     On August 21, 2014 at 9:39 p.m., Plaintiff received a phone call from Defendant Coady on her cell phone. Defendant Coady chastised Plaintiff for "calling in" the prior day, stating that this "inconvenienced him" and that "he counted on [Plaintiff] to do the case." Defendant Coady additionally suggested that she had "called in deliberately to upset [him] because [she] knew [he] wanted [her] to do the case on Tuesday." Defendant Coady also stated "I know your daughter may have issues but I was very upset that you called in."

120.     On August 22, 2014, Defendant Coady had booked two cardiac surgical procedures. Plaintiff started the first case at 6:30 a.m.  Approximately one hour after skin incision, Defendant Coady suddenly looked over the surgical screen and began to question Plaintiff about the anesthesia schedule. He began to chastise her again for "calling in." He did this in front of the entire OR team. He repeatedly stated how much this inconvenienced him. He

27

began to question her motives in taking the day off. He told her he was "disappointed" in her and that she put him in a bad position. He repeated twice that he found her "calling in" very upsetting. The conversation finally ended when Plaintiff stated "I don't want to talk about this in the OR."

121.    This situation caused a distraction for Plaintiff and for everyone else in the OR. Rather than allowing everyone to focus on the patient, Defendant Coady created a scene and a safety risk for the patient, and humiliated Plaintiff in the process.

122.    On August 22, in between the two cardiac cases, Plaintiff told Betty Ann Robustelli, SAS Vice President, about how Defendant Coady had behaved in the OR and how upset she was.

123.    On August 23, 2014, Plaintiff reported Defendant Coady's behavior in the OR and during the phone conference with her in an email to Defendant Mancino, the Director or Stamford Hospital's HR department.

124.    On Sunday, August 24, 2014, Plaintiff received an email from Defendant Bowling stating that she had been removed from the cardiac case for the following day because Amy Crane had been requested. This was the first time this had ever happened. Defendants retaliated against Plaintiff for taking a medical leave and reporting Defendant Coady's discriminatory and retaliatory conduct.

125.    Defendant Mancino responded to Plaintiff's complaint on August 25, 2014 stating that he would "begin to look into this matter."

28

126.     On Tuesday, August 26, 2014, Plaintiff received an email from Defendant Bowling that Defendant Coady wanted Dr. Margo Denham to do his case the following day. Dr. Bowling further advised Plaintiff that she was being re-assigned to the Catheterization Lab. This was the first time during Plaintiff's tenure with Stamford Hospital that this had happened. This was essentially a demotion.

127.     From the time of Dr. Coady's hire in March of 2010, Plaintiff has observed him acting in a discriminatory and retaliatory manner toward female employees. He takes liberties with female employees that he simply does not with male employees.  She watched him attack on a personal and professional level a number of female employees of Stamford Hospital and subject them to severe harassment.

## Meeting with Sal Mancino

128.     On or about Friday September 5, 2014, Plaintiff met with Defendant Mancino of Stamford Hospital's HR Department. When she arrived at the meeting, she was advised that Sara Devine RN (Nurse Recruitment and Retention Manager in HR) would also be a part of the meeting.

129.     In the discussions regarding Dr. Coady's general inappropriate behavior directed to women, Defendant Mancino repeatedly defended Defendant Coady's bad language and behavior directed to women by suggesting that it was acceptable due to the "stressful" nature of the job.

130.     Defendant Mancino defended Coady in every respect and made every attempt to dismiss Plaintiff's concerns and put Defendant Coady in the best light possible.

29

131.    Not once did Defendant Mancino acknowledge Defendant Coady's retaliation against Plaintiff for a one day medical leave due to her daughter's and her own medical condition. In fact, he seemed reluctant to discuss this. Defendant Mancino seemed much more focused on building a defense for Defendant Coady.

132.    Defendant Mancino focused on past statements and not on the current complaint that Defendant Coady chastised Plaintiff privately and publicly for calling in sick, the first time in nearly eight years of service to Stamford Hospital. He did not wish to discuss the false accusation Coady had directed to Plaintiff in March or Coady's history of abusive and inappropriate conduct toward women.

