## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| _____ | : | |
| SAMANTHA JANSSON, | : | Civil Action No. |
| Plaintiff | : | |
| | : | 3:16-cv-00260 (CSH) |
| v. | : | |
| | : | |
| STAMFORD HEALTH, INC. | : | |
| d/b/a STAMFORD HOSPITAL, | : | |
| THE STAMFORD HOSPITAL, | : | |
| STAMFORD ANESTHESIOLOGY | : | |
| SERVICES, P.C., | : | |
| VANTAGEPOINT LLC d/b/a | : | |
| VANTAGEPOINT HEALTHCARE | : | |
| ADVISORS, MICHAEL COADY, | : | |
| SHARON KIELY, SAL | : | |
| MANCINO AND THERESA BOWLING | : | JUNE 29, 2016 |
| Defendants. | : | |
| _____ | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The Plaintiff, Samantha Jansson, hereby submits this Memorandum of Law in Opposition

to the Motion to Dismiss filed by the Defendants, Stamford Health, Inc. and Stamford Hospital.

As the following discussion will show, the Motion to Dismiss should be denied.

## I.      BACKGROUND

### Summary of Complaint

Plaintiff alleges claims of gender discrimination, disability discrimination, retaliation for

expressing opposition to gender and disability discrimination, aiding and abetting, in violation of

Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*,

the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Family and

Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the Connecticut General Statutes § 31-

1

**ORAL ARGUMENT REQUESTED**

51q and the Connecticut Fair Employment Practices Act ("CFEPA") § 46a-60 *et seq*. Defendants Stamford Health, Inc. and Stamford Hospital (collectively referred to as "Stamford Hospital") move for partial dismissal of Counts One through Seven, Nine through Eleven, and Thirteen through Sixteen of the Plaintiff's Complaint, dated February 1, 2016 under Fed. R. Civ. P. 12(b)(6).

Plaintiff began working as an anesthesiologist for Stamford Hospital in the fall of 2007. Compl. ¶¶ 10-12; proposed Amended Complaint ("Am. Compl."), filed herewith as Exhibit A to Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Leave to Amend Complaint, ¶¶ 13-15. In or around 2012, Defendant Theresa Bowling, the head of Defendant Stamford Anesthesiology Services ("SAS"), began recruiting individuals to work as cardiac anesthesiologists for Stamford Hospital. She was attempting to recruit individuals who were still doing their fellowship, which meant that they had little actual unsupervised work experience. The Stamford Hospital cardiac program had limited cases and was not set up to provide the support necessary for the junior cardiac anesthesiologists. Plaintiff expressed concerns regarding the patient safety issues implicated by this plan, including the likelihood of an inexperienced graduate failing or having complications would be high in a community hospital environment where there was no in-house back up during night and weekend-end call. Compl. ¶ 24; Am. Compl. ¶ 27.

Plaintiff's concerns were particularly relevant given that in or around September 2009, the Stamford Hospital cardiac surgical program nearly collapsed due to several *poor surgical outcomes*. At this time, physicians associated with Columbia Presbyterian, which has an affiliation with Stamford Hospital, came to Stamford Hospital to supervise the cardiac surgery program. In order to avoid poor outcomes, the Columbia Presbyterian Chairman, Dr. Craig

Smith, insisted on having an *experienced* anesthesiologist cover the cardiac operating room. It was understood that the low volume of cases at Stamford Hospital would not allow for a junior anesthesiologist to gain enough experience and solidify skills. Am. Compl. ¶ 28. Plaintiff was also particularly concerned because some years earlier when the Defendants staffed surgical cases with less experienced anesthesiologists, there were devastating consequences to patients. One patient sustained an "anoxic encephalopathy" due to lack of oxygen resulting in permanent neurologic damage. In another case, the patient arrested under the care of a nurse-anesthetist when the attending anesthesiologist was unavailable to assist with the resuscitation of the patient, because he was taking care of another patient. Am. Compl. ¶ 33.

The discussions regarding safety were ongoing during 2013 and, in or around the beginning of 2014, Plaintiff learned that Defendant Bowling was recruiting inexperienced cardiac anesthesiologists, without informing Plaintiff, and without any proper plan in place for training in order to maintain the highest standards for patient care. Compl. ¶ 25; Am. Compl. ¶ 30. Plaintiff voiced her concerns regarding safety to both Stamford Hospital Chief Medical Officer, Defendant Sharon Kiely, and Defendant Bowling. Compl. ¶¶ 29-31; Am. Compl. ¶ 34-36. In an email responding to an email from Bowling regarding the hiring of inexperienced anesthesiologists, Plaintiff stated to Defendant Michael Coady, Stamford Hospital's Chief of Cardiology, the following: "We need to talk about this and come up with a better plan. She thinks she can hire someone fresh out of training and do a few cases a year and that will be ok?  What kind of quality product are we going to achieve with that model?" Compl. ¶ 27; Am. Compl. ¶ 32.  Plaintiff's concerns regarding the safety and quality issues were not favorably received. Compl. ¶ 33; Am. Compl. ¶ 38. In this time period, Defendants took advantage of an investigation of an unfounded complaint against Plaintiff by a lab technician by turning it into a

probe of Plaintiff's work in order to fabricate reasons to effectuate termination of Plaintiff's employment. In the process, they subjected Plaintiff to discrimination based on her disabilities and gender, and when she expressed her concerns regarding the conduct, Defendants subjected her to retaliation. Defendants also violated her rights under the FMLA.

On January 2nd 2014, while discussions regarding safety issues were ongoing, Defendant Bowling informed Plaintiff that someone in the Catheterization Lab had filed a complaint against her and that Stamford Hospital's Human Resources ("HR") department would be conducting an investigation. Compl. ¶ 38; Am. Compl. ¶ 43. Plaintiff knew that this investigation stemmed from her interaction with a newly hired Cardiac Catheterization Lab technician, who had openly criticized Plaintiff for questioning a patient about his dishonesty related to illicit drug usage, something the technician was not qualified or justified to do. Compl. ¶ 34; Am. Compl. ¶ 39. In follow up discussions regarding this complaint in January and February with Defendant Bowling, Plaintiff was advised that the investigation showed that the technician's complaint was without merit but that the investigation by Stamford Hospital was ongoing. Compl. ¶¶ 40-44; Am. Compl. ¶¶ 45-49.

On February 25, 2014, Plaintiff met with representatives of the three institutional defendants, Defendants Bowling and Kiely and Attorney Benjamin Albert of Defendant VantagePoint LLC d/b/a VantagePoint Healthcare Advisors ("VantagePoint"), an entity retained to provide management and HR services to the other institutional Defendants. At this meeting, Plaintiff was handed a lengthy disciplinary memorandum. This is when it became clear that the investigation, which was conducted by Stamford Hospital, had turned into a general probe of Plaintiff's work. Attorney Albert advised Plaintiff that the investigation revealed that there was no evidence to substantiate the concerns raised by the lab technician, but then began to identify

unrelated areas of concern regarding Plaintiff's performance. Compl. ¶¶ 46-47; Am. Compl. ¶¶ 10, 51-52.

Plaintiff was accused of not being appropriately engaged with patients when providing anesthesia care. Plaintiff was advised that this conclusion was based on a report that she sometimes put her right foot up while sitting in the operating room while monitoring patients, that some individuals who worked in the Catheterization Lab felt that she sometimes spoke more loudly than necessary, and that she did not sit immediately adjacent to the patient's head while working in the Electrophysiology Lab.  In response to these accusations, Plaintiff explained that following the induction of general anesthesia while she monitored the patient, she did sometimes elevate her right foot on a stool, and that she did so because she has severe mid-foot arthritis and swelling of her ankle and she had been advised to do so by her physician. Plaintiff further explained that she has partial hearing loss. She explained that due to the noise in the operating room, the placement of surgical masks over everyone's mouths, and the multiple sources of extraneous noise emanating from machines and suction equipment, she sometimes finds it difficult to hear conversation and that she might sometimes speak louder than she realized. Plaintiff also explained that the Stamford Hospital Radiation Safety Director had advised that her radiation exposure levels on her monitoring badge had significantly increased within the past year. She was instructed to continue to wear her lead gown and thyroid shield but also to stand as far away as possible from the point of radiation emission and sit behind the clear lead mobile screen located in each cardiac catheterization lab procedure suite. She explained that she was always in close proximity to the patient and in full view of the patient and the monitor screen. Defendant Bowling was openly annoyed by Plaintiff's explanations regarding her disabilities.

Plaintiff was advised that she would have to substantiate her disabilities/medical conditions in writing with documentation from her physicians. Compl. ¶¶ 52-56; Am. Compl. ¶¶ 57-61.