133.    Defendant Mancino acted as if this was the first time that he had heard any complaints about Defendant Coady, when he was fully aware this was not the case.  He knew Dr. Coady had referred to Plaintiff as a "cunt" and had made other derogatory and racist remarks towards women, and, yet, he looked Plaintiff in the eye and defended Defendant Coady and acted as if his behavior should be excused.

134.    The meeting was conducted in a manner where Plaintiff felt as though she had to defend herself. In the meeting, Defendant Mancino stated that he had advised Defendant Bowling of Plaintiff's complaint to Stamford Hospital's HR department.

135.    At one point, Plaintiff asked Defendant Mancino how he would feel if he had a child that was undergoing a serious medical issue that the physicians involved could not even diagnose and his boss chastised him for taking a day off to be with the child following multiple medical procedures.  Defendant Mancino said he had no idea how he would feel. She asked the

same question of Ms. Devine, who responded that she would be very upset by such treatment. Defendant Mancino refused to acknowledge any wrongdoing by Dr. Coady.

136.     Defendant Mancino never once mentioned that Defendant Coady's behavior of retaliating against Plaintiff for a medical leave is illegal and constitutes a violation of the Family and Medical Leave Act. Instead, he did everything he could to excuse Coady's behavior. He made no comment designed to support Plaintiff or the women who work for Stamford Hospital.

137.     During the meeting, Defendant Mancino advised Plaintiff that he would have to tell Defendant Coady about the complaint that she had made against him. Interestingly, when the technician had made a complaint against Plaintiff, she was advised by Stamford Hospital that it was against Stamford Hospital policy to disclose the identity of the individual who had made the complaint and that the specifics of the complaint would at all times remain confidential. It was clear that Defendant Mancino was changing Stamford Hospital's policies in order to support Defendant Coady.

138.     Plaintiff left the September 5, 2014 meeting feeling upset and dismayed.

139.     In a September 14, 2014 follow-up email to Mr. Mancino, Plaintiff asked why her complaint would be disclosed to Defendant Coady in violation of Stamford Hospital policy. There were plenty of people in the Operating Room who could have reported Defendant Coady's behavior.

140.     Defendant responded that there was no firm Stamford Hospital confidentiality policy and that this was decided on a "case by case" basis. This is absolutely contrary to what Plaintiff had been advised in the past.

141.    On September 26, 2014, Plaintiff received an email from Defendant stating that HR had "interviewed eight individuals and plan to meet with two more." He would get back to her with the outcome. He, again, conveniently failed to mention that Defendant Coady's treatment of Plaintiff was illegal and a violation of the Family and Medical Leave Act.

**<u>Termination Meeting</u>**

142.    On October 7, 2014, Plaintiff was called into a meeting with Defendants Bowling, Kiely, Chief Medical Officer of Stamford Hospital, and Sue Prior, the VantagePoint consultant working for SAS.

143.    Defendant Bowling advised Plaintiff that the business model for caring for cardiac surgical patients was changing and that Plaintiff's employment was being terminated.

144.    Defendant Bowling advised at the meeting that the reason for Plaintiff's termination is that she did not have sufficient experience in obstetrical, pediatric, and regional anesthesia anesthesiology in order to continue with her employment.

145.    Defendant Bowling advised at the meeting that Defendants had decided that, due to a change in policy, the cardiac anesthesiologist would now also cover different departments such as pediatrics, obstetrics, and perform regional blocks, and that Plaintiff was no longer suited to work for Defendants.

146.    Plaintiff was more than qualified to care for any patient undergoing any procedure that would be scheduled at Stamford Hospital. Plaintiff was skilled in the performance of spinal and epidural anesthesia, as well as the performance of axillary and femoral compartment nerve

blocks. Plaintiff reminded them at the meeting of her skills but her comments were ignored. The reason for the termination was fabricated by the Defendants.

147.    Plaintiff reminded them of the fact that few pediatric cases occurred at Stamford Hospital, and raised other issues which highlighted the absurdity of the explanation for the termination.