Plaintiff was advised at the meeting that Plaintiff would be required to have an evaluation by and participate in counseling by the Physicians Wellness Services Program, a program that is established to treat "disruptive" physicians and address performance issues related to depression, alcohol and drug abuse, and relationship problems. After this meeting, Plaintiff received follow up harassing emails demanding she enroll in the Physician Wellness Services Program. Plaintiff's requests for an explanation as to the reasons for the enrollment were ignored. On March 5, 2014, Plaintiff wrote to Defendants raising her concern that she was being subjected to criticisms and disciplinary actions regarding her performance and being attacked personally because of her disabilities and efforts to accommodate them. Compl.¶¶ 58-60; Am. Compl. ¶¶ 63-65.The harassment further escalated.

On March 7, 2014 ten days after the disciplinary memorandum was issued to Plaintiff, within days of the meeting with Defendants Bowling and Coady during which Plaintiff raised her safety concerns, and two days after Plaintiff raised her concerns regarding discrimination due to her disabilities, Defendant Coady sent Plaintiff an email, copying Defendant Bowling, falsely accusing Plaintiff of routinely using her phone during surgical procedures and not being properly engaged. Prior to this email accusation, Defendant Coady had never stated anything like this to Plaintiff. It appeared that Defendants Coady and Kiely were partnering with Defendant Bowling to effectuate Plaintiff's termination.  Compl. ¶¶ 61-63; Am. Compl. ¶¶ 66-68.

Because Defendant Coady had a history of targeting female employees, Plaintiff became concerned that she had become his next victim. Plaintiff reported Coady's false statement to Stamford Hospital's HR department and raised her concerns regarding his pattern of

discrimination and harassment directed to female employees in general. Compl. ¶¶ 66-67, 83, 85-88; Am. Compl. ¶¶ 71-72, 88, 90-93. The HR representatives involved did everything possible to protect Defendant Coady and ignore Plaintiff's rights. Plaintiff gave her hospital and personal cell phones to HR to examine the text and email messages which conclusively showed that Plaintiff had not sent any emails or text messages while in the OR on March 6, as Defendant Coady claimed. Compl. ¶¶ 96-97; Am. Compl. ¶¶ 101-102. Nonetheless, Stamford Hospital HR refused to acknowledge that Defendant Coady had directed a false accusation to Plaintiff. Compl. ¶¶ 98-100; Am. Compl. ¶¶ 103-105.

After this complaint to HR, Plaintiff's work situation further deteriorated. Defendants embarked on a relentless campaign of retaliation and harassment. Due to the breadth of the retaliation, Plaintiff highlights only some of the key conduct in the Complaint. Representatives of the three institutional Defendants, including the named Defendants, conspired to rid Plaintiff of her employment. Defendants continued to attempt to force Plaintiff to participate in the wellness program designed for disruptive physicians, ignoring Plaintiff's requests for information as to what she had done to warrant the participation. Compl. ¶¶ 70, 72-76; Am. Compl. ¶¶ 75, 77-81. Defendants threatened Plaintiff with termination if she did not do so. Compl. ¶¶ 80; Am. Compl. ¶¶ 75. Plaintiff was harassed with requests for medical documentation to substantiate her disabilities. Compl. ¶¶ 71, 77; Am. Compl. ¶¶ 76, 82. Defendants disclosed her personal medical documentation without her consent. Compl. ¶¶ 79-80; Am. Compl. ¶¶ 84-85. Plaintiff's job duties were diminished in the coming months. For example, on or about July 25, 2014, Plaintiff was removed as Call Schedule Coordinator. Compl. ¶ 105; Am. Compl. ¶ 110. Plaintiff was required to work 11 to 12 hours in the operating room without a break or lunch. Compl. ¶ 106; Am. Compl. ¶ 111. Plaintiff was chastised by

Defendants for minor issues. Defendant Bowling chastised Plaintiff for not responding to an email during the day when Defendant Bowling knew Plaintiff was in the operating room the entire work day. Compl. ¶ 107; Am. Compl. ¶ 112. In August, 2014 Stamford Hospital permitted Plaintiff's rights under the Family and Leave Act to be violated after she was forced to take a day off from work to care for her daughter, who had experienced neurological symptoms including what appeared to be seizure activity and was hospitalized, and to address her own exhaustion. Compl. ¶¶ 109-112; Am. Compl. ¶¶ 114-117. Plaintiff was removed from doing a cardiac case, something that had never happened during her tenure with Stamford Hospital. Compl. ¶ 119; Am. Compl. ¶ 124. Later in August Plaintiff was demoted and permanently reassigned to the Cardiac Catheterization Lab.

On October 7, Plaintiff was called into a meeting with representatives of the three institutional defendants and advised that her employment was being terminated. Plaintiff was advised that the termination was necessary because in the last few years of her employment, she primarily worked in the cardiac unit, and lacked sufficient experience in obstetrical, pediatric, and regional anesthesiology in order to continue with her employment. Compl. ¶¶ 137-140; Am. Compl. ¶¶ 142-145. Defendants feigned the explanation in order to effectuate the termination. Defendants claimed that anesthesiologists with little expertise in *any* area were somehow better suited to work at Stamford Hospital. Compl. ¶ 144; Am. Compl. ¶ 149. Plaintiff was required to continue working for the Hospital during the next three months, during which time Defendants continued to harass Plaintiff. Compl. ¶ 147-151; Am. Compl. ¶¶ 152-156.

Essentially, all of the Defendants conspired, cooperated and worked with each other in subjecting Plaintiff to discrimination and retaliation. Plaintiff alleges aiding and abetting claims under §46a-60(a)(5) of the Connecticut General Statutes against the individual Defendants, as

well as Defendants Stamford Hospital and SAS. (Compl. and Am. Compl., Counts Nine through Thirteen). Plaintiff also alleges an aiding and abetting claim against VantagePoint, the entity that provides management and HR services to the other institutional defendants. (Compl. and Am. Compl., Count Eight).

## II.     MOTION TO DISMISS STANDARD OF REVIEW

On a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (citation omitted). The Court's analysis must include "not only the assertions made within the four corners of the complaint itself, but also those contained in documents attached to the pleadings or in documents incorporated by reference." *Id*. "All complaints must be read liberally; dismissal on the pleadings *never* is warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005) (emphasis in original). Furthermore, a plaintiff is not required to plead her *prima facie* case, which is an evidentiary standard, not a pleading requirement. *Swierkiewicz v. Sorema N.A*., 534 U.S. 506, 510-11 (2002) (emphasis added). "[A]t the pleading stage a plaintiff must meet no more rigorous a burden than that found in Federal Rule of Civil Procedure 8(a), which requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Amron v. Morgan Stanley Investment Advisors, Inc*., 464 F.3d 338, 343 (2d Cir. 2006) (*quoting Swierkiewicz*, 534 U.S. at 512 (2002)).

The Federal Rules "reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of

pleading is to facilitate a proper decision on the merits." *Swierkiewicz*, *supra*, 534 U.S. at 514

(2002). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the

claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of

the pleading that a recovery is very remote and unlikely but that is not the test. This standard is

applied with even greater force where the plaintiff alleges civil rights violations." *Gant v.*

*Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)(citations and quotations omitted); *see*

*also Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (reiterating that courts in the Second

Circuit exercise particular care to avoid hastily dismissing complaints that allege civil rights

violations). Ultimately, in order to survive a motion to dismiss, as well as a motion for judgment

on the pleadings, a plaintiff need allege "only enough facts to state a claim to relief that is

plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also*

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1952 (2009) ("only a complaint that states a plausible claim

for relief survives a motion to dismiss.").

## III.    ARGUMENT

### A.    Defendant's Motion to Dismiss Plaintiff's Claim under § 31-51q.

Defendant Stamford Hospital argues that the content of Plaintiff's speech is not

constitutionally protected because it does not involve a matter of public concern and, therefore,

does not fall within the protection of § 31-51q of the Connecticut General Statutes.  Defendant's

argument fails because: 1) it is based on a description of Plaintiff's speech which is inaccurate

and incomplete; and 2) speech addressing workplace safety is a matter of public concern.