148.    Dr. Bowling could not respond other than to state that the business model was being changed. Dr. Bowling was stuttering when she responded because she had no legitimate way to support the justification of the termination of Plaintiff's employment.

149.    In 2014, two new anesthesiologists had been hired by Stamford Hospital and SAS to cover cardiac cases. One of the anesthesiologists had been out of training for two years and the other had just completed residency. These anesthesiologists were inexperienced in all areas. The most recent hire at that time, had not yet been completely oriented to the cardiac operating room policies and procedures. Yet, they were considered better suited to handle all cases rather than Plaintiff who had thirty years of experience.

150.    Plaintiff was further advised at the termination meeting that Dr. Vlad Frenk would begin doing cardiac cases and essentially serve as Plaintiff's replacement. Upon information and belief, Dr. Frenk was placed on probation and required to pay a $10,000 fine by the New York Professional Misconduct Board in 2013 for falsifying medical records; in New Jersey, after Dr. Frenk was found to have engaged in misconduct by the New Jersey Professional Misconduct Board in 2014 and was required to pay a $10,000.00 fine, he had to resign and give up his right

to practice medicine; and in 2014 Dr. Frenk was also subjected in Massachusetts to disciplinary action by the Board of Registration in Medicine.

151.    Defendants fabricated the explanation that these individuals were better suited to provide anesthesiology services at Stamford Hospital than Plaintiff in order to effectuate and justify Plaintiff's termination. Defendants placed their own retaliatory and discriminatory motives before the interest of the Stamford Hospital patients.

<u>**The Notice Period**</u>

152.    Based on Plaintiff's employment agreement, she was required to work for three months after the termination date.

153.    During the period of employment after the notice of termination, on or about the beginning of November, 2014, Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunities Commission.

154.    During the notice period, Defendants continued to harass Plaintiff. Plaintiff was falsely accused by Defendant Kiely of creating tension in OR.  On another occasion, Plaintiff was accused of improper conduct when she assisted with an emergency OR procedure for which she was not scheduled and during which she saved the patient's life.

155.    After the three month notice period, Plaintiff continued to be harassed.

156.    After the three month notice period, based on the contract for severance payments with Stamford Hospital, the Stamford Hospital Defendants were required to pay Plaintiff's wages for three months. Stamford Hospital refused to withhold applicable taxes from Plaintiff's paycheck committing tax fraud. Although Stamford Hospital paid Plaintiff's salary and provided

all of her benefits during her employment period, directed all of her employment related activities, required her to work exclusively for the Hospital and functioned as Plaintiff's employer in every manner, in order to avoid liability under the employment laws it had violated with respect to Plaintiff, Stamford Hospital claimed it was not Plaintiff's employer and refused to pay Stamford Hospital's share of payroll taxes.

157.    Based on the above, Defendants Stamford Hospital and SAS subjected Plaintiff to discipline and discharge due to her speech regarding safety concerns.

158.    Plaintiff's speech based on a public concern regarding safety of patients constitutes an exercise of free expression guaranteed by Sections 3, 4 and 14 of Article First of the Constitution of the State of Connecticut.

159.    Plaintiff was subjected to discipline and discharge because she spoke out on matters of public concern.

160.    Defendants Stamford Hospital and SAS by virtue of their conduct violated Section 31-51q of the Connecticut General Statutes.

161.    As a result of the Defendants' conduct, the Plaintiff has and continues to suffer damages.

**COUNT TWO - RETALIATION - TITLE VII –** (STAMFORD HOSPITAL and SAS)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.     Defendant Stamford Hospital engages in a pattern and practice of taking adverse employment actions against female employees who make any complaint against Defendant Coady. Defendant SAS participated in the retaliatory adverse employment actions.

158.     Defendants retaliated against Plaintiff for expressing opposition to discriminatory conduct based on sex. Defendants' conduct was willful.

159.     As a result, the Plaintiff has suffered damages.

160.     Defendants terminated Plaintiff's employment in violation of Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e *et seq*.