*McClain v. Pfizer Inc.*, 2011 WL 2633670, *2 (D. Conn. 2011) (safety issues are a matter of

public concern); *Lowe v. AmeriGas, Inc.*, 52 F.Supp.2d 349, 359 (D. Conn., 1999) (same);

*DiMartino v. Richens*, 263 Conn. 639, 667, 822 A.2d 205 (2003); *Guimard v. Falcon Financial*,

2005 WL 3663665 (Conn.Super. 2005).

Plaintiff's comments to Stamford Hospital were within the context of a matter of general public concern. Plaintiff's comments were related to patient safety in the area of anesthesiology services at Stamford Hospital. Plaintiff's comments were based on prior adverse surgical outcomes at Stamford Hospital where patients suffered health consequences. Plaintiff was aware of a history of problems at Stamford Hospital and elsewhere due to inexperienced anesthesiology staff. (Am. Compl., ¶¶ 27-38). Plaintiff's speech was about patient safety and not a personal matter as Stamford Hospital suggests. Stamford Hospital argues that § 31–51q does not protect Plaintiff's speech because her speech did not relate to public health and safety. In making this claim, Defendant mischaracterizes the nature of Plaintiff's speech claiming that her speech is merely about a "generalized concern" regarding "internal staffing concerns" and "not being involved in the hiring process." (Def. Mem. of Law, p. 11, 12). Plaintiff's speech regarding patient safety is, as a matter of law, speech regarding a matter of public concern.

In *King v. Connection, Inc.*, 2011 WL 3211250, at *4 (Conn.Super. 2011), one of the cases upon which the Defendant relies, the plaintiff "disagreed with a decision to hire, and necessarily pay with state funds, individuals she believed to be incompetent." The *King* case did not involve speech regarding public safety, the precise issue involved in this case. The decision in *Lowe v. AmeriGas, Inc.*, 52 F.Supp.2d 349, 359 (D.Conn., 1999), upon which Stamford Hospital also relies, actually supports the Plaintiff's position. In *Lowe*, the court found that the Plaintiff's "complaints about safety concerns regarding the improper storage of a hazardous substance such as propane… implicate[d] matters of public concern and, thus, constitute protected speech."

Defendant claims in its Motion to Dismiss that the Plaintiff's speech does not point to an "imminent threat to any patient or a group of patients," and that her concern was not about a

"particular anesthesiologist… who was not licensed or lacked the qualifications for the position."

However, Defendant has not supported these claims with any cases which show that the speech

has to show an "imminent threat" or that the Plaintiff has to identity a particular anesthesiologist

in order for her speech to fall within the First Amendment to under the United States or Sections

3, 4 and 14 of Article First of the constitution of the State of Connecticut of the Connecticut

State Constitutions.

Based on the foregoing, Defendant's Motion to Dismiss as to Connecticut General

Statutes § 31-51q should be denied.

**B.** **Plaintiff Alleges Pattern and Practice As A Method of Proof, And Not As a Theory Of Liability, To Support Her Individual Claims Of Discrimination.**

Defendant Stamford Hospital argues that Plaintiff's pattern and practice claim should be

dismissed. Plaintiff has not alleged a pattern and practice theory of liability against Stamford

Hospital, as it contends in the Motion to Dismiss. Evidence of pattern and practice, however, is

highly relevant to Plaintiff's individual discrimination and retaliation claims. Specifically,

Plaintiff alleges that she was one of the victims of Stamford Hospital's pattern and practice of

retaliating against female employees who make a complaint against Defendant Coady. Compl.

¶¶ 81–101; Am. Compl. ¶¶ 86-106). Plaintiff alleges that Stamford Hospital knew that Defendant

Coady made false and offensive statements against Plaintiff and other women and then protected

Defendant Coady by sweeping these complaints under the rug and protecting him from any

adverse consequences. *Id.* Plaintiff was a victim of Stamford Hospital's pattern and practice.

The Court has expressly recognized the relevance of pattern and practice evidence when

proffered in support of an individual discrimination claim. *Coale v. Metro North R. Co.,* 2011

WL 1870237 (D.Conn. 2011) *citing Hollander v. Amer. Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir.

1990) ("Evidence relating to company-wide practices may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual masks a discriminatory motive."); *Chamberlain v. Farmington Sav. Bank*, 247 F.R.D. 288, 291 (D. Conn. 2007) *citing Culkin v. Pitney Bowes, Inc.,* 225 F.R.D. 69, 71 (D.Conn.2004) (citations omitted) ("Evidence of general patterns of discrimination by an employer is clearly relevant in an individual disparate treatment case, and is therefore discoverable pursuant to Fed. R. Civ. P. 26(b)(1))." Discovery related to the Defendants' pattern and practice may provide evidence to support an inference that the defendant acted with a discriminatory and retaliatory motive in terminating the plaintiff and that its stated reasons for the plaintiff's termination are pretextual. *Chamberlain v. Farmington Sav. Bank*, 247 F.R.D. 288, 291; *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (as applied to claims under ADEA, the FMLA and the CFEPA).

The pattern or practice allegation in the Complaint is relevant evidence of Stamford Hospital's retaliatory motive against Plaintiff that should be further explored during discovery.

### C.     The Plaintiff Alleges a Plausible Claim of Disability Discrimination.

#### 1.     <u>Plaintiff alleges a disability under the ADA and the CFEPA</u>

In Counts Three and Four of the Complaint and Proposed Amended Complaint, Plaintiff alleges disability discrimination claims under the ADA and CFEPA, respectively.  Plaintiff claims that the Stamford Hospital discriminated against her due to her disabilities and that the conduct was willful. Compl.

¶ 152-153; Am. Compl. ¶ 157-158. Plaintiff has pled facts that she was limited in major life activities (hearing and standing) and that she suffers from permanent and chronic physical disabilities that are the cause of the limitation on the major life activities. (Compl. ¶¶ 53-54; Am.

Compl. ¶¶ 58-59. With respect to the arthritis condition in her foot, Plaintiff alleges that her personal physician had instructed her to elevate her foot and that he had been monitoring her condition for "several years." Compl. ¶ 53; Am. Compl. ¶ 58. With respect to the hearing loss, she alleges that her hearing loss would sometimes require her to speak "louder than she realized." Compl. ¶ 54; Am. Compl. ¶ 59. These allegations, taken as true and read in a light most favorable to the Plaintiff, support a claim for disability discrimination under the ADA and CFEPA.

In the Amended Complaint, Plaintiff further clarifies the permanent and chronic nature of the disabilities as follows:

> Plaintiff's symptoms in her feet began in her left ankle and foot in around 2009. Plaintiff's foot and ankle were swollen and she began to experience pain walking and standing. Plaintiff had an MRI in June of 2009 at Stamford Hospital which showed degenerative changes in the mid foot and findings that were representative of both acute and chronic tendonitis, and bony spurring within calcaneus with changes of medial core plantar fasciitis and peritendinous inflammation. These are chronic conditions which only worsen with time. Plaintiff was required to take anti-inflammatory medications on an ongoing basis. Over the course of the next two to three years, the symptoms spread to the right foot and eventually the symptoms in the right foot increased in severity than the symptoms in the left foot. Plaintiff had prominent swelling and pain in her right ankle which made it difficult to walk and stand. Plaintiff consulted with an orthopaedic surgeon in or around 2012. The Plaintiff's MRI confirmed that Plaintiff had mid-foot arthritis which had caused changes in the bones of the right foot. Plaintiff's physician advised that the foot issues would require chronic management and worsen with time. Plaintiff was prescribed an orthopaedic boot for the right foot for management of the symptoms and sent to a podiatrist who made custom orthotics for Plaintiff's shoes. Plaintiff was also required to have physical therapy for her right foot. Plaintiff was advised by her physicians in 2012 to elevate her right foot as much as possible in order to manage the symptoms and decrease foot swelling and pain which would occur on an ongoing basis.

Am. Compl., Par. 58.

> Plaintiff was first evaluated and diagnosed with hearing loss and ringing in her ears in March 2009 by a Stamford Hospital ENT. Plaintiff was advised that the hearing loss was permanent and that she would have to take preventative measures her entire life in order to prevent further damage to the ear.

Am. Compl., Par. 59

To state a facially valid discrimination claim under the ADA, a plaintiff must allege facts permitting the reasonable inference that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [her] disability or perceived disability." *Caskey v. Cnty. of Ontario*, 560 Fed.App'x 57, 58 (2d Cir. 2014) (quotation marks omitted).[1] Stamford Hospital claims that Plaintiff's pleading does not establish that she suffers from or is regarded as suffering from a disability under the ADA and CFEPA because Plaintiff does not allege that any condition substantially limits a major life activity and that she has a "chronic" condition. (Def. Mem. Of Law, p. 16). The ADA specifically lists hearing and standing as major life activities. <u>See</u> 42 USCA § 12102(2)A. Plaintiff's allegations clearly reflect that these are "chronic" conditions. Moreover, under the ADA, an impairment that is "episodic" is a disability if it would substantially limit a major life activity when active. 42 USCA § 12102(4)D. Defendant seems to suggest that Plaintiff's allegation that she "sometimes elevates her right foot" or "might sometimes speak louder than she realized" somehow diminishes Plaintiff's claim of disability. Defendant is wrong.