161.     The Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC") on or about November 1, 2014. Plaintiff received a release of jurisdiction from the CHRO on January 4, 2016 and the EEOC on December 1, 2015.

**COUNT THREE - DISCRIMINATION ADA – (**STAMFORD HOSPITAL and SAS)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.     Plaintiff is an individual with disabilities as defined by the Americans with Disabilities Act, Americans with Disabilities Act, as amended, 42 U.S.C. § 12101.

158.     Defendants discriminated against Plaintiff due to her disabilities or because she was perceived as having disabilities.  Defendant's conduct was willful.

159.     As a result of the Defendants' conduct, the Plaintiff has suffered damages.

36

160.    The Plaintiff filed a complaint with the CHRO and the EEOC on or about November 1, 2014. Plaintiff received a release of jurisdiction from the CHRO on January 4, 2016 and the EEOC on December 1, 2015.

**COUNT FOUR - DISCRIMINATION CFEPA – DISABILITY – (**STAMFORD HOSPITAL and SAS)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.    Plaintiff is an individual with disabilities as defined by the Connecticut Fair Employment Practices Act, Connecticut Fair Employment Practices Act, Connecticut General Statutes § 46a-60 *et seq.*

158.    Defendants discriminated against Plaintiff due to her disabilities or because she was perceived as having disabilities. Defendants' conduct was willful.

159.    As a result of the Defendants' conduct, the Plaintiff has suffered damages.

160.    The Plaintiff filed a complaint with the CHRO and the EEOC on or about November 1, 2014. Plaintiff received a release of jurisdiction from the CHRO on January 4, 2016 and the EEOC on December 1, 2015.

**COUNT FIVE - RETALIATION ADA – (**STAMFORD HOSPITAL and SAS)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.    Plaintiff expressed opposition to discrimination based on her disabilities. As a result thereof, Defendants subjected Plaintiff to retaliatory discipline and termination. Defendant's conduct was willful.

158.    Defendants' conduct constitutes a violation of the ADA, 42 U.S.C. §12203(a).

159.    As a result of the Defendants' conduct, the Plaintiff has suffered damages.

160.    The Plaintiff filed a complaint with the CHRO and the EEOC on or about November 1, 2014. Plaintiff received a release of jurisdiction from the CHRO on January 4, 2016 and the EEOC on December 1, 2015.

**COUNT SIX - RETALIATION** CFEPA (STAMFORD HOSPITAL and SAS)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.    Plaintiff expressed opposition to discrimination based on her disabilities and sex discrimination. As a result thereof, Defendants subjected Plaintiff to retaliatory discipline and termination.  Defendant's conduct was willful.

158.    Defendants' conduct constitutes a violation of Connecticut General Statutes § 46a-60a(4).

159.    As a result of the Defendants' conduct, the Plaintiff has suffered damages.

160.    The Plaintiff filed a complaint with the CHRO and the EEOC on or about November 1, 2014. Plaintiff received a release of jurisdiction from the CHRO on January 4, 2016 and the EEOC on December 1, 2015.

## COUNT SEVEN - FMLA RETALIATION (STAMFORD HOSPITAL)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.    Defendant Stamford Hospital retaliated against Plaintiff for taking a medical leave of one day due to her daughter's medical condition.   Defendant's conduct was willful.

158.    Defendant Stamford Hospital's conduct constitutes a violation of the Family and Medical Leave Act, 29 U.S.C. § 2617 *et seq*.

159.    As a result of the Defendants' conduct, the Plaintiff has and continues to suffer damages.

## COUNT EIGHT - AIDING AND ABETTING – CFEPA – (VANTAGEPOINT)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.    Defendant Vantage Point aided and abetted the discriminatory and retaliatory conduct of the Stamford Hospital Defendants and Defendant SAS based on Plaintiff disabilities and sex and for voicing her concerns of discrimination in violation of the CFEPA.

158.    Defendant Vantage Point's conduct gives rise to an aiding and abetting claim under § 46a-60(a)(5) of the Connecticut General Statutes.