In their motion to dismiss, Stamford Hospital fails to cite the ADA Amendment Act of 2008 ("ADAAA"), which governs the analysis in this case. The ADAAA "substantially broadened the definition of a disability under the law, in explicit response to *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), in which the ADA's terms defining disability had been strictly defined." *Girard v. Lincoln College of New England*, 27 F.Supp.3d 289 (2014) *citing, Hutchinson v. Ecolab, Inc.*, 2011 WL 4542957, at *7

---

[1] The Stamford Hospital's statement of elements of *prima facie* case is not accurate.

(D. Conn. 2011). Under the ADAAA, the definition of "disability" is construed in "favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). "Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individuals; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(1).

"The ADAAA expanded the interpretation of the ADA's three-category definition of 'disability.' For example, 'major life activity' includes 'caring for oneself, performing manual tasks ... *hearing*… walking, *standing*, lifting, bending, speaking, breathing.., and working,' as well as 'the operation of a major bodily function,' including 'neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.'" *Hutchinson*, 2011 WL 4542957, at *8 (quoting Pub. L. No. 110–325, 122 Stat. 3553, 3555 (2008) (emphasis added); *Girard v. Lincoln College of New England*, 27 F.Supp.3d 289 (D. Conn. 2012) citing, 42 U.S.C. § 12102(4)(A),(B) (In particular, the ADA now states that the definition of disability shall be "construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter" and that the term "substantially limits" shall be "interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." (Internal quotation marks omitted.).

The Equal Employment Opportunity Commission ("EEOC") regulations implementing the ADAAA, although having no binding effect, are "useful to understanding the intended meaning of the Amendments." *Hutchinson*, 2011 WL 4542957, at *8 n. 6. The EEOC regulations provide that under the ADAAA an impairment is a disability within the meaning of the statute where "it substantially limits the ability of an individual to perform a major life

activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. §1630.2(j)(1)(ii). The regulations further provide that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii). Thus, the fact that Plaintiff does not state that she "always" had to elevate her leg or speak loudly is beside the point.

Defendant also argues that the Plaintiff has not met the definition of disability under CFEPA because she does not allege a "chronic" condition. Clearly, arthritis and hearing loss are chronic conditions. The Defendant misconstrues the Plaintiff's allegations in the original Complaint. Plaintiff alleges that her physician had been monitoring her for "several years." In the Amended Complaint, Plaintiff specifically alleges that her foot condition and hearing loss were chronic and permanent. Plaintiff's chronic foot arthritis and pain resulting therefrom and hearing impairment falls within the parameters of a physically disabled person. Conn. Gen. Stat. § 46-51(15). As defined by Conn. Gen. Stat. § 46a-51(15), "[p]hysically disabled" refers to any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." As the CFEPA defines "impairment" for the purposes of its definition of "disability" broadly, there are sufficient allegations in the Amended Complaint to make a plausible claim that Plaintiff was disabled under CFEPA.

Defendants cite *Setkoski v. University of Connecticut Health Center,* Superior Court, Docket No. CV–10–6012794 in the motion to dismiss and contend that Plaintiff failed to plead

facts of a chronic disability.  One year later, the Connecticut superior court, however, distinguished *Setkoski* holding that "[i]n *Setkoski,* the trial court relied in part on the plaintiff's failure to 'allege that her condition [was] continuing' or otherwise 'subject to reoccurrences' ....[The plaintiff], however, has specifically alleged that he suffered from chronic conditions, which he has identified by name." (Citation omitted.)  <u>Dwyer v. Waterfront Enterprises, Inc.</u>, 2013 WL 2947907, at *3 (Conn.Super. 2013).  In *Dwyer*, the court was persuaded that the conditions alleged in the complaint reflected that they were "chronic and not transient." *Id*.  The Plaintiff identified "arteriosclerosis, high cholesterol, high blood pressure and coronary artery disease" as her disabilities. *Id.*, at *1. In this case, the conditions alleged are clearly not transient as Plaintiff's allegations make clear.

Defendant Stamford Hospital argues that Plaintiff cannot establish a disability because she fails to allege that her condition "substantially limits" a major life activity. (Def. Motion to Dismiss, p. 16). Again, Defendants fail to acknowledge the new definition of disability under the ADAAA. The ADAAA specifically rejects the stringent interpretation of "substantially limits," because  "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as … learned behavioral or adaptive neurological modifications." *Girard v. Lincoln College of New England*, 27 F.Supp.3d 289 (D. Conn. 2012), *citing* 42 U.S.C. § 12102(4)(E)(i). More importantly, the Amended Complaint clarifies the extent of Plaintiff's disabilities.

 Here, the Plaintiff's allegations have put the Defendant on notice of her specific physical disabilities. Accordingly, the Court should find that the Plaintiff sufficiently pleads a physical disability to sustain its cause of action under the CFEPA and the ADA.

## 2. Plaintiff's Allegations Support an Inference of Discrimination.

In the Motion to Dismiss, Stamford Hospital also claims that Plaintiff has failed to allege facts that support an inference of disability discrimination against Stamford Hospital. (Def. Mot. to Dismiss, p. 17). Defendants argue that Plaintiff's Complaint contains mere legal conclusions, but in support, Defendants cite ADA cases addressing motions for summary judgment and cases that do not involve ADA and CFEPA disability claims. Accordingly, the standards set forth in Defendants' Motion to Dismiss are not applicable in this case. For example, Defendants cite *Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985), for the proposition that Plaintiff has failed to make out a prima facie case of disability discrimination for failure to demonstrate all four elements of her claim. "The prima facie case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 510 (2002). "[A]t this stage of the proceedings a plaintiff need not make out a prima facie case. She need only plead facts sufficient to show her entitlement to relief, and to give a defendant fair notice of what the claim is and the grounds upon which it rests." *Leibowitz v. Cornell University*, 445 F.3d 586, 593 (2d Cir. 2006).

Plaintiff alleges that Defendant Bowling was openly annoyed with Plaintiff when she discussed her disabilities and that Bowling demanded that Plaintiff substantiate her disabilities with doctor reports or be terminated. Compl. ¶¶ 56, 71; Am. Compl. ¶¶ 61, 76. Plaintiff alleges a pattern of discriminatory conduct by Hospital representatives after she was forced to disclose her disabilities on February 25. Defendant Kiely participated in the harassment and retaliation. Compl. ¶¶ 46-58, 103-104, 137-146, 149, 154; Am. Compl. ¶¶ 51-63, 108-109, 142-151, 154. She was at the meeting where Plaintiff was required to participate in a wellness program designed for disruptive physicians. Compl. ¶¶ 70, 72-76; Am. Compl. ¶¶ 75, 77-81. Defendants

threatened Plaintiff with termination if she did not do so. Compl. ¶¶ 80; Am. Compl. ¶¶ 75.

Plaintiff was harassed with requests for medical documentation to substantiate her disabilities.

Compl. ¶¶ 71, 77; Am. Compl. ¶¶ 76, 82. Defendant Coady, the Hospital Chief Cardiac Surgeon,

harassed and retaliated against Plaintiff in a number of respects, including falsely accusing her of

misconduct. Compl. ¶¶ 61-68, 81-88, 109-122; Am. Compl. ¶¶ 66-73, 86-93, 114-

127. Defendant Mancino, the head of the Hospital's HR department, also participated in the

discrimination and retaliation. Compl. ¶¶ 123-136; Am. Compl. ¶¶ 128-141. Defendant Kiely

falsely accused Plaintiff of creating a safety issue. Compl. ¶ 149; Am. Compl. ¶ 154. Plaintiff

was demoted and then her employment was terminated. Compl. ¶ 138; Am. Compl. ¶ 143. The

Hospital's Chief Medical Officer participated in the termination meeting. Compl. ¶ 137; Am.

Compl. ¶ 142. Plaintiff's Complaint has adequately alleged disability discrimination and it gives

Defendant Stamford Hospital fair notice of the basis for plaintiff's claims. *See Swierkiewicz v.*

*Sorema N.A.*, 534 U.S. 534 U.S. 506 at 510–15 (2002). These allegations, taken as true and read

in a light most favorable to the Plaintiff, support a claim for disability discrimination under the

ADA and the CFEPA.

**D.    Defendant's Motion to Dismiss Directed to Counts Five and Six.**

Stamford Hospital argues in its Memorandum of Law that Counts Five and Six alleging

retaliation for voicing concerns regarding disability discrimination should be dismissed.