159.    As a result of the Defendants' conduct, the Plaintiff has and continues to suffer damages.

39

160.     The Plaintiff filed a complaint with the CHRO on April 1, 2015. Plaintiff received

a release of jurisdiction from the CHRO on January 4, 2016.

**COUNT NINE - AIDING AND ABETTING – CFEPA** (MICHAEL COADY)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if

fully set forth herein.

157.     Defendant Michael Coady aided, abetted, incited, compelled and coerced the

discriminatory and retaliatory conduct of the Stamford Hospital Defendants, Defendant SAS and

the other individual Defendants based on Plaintiff disabilities and sex in violation of the CFEPA.

158.     Defendant Michael Coady's conduct gives rise to an aiding and abetting claim

under § 46a-60(a)(5) of the Connecticut General Statutes.

159.     As a result of the Defendant's conduct, the Plaintiff has and continues to suffer

damages.

160.     The Plaintiff filed a complaint with the CHRO on April 1, 2015. Plaintiff received

a release of jurisdiction from the CHRO on December 4, 2015.

**COUNT TEN - AIDING AND ABETTING - CFEPA** (SHARON KIELY)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if

fully set forth herein.

157.     Defendant Sharon Kiely aided, abetted, coerced, compelled and incited the

discriminatory and retaliatory conduct of the Stamford Hospital Defendants, Defendant SAS and

the other individual Defendants based on Plaintiff disabilities and sex in violation of the CFEPA.

158.    Defendant's conduct gives rise to an aiding and abetting claim under § 46a-60(a)(5) of the Connecticut General Statutes.

159.    As a result of the Defendant's conduct, the Plaintiff has and continues to suffer damages.

160.    The Plaintiff filed a complaint with the CHRO on April 1, 2015. Plaintiff received a release of jurisdiction from the CHRO on December 4, 2015.

**COUNT ELEVEN - AIDING AND ABETTING – CFEPA -** (SAL MANCINO)

1-156.   Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.    Defendant Sal Mancino aided, abetted, coerced, compelled and incited the discriminatory and retaliatory conduct of the Stamford Hospital Defendants, Defendant SAS and the other individual Defendants based on Plaintiff disabilities and sex in violation of the CFEPA.

158.    Defendant's conduct gives rise to an aiding and abetting claim under § 46a-60(a)(5) of the Connecticut General Statutes.

159.    As a result of the Defendant's conduct, the Plaintiff has and continues to suffer damages.

160.    The Plaintiff filed a complaint with the CHRO on April 1, 2015. Plaintiff received a release of jurisdiction from the CHRO on December 4, 2015.

**COUNT TWELVE - AIDING AND ABETTING – CFEPA -** (THERESA BOWLING)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

41

157.     Defendant Bowling aided, abetted, coerced, compelled and incited the discriminatory and retaliatory conduct of the Stamford Hospital Defendants, Defendant SAS and the other individual Defendants based on Plaintiff disabilities and sex in violation of the CFEPA.

158.     Defendant's conduct gives rise to an aiding and abetting claim under § 46a-60(a)(5) of the Connecticut General Statutes.

159.     As a result of the Defendant's conduct, the Plaintiff has and continues to suffer damages.

160.     The Plaintiff filed a complaint with the CHRO on April 1, 2015. Plaintiff received a release of jurisdiction from the CHRO on December 4, 2015.

## COUNT THIRTEEN - AIDING AND ABETTING – CFEPA - (STAMFORD HOSPITAL AND SAS)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.     The Stamford Hospital Defendants and Defendant SAS aided, abetted, coerced, compelled and incited the other's discriminatory and retaliatory conduct based on Plaintiff disabilities and sex in violation of the CFEPA.

158.     Defendants' conduct gives rise to an aiding and abetting claim under §46a-60(a)(5) of the Connecticut General Statutes.

159.     As a result of the Defendants' conduct, the Plaintiff has and continues to suffer damages.

160.    The Plaintiff timely filed a complaint with the CHRO and the EEOC on or about April 1, 2015. Plaintiff received a release of jurisdiction from the CHRO on January 4, 2016 and the EEOC on December 1, 2015.