Defendant claims that Plaintiff does not allege that she expressed opposition to discrimination

based on her disabilities to Stamford Hospital. (Def. Mem. of Law, pp. 18, 19). This is not an

accurate statement. Plaintiff alleges that in or around March 7, she met with Evena Williams of

Stamford Hospital's HR department to report her concerns regarding gender discrimination.

Compl. ¶ 85; Am. Compl. ¶ 90. Plaintiff then states that at this time, she also reported to

Stamford Hospital HR her concerns regarding discrimination based on her disabilities. Compl. ¶¶ 89, 90: Am. Compl. ¶¶ 94, 95. Plaintiff then describes some of the retaliatory actions that occurred thereafter. Compl. ¶¶ 102-137; Am. Compl. ¶¶ 107-142. Stamford Hospital's claim, therefore, that Plaintiff did not allege that she expressed opposition to Stamford Hospital regarding her concerns of disability discrimination is without merit.

Defendant Stamford Hospital further argues that Plaintiff's retaliation claim is deficient because there is insufficient temporal proximity between Plaintiff's protected conduct and the adverse employment action, which action it defines as the termination. In making this argument, Stamford Hospital ignores the retaliatory actions directed to Plaintiff that came before the termination, upon which she can rely to prove retaliatory motive and causation. A causal connection between a protected activity and an adverse action "can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment ... or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000). In this case, Plaintiff has alleged a pattern of conduct upon which she can rely to show retaliatory animus that preceded the termination.

In March of 2014, Plaintiff was falsely accused of misconduct by Stamford Hospital's Chief of Cardiac Surgery. In April of 2014, Defendant's HR department refused to assist Plaintiff even when she demonstrated through her work and private cell phone records that she was not using the phone during a surgical procedure as Coady claimed. On April 1, 2014, Plaintiff was directed by Stamford Hospital's Chief Medical Officer to sign a document acknowledging that she would relinquish her Medical Staff privileges at Stamford Hospital should she ever be terminated by SAS. In July of 2014 Plaintiff was removed as Call Schedule

Coordinator. In this time period, Plaintiff was required to work in the OR for 10 to 11 hours without a lunch break. In August, 2014 Plaintiff was subjected to hostility for taking a leave of absence of one day by Stamford Hospital's Chief of Cardiac Surgery. In August 2014, Plaintiff was re-assigned to the Catheterization Lab as a form of demotion. In September, Plaintiff was treated in an inappropriate manner while she sought assistance from Stamford HR based on violation of her FMLA rights. During the notice period following the termination decision, Defendants continued to harass Plaintiff. Plaintiff was falsely accused by Defendant Kiely of creating tension in OR. On another occasion, Plaintiff was accused of improper conduct when she assisted with an emergency OR procedure for which she was not scheduled and during which she saved the patient's life. *See* summary of facts above.

The ADA / Title VII's "antiretaliation provision, unlike the substantive [antidiscrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 64, 126 S.Ct. 2405, 2412–13 (2006). In addition, the anti-retaliation provision also "covers those ... employer actions that would have been materially adverse to a reasonable employee or job applicant ... to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57, 126 S.Ct. at 2409. The Plaintiff was subjected to a campaign of retaliation and harassment. Obviously, the Court should consider the actions that were part of the campaign of retaliation in their entirety in assessing whether Plaintiff has alleged a viable claim and not simply calculate the months between the protected conduct and the termination, as Defendant suggests. Plaintiff was demoted prior to the termination. Plaintiff's role as Call Schedule Coordinator was also removed. Stamford Hospital also attempted to restructure its agreement with Plaintiff regarding the status of her medical staff privileges at the

Hospital in the event of the termination of her relationship with Defendant SAS. She was also threatened with termination if she did not join a wellness program designed for disruptive physicians.

Based on the foregoing, the Court should deny the Defendant's Motion to Dismiss directed to Counts Five and Six.

**E.** **Defendant's Motion to Dismiss Plaintiff's Claim for FMLA Retaliation in Count Seven.**

Defendant's claim that Plaintiff's FMLA claim in Count Seven should be dismissed because she did not exercise rights protected under the FMLA, she never gave Stamford Hospital notice of her absence, and that the actions she claims were retaliatory could not have occurred under circumstances giving rise to an inference of retaliatory intent. (Def. Mem. of Law, p. 22). Defendant's basis for dismissal of the FMLA claim is without merit.

*Plaintiff Exercised Her Rights under FMLA*

In the Dismissal papers, Stamford Hospital completely ignores the part of the Complaint under the section "Plaintiff's FMLA Leave" where it is alleged that Plaintiff's daughter had a seizure while on a family vacation and that was precisely the reason why Plaintiff took a leave of absence for one day. Compl. ¶ 109; Am. Compl. ¶ 114. Inexplicably, Defendants wrongly claim that Plaintiff did not allege a "serious health condition." Def. Mot. to Dismiss, p. 24-25. The Complaint clearly states that on August 14, 2014, while traveling abroad with her family, Plaintiff's daughter began to experience neurological symptoms and seizure activity. Compl. ¶ 109; Am. Compl. ¶114. Plaintiff's family immediately returned to the United States and her daughter was emergently admitted to Stamford Hospital on Saturday evening, August 16, 2014, for stabilization and diagnostic test performance. *Id.* Plaintiff took a day off on Tuesday, August 19, 2014, to care for her and because Plaintiff suffered from exhaustion. Compl. ¶ 110; Am.

Compl. ¶ 115. Thus, contrary to Defendant's assertions, Plaintiff exercised rights under the FMLA.

<u>Defendant's Argument Regarding Insufficient Notice</u>

"When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). "It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir.2005) (quoting 29 C.F.R. § 825.303(a)).

"It generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable to such leave [in accordance with 29 C.F.R. § 825.303(c) ]." *Id.* Section 82.303(c) provides that "in the case of an *emergency requiring leave because* of a FMLA-qualifying reason, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved" 29 C.F.R. § 825.303(c) (emphasis added).

The Plaintiff has alleged that she notified Stamford Hospital of her daughter's sudden and unforeseeable illness triggering FMLA emergency notice provision under Section 82.303(c) -- "[I]n the case of an emergency requiring leave because of a FMLA-qualifying reason, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved." 29 C.F.R. § 825.303(c). Defendant, however, completely ignores this exception under FMLA which protects the Plaintiff under this situation. Rather, Defendant cites cases holding that calling in sick did not give notice under the FMLA. Defendant's cases are

inapposite to the facts presented here because those cases concerned planned sick leave and not unforeseeable emergencies, as in the case here. *See Def. Mot. to Dismiss*, p. 23 *citing Festerman v. Cnty. of Wayne*, 611 Fed. Appx. 310, 315 (6th Cir. 2015); *Brown v. Kansas City Freightliner Sales, Inc.*, 617 F.3d 995 (8th Cir. 2010); *De La Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008); *Basso v. Potter*, 596 F.Supp.2d 324, 338 (D. Conn. 2009).

Even if Plaintiff does not allege that she mentioned the FMLA, her alleged request nevertheless constituted an exercise of her rights under the FMLA. *Santiago v. Butler*, 2012 WL 527699 (D. Conn. 2012). If an employee makes a request that substantively triggers the FMLA, the fact that he knows about FMLA rights and fails to mention those rights is not determinative. "An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA—qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). It is the employer who must inquire further to determine if FMLA leave is at issue. *Id.; Santiago v. Butler*, 2012 WL 527699 (Dist. Conn. 2012).

Nonetheless, Defendant argues that it did not have notice simply because Plaintiff did not inform anyone of supervisory authority. Defendant, however, fails to cite any authority for this erroneous proposition. In this case, Plaintiff notified Defendant of her daughter's illness prior to taking a one day leave of absence. Compl. ¶ 111; Am. Compl. ¶ 116. Plaintiff called the Hospital at 5 a.m. and spoke to Dr. Richard Margolis, the in-house anesthesiologist for that night, and advised him that she was not well enough to come to work. *Id*. Dr. Margolis told Plaintiff that Dr. Amy Crane was easily able to cover Defendant Coady's procedure for that day and that he would call her and let her know. *Id*. Dr. Crane called Plaintiff from Stamford Hospital at approximately 6:15 a.m. to confirm coverage. *Id*.