**COUNT FOURTEEN - INTERFERENCE CLAIMS UNDER TITLE VII, ADA AND CFEPA** (STAMFORD HOSPITAL AND SAS)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.    The Stamford Hospital Defendants and Defendant SAS interfered with the Plaintiff's relationship and opportunities with the other in violation of Title VII, ADA and CFEPA due to their discriminatory and retaliatory motives.

158.    As a result of the Defendants' conduct, the Plaintiff has and continues to suffer damages.

159.    The Plaintiff timely filed a complaint alleging interference with the CHRO and the EEOC on April 1, 2015. Plaintiff received a release of jurisdiction from the CHRO on January 4, 2016 and the EEOC on December 1, 2015.

**COUNT FIFTEEN - DISCRIMINATION CFEPA – SEX -** (STAMFORD HOSPITAL AND SAS)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.    Defendants Stamford Hospital and SAS discriminated against Plaintiff due to her sex in violation of CFEPA, Conn. Gen. Stat. Sec. 46a-60 *et seq*.

158.     As a result of the Defendants' conduct, the Plaintiff has and continues to suffer damages.

159.     The Plaintiff filed a complaint with the CHRO and the EEOC on or about November 1, 2014. Plaintiff received a release of jurisdiction from the CHRO on January 4, 2016 and the EEOC on December 1, 2015.

## COUNT SIXTEEN - DISCRIMINATION TITLE VII – SEX - (STAMFORD HOSPITAL AND SAS)

1-156.  Plaintiff realleges and incorporates by reference paragraphs 1 through 156 as if fully set forth herein.

157.     Defendants Stamford Hospital and SAS discriminated against Plaintiff due to her sex in violation of Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e *et seq*.

158.     As a result of the Defendants' conduct, the Plaintiff has and continues to suffer damages.

159.     The Plaintiff filed a complaint with the CHRO and the EEOC on or about November 1, 2014. Plaintiff received a release of jurisdiction from the CHRO on January 4, 2016 and the EEOC on December 1, 2015.

**WHEREFORE, PLAINTIFF CLAIMS A TRIAL BY JURY, JUDGMENT AGAINST DEFENDANTS AND DAMAGES AS FOLLOWS:**

1.      Economic damages including, but not limited to: lost wages and benefits such as pension, 401k, stock, restricted stock and stock options, deferred compensation, bonuses, health, dental, life and disability benefits with interest from the date said sums were due;

2.      Non-economic compensatory damages for emotional distress, harm to reputation, and loss of enjoyment of life and equitable relief pursuant to 42 U.S.C. § 1981a, The Family Medical Leave Act, 29 U.S.C. § 2617, the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, Connecticut General Statutes § 46a-104 and Connecticut General Statutes § 31-51q;

3.      Punitive damages pursuant to 42 U.S.C. § 1981a and Connecticut General Statutes § 31-51q;

4.      Liquidated damages pursuant to the Family Medical Leave Act, 29 U.S.C. Section 2617(a).

5.      Attorneys' fees and costs pursuant to Conn. Gen. Stat. § 31-51q, 42 U.S.C. § 1981a, the Family Medical Leave Act, 29 U.S.C. § 2617, the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, and Conn. Gen. Stat. § 46a-104;

6.      Interest pursuant to Conn. Gen. Stat. § 37-3a and Costs;

7.      Such other relief in law or equity the court deems appropriate.

                        PLAINTIFF
                        SAMANTHA JANSSON


          By:     /s/ Heena Kapadia 11869
                  Heena Kapadia
                  Law Office of Heena Kapadia
                  2750 Whitney Avenue
                  Hamden, CT 06518
                  Phone:  203-288-8006
                  Fax:      203-281-7887
                  *hkapadia@heenakapadialaw.com*

46

## <u>CERTIFICATION</u>

I hereby certify that on June 29, 2016, a copy of the foregoing Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

<u>/s/ Heena Kapadia 11869</u>
Heena Kapadia