This was Plaintiff's first time seeking leave and "[w]hen an employee seeks leave for the first time for an FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.302(c). "In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." *Id.*; *Santiago v. Butler,* 2012 WL 527699 (Dist. Conn. 2012). Stamford Hospital knew or should have known of her likely eligibility, and Defendant nonetheless retaliated against her for taking her likely protected leave. *McNamara v. Trinity College*, 2013 WL 164221 (D.Conn. 2013) (plaintiff's failure to have requested or inquired about FMLA leave does not bar his retaliation claim). This is the first day that Plaintiff in this case had taken off as a medical or sick leave in the entirety of her eight years of employment with Stamford Hospital. Compl. ¶ 112; Am. Compl. ¶ 117. Plaintiff returned to work on Wednesday, August 20, 2014 and was assigned to cases scheduled in the Cardiac Catheterization suite for the day. Compl. ¶ 113; Am. Compl. ¶ 118. Whether Plaintiff's notice in this case provided Defendant with enough information for it to reasonably conclude that an FMLA-qualifying event occurred is a question of fact, and, therefore, the Defendant's Motion to Dismiss on this ground should be denied.

*Defendant's Claim That Plaintiff Has Not Alleged Facts
That Could Show Retaliatory Animus*

Plaintiff has alleged evidence of retaliatory animus and temporal proximity to her demotion that followed her FMLA leave. Plaintiff alleges that she was demoted within days of taking a one day leave and was chastised by Defendant Coady specifically for taking leave to care for her daughter. Compl. ¶¶ 114-121; Am. Compl. ¶¶ 119-126, Verbal comments constitute evidence of discriminatory motive when a plaintiff demonstrates a nexus between the allegedly

discriminatory statements and a defendant's decision to discharge the plaintiff. *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004).

On August 21, 2014, one day after taking her FMLA leave, Defendant Coady chastised Plaintiff in a phone call and later in the operating room in the presence of the OR team for "calling in" the prior day, stating that this "inconvenienced him." and that "he counted on Plaintiff to do the case." Compl. ¶ 114-115; Am. Compl. ¶¶ 119-120. Defendant Coady stated in the phone call "I know your daughter may have issues but I was very upset that you called in." *Id*. Coady questioned Plaintiff's motives in taking the leave. *Id*. He told her he was "disappointed" in her and that she put him in a bad position. *Id*. He repeated twice that he found her "calling in" very upsetting. *Id*. This situation caused a distraction for Plaintiff and humiliated her. Compl. ¶ 116; Am. Compl. ¶ 121. On August 23, 2014, Plaintiff reported Defendant Coady's behavior to Defendant Mancino, the Director of Stamford Hospital's HR department. Compl. ¶ 118; Am. Compl. ¶ 123. The next day, on August 24, 2014, Plaintiff was removed from a cardiac case. Compl. ¶ 119; Am. Compl. ¶ 124. This was the first time this had ever happened to Plaintiff. *Id*. Defendants retaliated against Plaintiff for taking a medical leave. On Tuesday, August 26, 2014, Defendants demoted Plaintiff and re-assigned her to the Catheterization Lab. Compl. ¶ 121; Am. Compl. 126. This was the first time during Plaintiff's tenure with Stamford Hospital that this had happened. *Id*. This alleged conduct undeniably creates an inference of retaliatory intent.

The timing of Plaintiff's demotion within seven days of FMLA leave lends further support to an inference of retaliatory intent. Temporal proximity between a plaintiff's exercise of rights created by FMLA and an adverse employment action can give rise to an inference of retaliation. S*ee Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

The arguments Stamford Hospital has raised to support the dismissal of the FMLA retaliation claim in Count Seven are without merit. Thus, the Court should deny Defendants' motion to dismiss Count Seven of the Plaintiff's Complaint.

   **F.      Plaintiff Alleges a Plausible Claim of Defendants' Aiding and Abetting Under CFEPA § 46a-60(a)(5) in Counts Nine, Ten, Eleven and Thirteen.**

Plaintiff alleges that the individual Defendants Coady, Kiely and Mancino, aided and abetted each other and Defendant SAS in their discriminatory practices in violation of Section 46a-60(a)(5) of the Connecticut General Statutes. (Compl., Counts Nine through Eleven). Plaintiff also alleges Stamford Hospital aided and abetted Defendant SAS in its discrimination against Plaintiff. (Compl., Count Thirteen).

*Stamford Hospital*

Stamford Hospital argues in the Motion to Dismiss that Plaintiff cannot claim that Stamford Hospital aided and abetted its "own" discriminatory practices and cites *Bolick v. Alea Group Holdings, Ltd.*, 278 F.Supp.2d 278, 283 (D. Conn. 2003) in support of its position. Stamford Hospital mischaracterizes the aiding and abetting claim against it. In Count Thirteen, Plaintiff alleges the following: "The Stamford Hospital Defendants and Defendant SAS aided, abetted, coerced, compelled and incited the other's discriminatory and retaliatory conduct based on Plaintiff disabilities and sex in violation of the CFEPA."  The Plaintiff did not allege that Stamford Hospital aided and abetted its "own" discriminatory practices.

Moreover, Stamford Hospital's reliance on the *Bolick* decision is misplaced.  In *Bolick*, the Court concluded that applying the aiding and abetting provision of CFEPA against an employee who was the sole perpetrator of the alleged harassment would produce an illogical result; accordingly, it held that a sole perpetrator cannot be held liable under the aiding and abetting provision. *Id*. at 282. Where more than one person is allegedly involved in an

28

employer's discriminatory practices, a plaintiff may be able to show that an individual defendant aided the employer's discriminatory practices by colluding with other employees to perpetuate the alleged discrimination. *Kanios v. Ust Inc. and Uliasz*, 2005 WL 3579161, at *8 (D. Conn. 2005). "Therefore, so long as a complaint alleges a situation other than one in which a single perpetrator engages in discriminatory conduct, individual persons may be held liable for aiding and abetting under CFEPA." *Schaefer v. General Elec. Co.*, 2008 WL 2001244, *3 (D. Conn. 2008). Because Plaintiff has clearly alleged that numerous individuals have aided and abetted the other individual Defendants' discriminatory conduct (Compl., Counts 9-13), Stamford Hospital's argument that it cannot be liable under the CFEPA is without merit.

## *Individual Defendants*

Under the liberal pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure, Plaintiff's allegations sufficiently state claims against the individual Defendants in Counts Nine, Ten and Eleven under Section 46a-60(a)(5), which specifically provides that "[i]t shall be a discriminatory practice in violation of this section: ... For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so." Conn. Gen. Stat. § 46a-60(a)(5). District courts in this circuit have held that liability lies under this statute when a party in some way "helps or compels" another individual to act in a discriminatory manner. *Read v. Nationwide Mut. Ins. Co.*, No.3:06-cv-514(JCH), 2006 WL 2621652, at *3 (D. Conn. 2006); *see also Wasik v. Stevens Lincoln-Mercury, Inc.*, No. 3:98-cv-1083 (DJS), 2000 WL 306048, 22 at *7 (D.Conn. 2000) (finding there was a cognizable claim for individual liability under Section 46a-60(a)(5) where other employees' actions "ratified, endorsed and perpetrated" another employee's unlawful conduct). Furthermore, "[t]his individual liability is particularly applicable

to supervisors in the use of their authority, even where the employer's liability is derived from the supervisor's wrongful conduct." *Id., citing Wasik v. Stevens Lincoln-Mercury, Inc.*, 2000 U.S. Dist. LEXIS 15438, No. 3:98CV1083, 2000 WL 306048, at *6 (D. Conn. 2000). That is the scenario here.

Stamford Hospital's arguments that Plaintiff insufficiently alleged aiding and abetting on the part of the individual Defendants or that she fails to allege the requisite intent are, therefore, without merit. Plaintiff adequately pleads that the individual Defendants aided and abetted the discriminatory practices alleged. The Complaint clearly alleges that Defendants Kiely (Chief Medical Officer for Stamford Hospital), Mancino (head of Stamford Hospital Human Resources), and Coady (Chief of Cardiac Surgery) each approved, ratified, and assisted in the wrongful acts described in the Complaint. Moreover, the issue of an employer's intent is a question of fact that cannot be resolved on a motion to dismiss. Equal Employment Opportunity Commission v. Day & Zimmerman NPS, Inc., 2016 WL 1449543, at *5 (D.Conn. 2016) citing *Cf. Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).

### *Kiely*

In the Complaint, Plaintiff alleges Defendant Kiely, the Hospital's Chief Medical Officer, was involved in a meeting on February 25, 2014, where Plaintiff was issued a disciplinary memorandum. Compl. ¶¶ 46-47; Am. Compl. ¶¶ 51-52. Kiely was involved in the process to force Plaintiff to enroll in the Physicians Wellness Services Program. Compl ¶¶ 46-47, 58; Am. Compl. ¶¶ 51-52, 63. Kiely attempted to have Plaintiff sign a document acknowledging that she would relinquish her Medical Staff privileges at Stamford Hospital should she ever be terminated by SAS. Compl. ¶¶ 102-104; Am. Compl. ¶¶ 107-109. Defendant Kiely participated in the termination and supported the fabricated explanation for the termination. Compl. ¶¶ 137, 146;

Am. Compl. ¶¶ 142, 151. Defendant Kiely falsely accused Plaintiff of creating tension in the OR. Compl. ¶ 149; Am. Compl. ¶ 154. One can also infer that as the Chief Medical Officer, Kiely participated in / ratified the decision to demote Plaintiff and reassign her to the Catheterization Lab. Plaintiff alleges in the Complaint that she was advised that her termination was necessary because "the business model for caring for cardiac surgical patients was changing" and that everyone involved "had decided that, due to a change in policy, the cardiac anesthesiologist would now also cover different departments such as pediatrics, obstetrics, and perform regional blocks, and that Plaintiff was no longer suited to work for Defendants." (Compl. ¶¶ 138,140; Am. Compl. ¶¶ 143, 145). Stamford Hospital's Chief Medical Officer, Kiely, acted as the representative of Stamford Hospital and ratified this plan.

Defendant claims that the fact that Plaintiff does not allege that Kiely made remarks at the disciplinary and termination meetings somehow means that Kiely was "not responsible for the decision to terminate Plaintiff's employment in any manner." (Def. Mem. of Law, p. 28). This is quite a leap for one to make on a motion to dismiss. Kiely was the Chief Medical Officer of Stamford Hospital. Plaintiff held the position of Director of Cardiac Anesthesiology. Defendant would have this Court infer from the allegations that Kiely was not involved in the decision making or creation of the business plan Plaintiff was advised required the termination. Plaintiff alleges that she was advised during the meeting that all of the institutional defendants had created the plan. In deciding a motion to dismiss, the Court must draw inferences from the "allegations in the complaint in the light most favorable to plaintiff, and construe the complaint liberally." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (citation omitted). Defendant is asking the Court to construe the allegations in a manner completely inconsistent with this standard.

## *Coady*

Defendant Coady partnered with Defendant Bowling to support the disciplinary action by making a false complaint against Plaintiff, which complaint was obviously designed to effectuate Plaintiff's termination. Compl. ¶¶ 57, 61-63; Am. Compl. ¶¶ 62, 66-68. Defendant Coady has a long and disturbing history of discrimination and harassment of female employees, as alleged in the Complaint. Compl. ¶¶ 65, 68; Am. Compl., ¶¶ 70-73, 86-93). Defendant claims that there is no "allegation anywhere that Defendant Coady's email [falsely accusing Plaintiff] or criticism of a sick day was ever used as a basis for disciplining Plaintiff." (Def. Mem. of Law., p. 29). Defendant is ignoring Plaintiff's allegations. Plaintiff was subjected to harassment and discipline after Coady sent his email falsely accusing her of misconduct. She was being forced to attend a wellness program for disruptive physicians. She was asked to acknowledge that she would relinquish her privileges at Stamford Hospital in the event of a termination of her relationship with SAS. Plaintiff also alleges that she was removed from a case with Coady in OR four days after she took a medical a leave for which Coady chastised Plaintiff. Six days after the medical leave, she was removed from another case with Coady and then then reassigned to the Catheterization Lab, which is a demotion. Compl. ¶¶ 119, 121; Am. Compl., ¶¶ 124, 126. Based on these allegations, it is somewhat disingenuous for Defendant to claim that there is no basis for one to infer that Coady's conduct played a role in the Plaintiff's employment.

## *Mancino*

Stamford Hospital's HR department, of which Defendant Mancino is the head, completely ignored evidence that would vindicate Plaintiff, such as data usage records and a

witness, Dr. Feng, who stated that her work was "impeccable." Compl. ¶¶ 64, 96-98: Am. Compl. ¶¶ 69, 101-103. Defendant Mancino was directly involved in the investigations of Plaintiff's complaint against Coady. Plaintiff reported to Stamford Hospital HR regarding Coady's language and treatment of Plaintiff and other female employees. Compl. ¶ 66; Am. Compl. ¶ 71. Defendant Mancino failed to timely investigate Plaintiff's complaints against Coady and retaliated against Plaintiff.

Plaintiff's meeting with Defendant Mancino occurred on September 5, 2014. Plaintiff left that meeting feeling "upset and dismayed." Plaintiff was particularly concerned that Defendant Mancino modified the Stamford Hospital investigation procedure for the investigation of Plaintiff's complaint against Coady. He treated Coady more favorably than she was treated during the investigation that Stamford Hospital conducted with respect to the Technician's compliant against her. An employer's deviation from its own standard procedures and policies may serve as evidence of discrimination and retaliation. *Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1423 (3d Cir. 1991); Craine v. Trinity College, 259 Conn. 625, 640-44 (2002).* Defendant Mancino did not mention that Plaintiff had rights under the FMLA and that Defendant Coady's conduct was a violation of those rights. Even though Defendant Mancino was fully aware of Coady's history with female employees, since a number of women have complained to Stamford Hospital HR regarding Coady, including the fact that Coady had referred to the Plaintiff as a "cunt", Mancino defended Coady, acted as if this was the first time he was hearing a complaint against Coady, and made Plaintiff defend herself at this September 5 meeting. Defendant Mancino contacted Plaintiff on September 26 and stated that he was conducting the investigation of her complaint. Plaintiff's termination occurred on October 7, a little over a month after this meeting. Compl. ¶¶ 123, 128; Am. Compl., ¶¶ 128-142.

Stamford Hospital claims that there is no allegation that Mancino played a role in any adverse employment action. (Def. Mem. of Law, p. 30). By making this statement, Defendant Stamford Hospital asks this Court to infer that Mancino, who was the highest level person in HR at the Hospital, played no role in the decisions affecting Plaintiff's employment, who held a high level position at the Hospital. Stamford Hospital also asks this Court to ignore the temporal proximity between Mancino's investigation and the termination decision and the Plaintiff's allegations as to the manner in which she was treated in the investigation process. Defendant is essentially asking this court to ignore the motion to dismiss standard, which requires all inferences to be drawn in Plaintiff's favor.

The individual Defendants were involved in Plaintiff's removal from the OR and demotion and subsequent termination. Compl, ¶¶ 31, 68, 102-108, 137-146; Am. Compl. ¶¶ 36, 73, 107-113, 142-151. Defendants conspired with each other to effectuate Plaintiff's termination. Compl. ¶ 68; Am. Compl. ¶ 73.

For all these reasons, Plaintiff has sufficiently stated a CFEPA aiding and abetting claim against the individual Defendants, as well as against Stamford Hospital. The facts show that the Defendants all played a part in the discrimination and retaliation. Thus, the Motion to Dismiss Counts Nine through Eleven and Thirteen for failure to state a claim should be denied.

**G.    Defendant's Motion to Dismiss Interference Claim.**

Plaintiff does not oppose the Motion to Dismiss directed to Count Fourteen.

**H.    Plaintiff Pleads a Plausible Claim of Sex Discrimination in Counts Fifteen and Sixteen of the Complaint.**

Title VII and CFEPA prohibit an employer from refusing to hire, discharging, or otherwise discriminating against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or

34

national origin. 42 U.S.C. § 2000e-2(a)(1); *see State v. Commission on Human Rights and Opportunities*, 211 Conn. 464, 470 (1989) (The intent of the Connecticut legislature in adopting the CFEPA was to make the statute coextensive with Title VII). To state a sex discrimination claim, a plaintiff must allege facts plausibly suggesting that she is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent. *Brown v. Hearst*, 2015 WL 5010551 (D. Conn. 2015) citing *Littlejohn v. City of New York et al.*, 795 F.3d 297, 2015 WL 4604250, at *8 (2d Cir. 2015). The Second Circuit recently clarified that a relaxed pleading standard applies on a motion to dismiss a Title VII claim:

> [W]hile the plaintiff ultimately will need evidence sufficient to prove discriminatory motivation on the part of the employer defendant, at the initial stage of the litigation—prior to the employer's coming forward with the claimed reason for its action—the plaintiff does not need substantial evidence of discriminatory intent. If she makes a showing (1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation, then she has satisfied the prima facie requirements.

*Littlejohn v. City of New York et al.*, 795 F.3d 297, at 307, 311 (2d Cir. 2015). Accordingly, "[t]he facts required by [a party] to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Id.*

An adverse employment action means a materially adverse change in the terms and conditions of employment. *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (An adverse employment action includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices unique to a particular situation." (internal quotation marks and citations omitted)). An inference of discrimination can arise from circumstances including, but not limited to, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (*citing Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). Remarks made by coworkers may also be probative of discriminatory intent, depending on the particular circumstances under which the comments were made. *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (outlining four factors district courts in this circuit routinely consider in evaluating the probative value of such remarks, including (1) the identity and position of the individual making the remark, (2) the timing of the remark in relation to the employment decision, (3) the content of the remark, and (4) the context in which it was made); *Mesias v. Cravath, Swaine & Moore LLP*, 2015 WL 2069419, at *6 (S.D.N.Y. 2015) ("Remarks may raise an inference of discrimination if there is a nexus between the remarks and an adverse employment decision.") *citing Zhang v. Barr Labs., Inc.*, No. 98-CV-5717, 2000 WL 565185, at *4 (S.D.N.Y. May 8, 2000).

Further, Plaintiff is not required to directly tie every instance of mistreatment to her sex. Plaintiff may use incidents that are facially sex-neutral. *See Alfano v. Costello*, 294 F.3d 365, 375 (2d. Cir. 2002) (There is little question that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not.).

Plaintiff has alleged that Defendant Coady engaged in a pattern and practice of

discrimination and harassment toward female employees and his false accusation against her was motivated by this discriminatory motive. Compl. ¶¶ 67, 82-83; Am. Compl. 72, 87-88. Plaintiff had raised her concerns regarding Coady's behavior to representatives of SAS during her employment. Am. Compl., ¶ 71). Plaintiff complained to Stamford Hospital's HR department that Coady refers to women as bitches, cunts, whores, and trailer tramps. Compl. ¶ 83; Am. Compl. ¶ 88. He made fun of female employees because of their religion, their ethnicity or race and their orthopedic disabilities. *Id*. He mocked a woman who was fighting breast cancer and accused her of shaving her hair off during chemotherapy in order to get attention. *Id*. He repeatedly swears at women in the operating room. *Id* He stated on more than one occasion that he is going to get this woman or that woman "fired and that they won't even know he was responsible." *Id*. He has also made racial comments regarding women such as "fat Puerto Rican." *Id*. He has referred to Plaintiff as a "fucking cunt," told her to get off her "fucking ass and move faster" in the operating room, and repeatedly called her a "fucking bitch" when he didn't approve of changes in the anesthesia on-call schedule. *Id*.

Significantly, Plaintiff alleges she never heard Coady speak in a sarcastic, derogatory, or foul manner about any male employee at Stamford Hospital or otherwise act in an abusive manner toward male employees. Compl. ¶ 84; Am. Compl. ¶ 89. Plaintiff alleges that Stamford Hospital was aware that Defendant Coady had engaged in inappropriate behavior with women in general and referred to Plaintiff and other women as "cunts." Compl. ¶¶ 85, 88; Am. Compl. ¶¶ 90, 93. Stamford Hospital was in a lawsuit with Julia Mumm, one of the individuals who was a victim of Defendant Coady's discriminatory and retaliatory practices. Compl. ¶¶ 86-87; Am. Compl. ¶¶ 91-92. Despite these facts, Stamford Hospital HR protected Defendant Coady and swept Plaintiff's complaint under the rug. Compl. ¶ 88; Am. Compl. ¶ 93.

On March 7, 2014, Plaintiff reported to Stamford Hospital's HR department Coady's false accusations regarding Plaintiff using an electronic device during surgery and his pattern and practice of discriminating and retaliating against women in the workplace. Plaintiff was concerned that his discriminatory animus led to the false complaint and that she had somehow become his next victim. Compl. ¶ ¶ 61, 67, -81-85; Am. Compl. ¶¶ 66, 72, 86-90. Further, Plaintiff alleges that on March 14, 2014 and March 28, 2014, she followed up with Stamford Hospital HR on her concerns regarding discrimination based upon her gender. Compl. ¶¶ 92-93; Am. Compl. 97-98. As of April 3, 2014, one month later, HR had not conducted any investigation of her complaints. Compl. ¶ 94; Am. Compl. ¶ 99. On the first week of May 2014, HR informed Plaintiff that there was insufficient proof that Coady made a false statement that Plaintiff was using electronic devices in the OR. Compl. ¶¶ 57, 98; Am. Compl. 62, 103. They ignored Plaintiff's proof that showed her data usage which conclusively proved Coady lied about Plaintiff. Compl. ¶¶ 96-100; Am. Compl. ¶¶ 101-105.

In the follow up investigation by Defendant Mancino with respect to Defendant Coady's mistreatment of Plaintiff during a medical crisis involving the health of her daughter, Defendant Mancino repeatedly defended Defendant Coady's bad language and behavior directed to women by suggesting that it was acceptable due to the "stressful" nature of the job. Compl. ¶ 124; Am. Compl. ¶ 129. Defendant Mancino defended Coady in every respect and made every attempt to dismiss Plaintiff's concerns and put Defendant Coady in the best light possible. Compl. ¶ 125; Am .Compl. ¶ 130. Defendant Mancino acted as if this was the first time that he had heard any complaints about Defendant Coady, when he was fully aware this was not the case. Compl. ¶ 128; Am. Compl. ¶ 132. He knew Dr. Coady had referred to Plaintiff as a "cunt" and had made other derogatory and racial remarks towards women, and, yet, he defended Defendant Coady and

acted as if his behavior should be excused. *Id*. Plaintiff was removed from the OR and reassigned to the lab after Coady's outburst directed to her in the OR. On August 24, 2014, Plaintiff was notified that she was removed from a cardiac case. On August 26, 2014, Plaintiff was demoted and re-assigned to the Catheterization Lab. Compl, ¶ 121; Am. Compl. 126.

On September 5, 2014, Plaintiff met with defendant Mancino from Stamford Hospital's HR department. Compl ¶ 123; Am. Compl. ¶ 128. During the meeting, Defendant Mancino advised Plaintiff that he would have to tell Defendant Coady about the complaint that she had made against him. Disclosing the identities or specifics of a complaint was a violation of Stamford Hospital policy but Mancino planned to do so in order to support Defendant Coady and discriminate against Plaintiff. Compl. ¶ ¶ 132-133; Am. Compl. 137-138. A few weeks later, on October 7, 2014, Defendants terminated Plaintiff's employment. Compl. ¶ 137; Am. Compl. ¶ 142.  Plaintiff alleges that she was one of the victims of Stamford Hospital's pattern and practice of retaliating against female employees who make a complaint against Defendant Coady. Compl. ¶¶ 81–101; Am. Compl. ¶¶ 86-106). Plaintiff was a victim of Stamford Hospital's pattern and practice. Plaintiff's allegations essentially show that Stamford Hospital HR condones the discrimination by protecting Coady and punishing the women who complain. The HR department partners in the discrimination.

Defendant once again argues that there is no allegation that Defendant Coady's email with the false accusation of his harassment of Plaintiff's absence was ever used as a basis for disciplining Plaintiff. (Def. Mem. of Law, p. 34). This is the identical argument Defendant made in moving to dismiss the aiding and abetting claim against Defendant Coady. Plaintiff's response to that argument, articulated in Section F above under the heading of *Coady*, is incorporated herein by reference.

Plaintiff alleges she was treated differently than Coady during the investigation. Plaintiff also alleges that she and other female employees have been subjected to Coady's disparaging remarks and she has alleged that he consistently gender stereotypes women. This along with the temporal proximity between Plaintiff's complaints and the adverse employment actions sufficiently alleges a claim for sex discrimination under Title VII and CFEPA.  Moreover, the issue of an employer's intent is a question of fact that cannot be resolved on a motion to dismiss. Equal Employment Opportunity Commission v. Day & Zimmerman NPS, Inc., 2016 WL 1449543, at *5 (D.Conn. 2016) citing *Cf. Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Therefore, the Court should deny Defendants' Motion to Dismiss Counts Fifteen and Sixteen.

## IV.    CONCLUSION

For all of the reasons set forth herein, the Plaintiff respectfully requests that the Court deny the Defendant's Motion to Dismiss.

<div style="margin-left:40%">

PLAINTIFF

By:    /s/ Heena Kapadia 11869
       Heena Kapadia (ct11869)
       Law Office of Heena Kapadia
       2750 Whitney Avenue
       Hamden, CT 06518
       Phone:  203-288-8006
       Fax:     203-281-7887
       *hkapadia@heenakapadialaw.com*

</div>

## **CERTIFICATION**

I hereby certify that on June 29, 2016, a copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Heena Kapadia 11869
Heena Kapadia