# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SAMANTHA JANSSON,

                Plaintiff,

  v.

STAMFORD HEALTH, INC. d/b/a
STAMFORD HOSPITAL, STAMFORD
HOSPITAL, STAMFORD
ANESTHESIOLOGY SERVICES, P.C.,
VANTAGEPOINT LLC d/b/a
VANTAGEPOINT HEALTHCARE
ADVISORS, MICHAEL COADY, SHARON
KIELY, SAL MANCINO and THERESA
BOWLING,

                Defendants.

Civil Action No.
No. 3:16-cv-260 (CSH)

**APRIL 5, 2017**

### RULING ON PLAINTIFF'S SECOND MOTION TO AMEND COMPLAINT [DOC. 59]

**HAIGHT, Senior District Judge:**

## I.  INTRODUCTION

Plaintiff Samantha Jansson commenced this employment discrimination action, alleging that she was wrongfully terminated by her two former employers, Stamford Hospital  (including Stamford Health, Inc., doing business as Stamford Hospital) and Stamford Anesthesiology Services P.C. ("SAS").  She brings this action against these two employers, certain named individual employees, and VantagePoint HealthCare, a consulting firm which provided human resources and management services to Stamford Hospital and SAS.[1]  Plaintiff alleges that she was employed as an

---

[1]  The individual employee defendants of Stamford Hospital include:  Michael A. Coady, Chief of Cardiac Surgery, Sal Mancino, head of Human Resources, and Sharon Kiely, Chief Medical

anesthesiologist by co-defendants Stamford Hospital and SAS from approximately November 2007 until January 2015. Doc. 59-1, at 9 (¶ 18), at 37 (¶ 142), and at 39 (¶ 152).[2]  Plaintiff has been an anesthesiologist for over 31 years and is "Board Certified in Anesthesiology and Echocardiography." *Id.*, at 8 ( ¶ 13).  During her employment with Stamford Hospital and SAS, she occupied the position of "Director of Cardiac Anesthesiology" at Stamford Hospital.  *Id.*, at 9 (¶¶ 16-17).  Plaintiff alleges, *inter alia*,  that she was terminated from this position in retaliation for speech regarding safety issues relating to the hospital's hiring of inexperienced anesthesiologists.

Furthermore, Plaintiff alleges discrimination by her employers due to her physical disabilities.  According to Plaintiff, she was criticized in a disciplinary memorandum for elevating her right foot on a stool while inducing patients with general anesthesia; but such elevation was necessary due to her severe mid-foot arthritis. *Id.,* at 18-19 (¶¶ 57-58).  In addition, she was allegedly accused by the hospital of speaking louder than necessary in the operation room.  However, Plaintiff asserts that such loud speech was the result of her  partial hearing loss.  *Id.*, at 19 (¶ 59).  Lastly, Plaintiff was criticized for not appropriately engaging with patients while providing anesthesia.  *Id.*, at 18-19 (¶ 57). Plaintiff, however, alleges that she had been instructed by the hospital's Radiation Safety Director that her radiation exposure levels on her monitoring badge had increased to the point where she should wear a lead gown and thyroid shield and either stand as far away as possible from the point of radiation emission or sit behind the lead screen in the lab procedure suite.  *Id.*,  at 20 (¶ 60).

---

Officer.   The final individual defendant is Theresa Bowling, an officer of SAS.

[2]  The Court cites Plaintiff's factual allegations in her proposed Amended Complaint. Doc. 59-1.

As Plaintiff summarizes, "[a]s a result of raising safety issues, an intense and committed campaign of retaliation against Plaintiff followed involving all of the Defendants that ultimately resulted in her termination." *Id.*, at 23 (¶ 73).  Moreover, "Defendants conspired with each other to effectuate Plaintiff's termination," "discriminated against Plaintiff due to her disabilities," and "retaliated against Plaintiff due to raising concerns regarding her disabilities and gender." *Id.*

## A.      Claims in Proposed Amended Complaint

In her proposed Amended  Complaint, Plaintiff brings the following causes of action.  In Count One, Plaintiff alleges that Stamford Hospital and SAS disciplined and discharged her for speaking out regarding patients' safety, a matter of public concern, in violation of Conn. Gen. Stat. § 31-51q.  Specifically, these defendants allegedly violated her right to exercise free expression, as guaranteed by Sections 3, 4 and 14 of Article First of the Constitution of the State of Connecticut.

Plaintiff alleges in Count Two that Stamford Hospital and SAS retaliated against her in violation of Title VII of the Civil Rights Act of 1964.  Specifically, she alleges that Stamford Hospital engages in a pattern and practice of taking adverse employment actions against female employees who make complaints against Defendant Coady for his sexual harassment of  female employees. Furthermore, SAS allegedly participated in  retaliatory adverse employment actions against her.  In addition, Plaintiff alleges that her employment was terminated by these employers in violation of Title VII.

Next, in Counts Three and Four, respectively,  Plaintiff alleges that Stamford Hospital and SAS discriminated against her due to her disabilities under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, 12203(a),  and the Connecticut Fair Employment Practices Act

("CFEPA"), Conn. Gen. Stat § 46a-60.[3]

Under Count Five, Plaintiff alleges that Stamford Hospital and SAS retaliated against her in violation of the ADA by subjecting her to discipline, and ultimately termination, in retaliation for expressing opposition to discrimination based on her disabilities.

In Count Six, Plaintiff alleges retaliation under CFEPA by Stamford Hospital and SAS for opposing discrimination based on her disabilities and sex, Conn. Gen. Stat. § 46a-60 (a)(1)-(2).

Next, in Count Seven, Plaintiff alleges that Stamford Hospital retaliated against her for exercising her right under the Family and Medical Leave Act (" FMLA"), 29 U.S.C. § 2617, *et seq.*, to take medical leave of one day due to her daughter's medical condition.

Plaintiff brings Counts Eight through Twelve against five defendants for "aiding and abetting" the discriminatory and retaliatory conduct of Stamford Hospital and SAS (which was allegedly based on Plaintiff's disabilities and sex in violation of the CFEPA, Conn. Gen Stat. § 46a-60(a)(5)). The defendants against whom these claims are brought include, respectively: VantagePoint, Michael Coady, Sharon Kiely, Sal Mancino, and Theresa Bowling. With respect to each defendant's alleged violations of the CFEPA, Plaintiff has filed a corresponding complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on April 1, 2015, and

---

[3]    Plaintiff asserts that she filed a complaint with the CHRO and EEOC on or about November 1, 2014. She received a release of jurisdiction from the CHRO on January 4, 2016, and one from the EEOC, on December 1, 2015. Thus, when she commenced her action in state court on or about January 20, 2016, she had fulfilled the administrative prerequisites. *See, e.g.*, *Anderson v. Derby Bd. of Educ.*, 718 F. Supp. 2d 258, 271 (D. Conn. 2010) (Under the CFEPA, a plaintiff must follow the administrative route prescribed for a CFEPA discrimination claim or will otherwise lack statutory authority to pursue that claim in court). Defendant Stamford Hospital, with the consent of all defendants, removed this action to this Court on February 17, 2016. Doc. 1.

received a release of jurisdiction from CHRO.[4]

In Count Thirteen, Plaintiff alleges that "[t]he Stamford Hospital Defendants and SAS aided, abetted, coerced, compelled and incited the other's discriminatory and retaliatory conduct based on Plaintiff['s] disabilities and sex in violation of the CFEPA," Conn. Gen. Stat. § 46a-60(a)(5).  Doc. 59-1, at 47 (¶ 157).  As to this conduct, Plaintiff asserts that she filed a complaint with the CHRO and EEOC on April 1, 2015, and received releases of jurisdiction from the CHRO on January 4, 2016, and from the EEOC on December 1, 2015.  *Id.*, at 48 (¶ 160).

Plaintiff next alleges in Count Fourteen that Stamford Hospital and SAS "interfered with [her] relationship and opportunities with the other in violation of Title VII, ADA and CFEPA due to their discriminatory and retaliatory motives."  *Id.* (¶ 157).  As in Count Thirteen, Plaintiff asserts that she filed a complaint with the CHRO and EEOC on April 1, 2015, and received releases of jurisdiction from the CHRO on January 4, 2016, and from the EEOC on December 1, 2015.  *Id.* (¶ 159).

In Count Fifteen, Plaintiff alleges that Defendants Stamford Hospital and SAS "discriminated against [her] due to her sex in violation of CFEPA, Conn. Gen. Stat. Sec. 46a-60 *et seq*."  *Id.* , at 49 (¶ 157).  Similarly, in Count Sixteen, Plaintiff asserts that "Defendants Stamford Hospital and SAS discriminated against Plaintiff due to her sex in violation of Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e[,] *et seq*."  *Id.*, at (¶ 157).  As to these two counts for sex discrimination, state and federal, Plaintiff alleges that  she filed a complaint with the CHRO and EEOC on April 1, 2015, and received releases of jurisdiction from the CHRO on January 4, 2016,

---

[4]  With respect to VantagePoint, Plaintiff received the release of jurisdiction from the CHRO on January 4, 2016.  As to the other four defendants named in Counts Nine through Twelve, Plaintiff received such a release of jurisdiction on December 4, 2015.  Doc. 59-1, at 44 (¶ 160).

and from the EEOC on December 1, 2015.  *Id.* (¶ 159).

**B.    Pending Motion**

In  Plaintiff's pending second motion for leave to amend her complaint [Doc. 59], she explains, in her own words, that "[b]y way of this amendment, she seeks to do the following:

"1.    Clarify the extent and chronic nature of her medical conditions giving rise to her disability discrimination claims;

2.    Clarify the speech and her motivation for speech giving rise to her claim under Section 31-51q of the Connecticut General Statu[t]es;

3.    Clarify the role of Defendant VantagePoint LLC d/b/a VantagePoint Healthcare;

4.    Add an introductory paragraph and a paragraph regarding the Court's jurisdiction, consistent with federal pleading standard for complaints; and

5.    Support the claim under Section 31-51q of the Connecticut General Statutes that Plaintiff's speech did not materially or substantial[ly] interfere with her bona fide job performance or the working relationship."

Doc. 59, p. 1-2.

**C.    Procedural History**

Placing the pending motion in context, the Court notes that Plaintiff filed her original complaint in state court (Judicial District of Fairfield) on or about January 20, 2016.  Defendant Stamford Hospital then filed that complaint in this court in conjunction with Defendants' "Petition of Removal" on February 17, 2016.  Doc. 1.  Thereafter, Defendants Coady, Kiely, Mancino, and Stamford Hospital filed a "Motion to Dismiss" [Doc. 25] on April 8, 2016.  A few days later,

Defendants Bowling and SAS filed a separate "Motion to Dismiss" [Doc. 26].  While these two motions were pending and unripe for decision, Plaintiff filed an Opposition to the first motion to dismiss [Doc. 49] contemporaneously with a first "Motion for Leave to Amend Complaint" [Doc. 48].  After seeking and obtaining extensions to respond to the second motion to dismiss [Doc. 26], Plaintiff moved to amend or correct her first motion to amend in a pleading entitled, "Amendment to Motion for Leave to Amend Complaint" [Doc. 54]. The Court granted that motion, allowing Plaintiff to make amendments/corrections to her first "Motion for Leave to Amend Complaint" and directed Plaintiff to file her second motion to amend in the form she proposed. Doc. 56.  The Court further explained that "if Plaintiff's amended motion to amend is granted, there will be a new operative complaint in this action" and the pending motions to dismiss will no longer be directed to the proper complaint." Doc. 57.  Therefore, "[a]ll remaining briefing deadlines for the pending Motions to Dismiss [Doc. 25 and 26] [were] . . . suspended until the Court [could] rule[ ] on Plaintiff's second motion to amend the complaint."[5]  *Id.*  Subsequently, Plaintiff filed her "Second Motion for Leave to Amend Complaint" [Doc. 59], which is the subject of this Ruling.

As set forth *supra*, the Defendants have not objected to this second motion to amend. However, to the extent that their arguments in their motions to dismiss affect the viability or futility of the claims included in the proposed "Amended Complaint," the Court considers them herein.

---

[5]  The Court further noted that if the pending motions to dismiss became moot due to the Court's acceptance of a second amended complaint, the Defendants would have the option of reinstating the motions "by directing them to the amended complaint" or filing "new motions to dismiss with respect to the amended complaint." Doc. 57.

## II. <u>DISCUSSION</u>

**A.    <u>Rule 15(a)</u>**

In general, a party may amend its pleading once as a matter of course within 21 days after serving it.[6]  In the case at bar, Plaintiff's motion to amend is her "second" such motion and is thus governed by Rule 15(a)(2), Fed. R. Civ. P., which provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave" and "[t]he court should freely give leave when justice so requires."[7]  Plaintiff has not obtained the opposing parties' written consent to amend.[8]  Therefore, she seeks the Court's leave.

In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the United States Supreme Court articulated the relevant standard for a court to determine whether to grant a party's request to amend his or her

---

[6]  Rule 15(a), Fed. R. Civ. P., provides:

(1) *Amending as a Matter of Course.* A party may amend its pleading once as a matter of course within:

    (A) 21 days after serving it, or

    (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

[7]  With respect to amendments other than those which may be made a matter of course, Rule 15(a)(2), Fed. R. Civ. P., provides:

(2) *Other Amendments.* In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

[8]  Although Defendants have not consented to the Plaintiff's motion to amend, they have not objected and the time to do so has expired.  *See* D. Conn. L. Civ. R. 7(a) ("[A]ll opposition memoranda shall be filed within twenty-one (21) days of the filing of the motion, and . . . [f]ailure to submit a memorandum in opposition to a motion may be deemed sufficient cause to grant the motion").

pleading under Federal Civil Rule 15(a).[9]  In particular, the *Foman* court stated:  "In the absence of any apparent or declared  reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be 'freely given.'"  371 U.S. at 182.  "Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Id.*

The Second Circuit consistently applies *Foman* in favor of motions to amend. *See, e.g., Knife Rights, Inc. v. Vance,* 802 F.3d 377, 389 (2d Cir. 2015) (Rule 15(a)(2) "affords district courts considerable discretion to deny amendment when there has been 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'") (quoting *Foman*, 371 U.S. at 182); *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 109 (2d Cir. 2014) ("The Federal Rules provide that courts 'should freely give leave [to amend] when justice so requires'" and "[i]n the absence of any apparent or declared reason . . . such as undue delay, bad faith or dilatory motive on the part of the movant . . . [or] undue prejudice to the

---

[9] With respect to amendments other than those which may be made as a  matter of course, Rule 15(a)(2), Fed. R. Civ. P., provides:

(2) *Other Amendments.*  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

opposing party by virtue of allowance of the amendment . . . the leave sought should, as the rules require, be 'freely given.'") (quoting *Foman,* 371 U.S. at 182); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) ("When a party requests leave to amend his complaint, permission generally should be freely granted.") (citing *Foman*, 371 U.S. at 182); *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) ("Leave to file an amended complaint 'shall be freely given when justice so requires,' Fed. R. Civ. P. 15(a), and should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.").

Applying the *Foman* standard to Plaintiff's second motion to amend, there is no evidence that the proposed amendments are the product of any undue delay or bad faith. Plaintiff filed her first request for leave to amend her complaint [Doc. 48] within the time frame specified by the Court for amendment of pleadings. *See* Scheduling Order (dated 4/26/2016) [Doc. 38]. Plaintiff thereafter, within two weeks after her first motion to amend, sought leave to amend her motion to amend her complaint to include additional information to "support the claim under Section 31-51q of the Connecticut General Statutes that Plaintiff's speech did not materially or substantial[ly] interfere with her bona fide job performance or the working relationship." Doc. 54, at 1. The Court granted such leave [Doc. 56]; and Plaintiff promptly filed her second motion to amend [Doc. 59] (filed 7/22/2016). Under these circumstances, the Court views the second motion to amend as timely.

Furthermore, no facts indicate that Plaintiff has acted in "bad faith" or sought to delay the proceedings. Rather, as she states in her motion, Plaintiff seeks to supplement her complaint by inserting additional facts.[10] In her own words, she seeks to "[c]larify the extent and chronic nature

---

[10]  The Court notes that Plaintiff filed her motion [Doc. 54] for leave to amend her first motion to amend contemporaneously with her opposition [Doc. 53] to Defendants' motion to dismiss Counts One through Six and Twelve through Sixteen of Plaintiff's Complaint. Doc. 26. In

of her medical conditions giving rise to her disability discrimination claim," "[c]larify the speech and her motivation for speech giving rise to her claim under Section 31-51q of the Connecticut General Statu[t]es;" "[c]larify the role of Defendant VantagePoint LLC d/b/a VantagePoint Healthcare;" "[a]dd an introductory paragraph and a paragraph regarding the Court's jurisdiction, consistent with federal pleading standard for complaints;" and "[s]upport the claim under Section 31-51q of the Connecticut General Statutes that Plaintiff's speech did not materially or substantial[ly] interfere with her bona fide job performance or the working relationship." Doc. 59, at 1-2.

Moreover, there has been neither "repeated failure [by Plaintiff] to cure deficiencies by amendments previously allowed;" nor is there "undue prejudice" to Defendants in allowing Plaintiff to amend. Upon electronic notice of Plaintiffs' proposed amendments and after weeks to consider her motion, Defendants took no action to oppose the amendments. Also, as Plaintiff has asserted, "Plaintiff has not added any new claims" and "[t]he parties are at the beginning states of discovery." Doc. 59-1, at 3.

Unless amendment would be "futile," the leave sought should be freely given. Plaintiff's addition of facts in an attempt to clarify and enhance the factual allegations in support of her claims is not, in and of itself, futile. If anything, additional facts may strengthen, rather than nullify, her claims before the Court. The Court will thus examine each claim to determine whether its inclusion, as drafted in the proposed amended complaint, would be "futile."

**B.    Potential Futility**

With respect to futility, "[w]here it appears that granting leave to amend is unlikely to be

_____

requesting to supplement her allegations regarding her claims under Conn. Gen. Stat. § 31-51q, she wishes to ensure that her Complaint states a viable claim with respect to that statutory section. Doc. 54, at 1.

11

productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (citing *Foman*, 371 U.S. at 182). *See also Health–Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("[W]here . . . there is no merit in the proposed amendments, leave to amend should be denied."); *Albany Ins. Co. v. Esses*, 831 F.2d 41, 45 (2d Cir. 1987) ("[T]he district court may deny leave to replead if the proposed amendments would be futile.").

In other words, although leave to amend must be freely given under ordinary circumstances, denial is proper where the proposed amendment would be "futile." *Foman*, 371 U.S. at 182. An amendment is considered "futile" if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis. *See, e.g., Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 258 (2d Cir. 2002 ) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).") (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)); *Donovan v. Am. Skandia Life Assur. Corp.*, 217 F.R.D. 325, 325 (S.D.N.Y. 2003) ("Where a proposed amended complaint cannot itself survive a motion to dismiss, leave to amend would be futile and may clearly be denied."), *aff'd*, 96 F. App'x 779 (2d Cir. 2004); *Bentley v. Greensky Trade Credit*, *LLC*, No. 3:14-CV-1157 (VAB), 2015 WL 9581730, at *2 (D.Conn. Dec. 30, 2015) ("[A] Court may deny leave to amend if the proposed amendment would be futile because it fails to state a claim that would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)."), *reconsideration denied sub nom.*, *Bentley v. Tri State of Branford, LLC*, No. 3:14-CV-1157 (VAB), 2016 WL 2626805 (D. Conn. May 6, 2016). *See also Faryniarz v. Ramirez*, 62 F. Supp. 3d

240, 249 (D.Conn. Dec. 1, 2014) (collecting cases). [11]

A proposed amendment would thus be futile, for example, if it "destroyed the Court's subject matter jurisdiction, failed to state a claim, or asserted claims which are time-barred by the relevant statutes of limitation." *Faryniarz*, 62 F. Supp. 3d at 249-50 (citing *Taurus B, LLC v. Esserman*, No. 3:14cv715 (CSH), 2014 WL 4494398, at *2 (D. Conn. Sept. 12, 2014)). *See also Wilson–Richardson v. Regional Transit Serv., Inc.*, 948 F. Supp.2d 300, 306 (W.D.N.Y. 2013) ('I conclude that no amendment of the complaint would be sufficient to salvage claims which are undisputedly unexhausted and untimely, and/or over which the Court lacks jurisdiction").

In addition, a claim is futile if it lacks the facts necessary to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding whether to dismiss for failure to state a claim, a court must "take[ ] factual allegations [in the complaint] to be true and draw[ ] all reasonable inferences in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted). Although a complaint need not contain "detailed factual allegations," it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Put simply, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rather, the plaintiff's complaint must include "enough facts to state a claim to relief that is plausible

---

[11] The United States Supreme Court has clarified that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 663-64 (citing *Twombly*, 550 U.S. at 556).

With respect to futility in particular, as the Second Circuit summarized, "if the plaintiff has at least colorable grounds for relief," absent "undue delay or bad faith or undue prejudice or unless [amendment] would unduly prejudice the opposing party," "justice does so require" permission to amend. *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block Bldg. 1 Hous. Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir. 1979) (citing *Foman*, 371 U.S. at 182).

**C.    Plaintiff's Claims**

In assessing Plaintiff's claims for potential futility, the Court examines whether each of her proposed claims states a plausible claim for relief. *Iqbal*, 556 U.S. at 679. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

**1.    Count One - Conn. Gen. Stat. § 31-51q**

**a.    Standard of Law**

Plaintiff's first count sets forth a claim pursuant to Conn. Gen. Stat. § 31-51q, alleging that her employers disciplined or discharged her in violation of her first amendment right to free speech. Under Connecticut law, an employer is liable to an employee for compensatory and punitive damages, in addition to attorney's fees and costs, if that employee was disciplined or discharged "on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or sections 3, 4, or 14 of article first of the [Connecticut Constitution]." Conn.

Gen. Stat. § 31-51q.

To state a plausible claim for violation of § 31-51q, a plaintiff must allege "protected activity, adverse action, a causal relationship between the activity and the adverse action, and that the protected activity did not interfere with the central purposes of the employment relationship." *McClain v. Pfizer*, Inc., 692 F. Supp. 2d 229, 241 (D. Conn. 2010) (quoting *Winik–Nystrup v. Manufacturers Life Ins. Co.*, 8 F.Supp.2d 157, 159 (D.Conn., 1998)). It thus follows that "[w]hen establishing the prima facie elements of a § 31-51q action, the plaintiff must prove three elements: "(1) that he engaged in constitutionally protected speech, (2) that his employer took an adverse action against him, and (3) that there was a casual relationship between the protected activity and the adverse action.'" *Karagozian v. Luxottica Retail N. Am.*, 147 F. Supp. 3d 23, 35 (D. Conn. 2015) (citing, *inter alia*, *Lowe v. AmeriGas, Inc.*, 52 F.Supp.2d 349, 359 (D.Conn.1999) (citations omitted), *aff'd*, 208 F.3d 203 (2d Cir.2000)). Per the language of the statute, "[t]he plaintiff must also show that (4) the exercise of his or her First Amendment rights did 'not substantially or materially interfere with [his or her] bona fide job performance or the working relationship between the employee and the employer.'" *Id.* (quoting Conn. Gen. Stat. § 31-51q). *See also D'Angelo v. McGoldrick*, 239 Conn. 356, 361 (1996)).

"A clear prerequisite to the application of § 31–51q . . . is that the speech at issue must be constitutionally protected . . ." *Schumann v. Dianon Systems, Inc.*, 304 Conn. 585, 600 (2012). To be protected under the United States Constitution, speech must address a matter of public concern, which occurs when it can "be fairly considered as relating to any matter of political, social, or other concern to the community . . . ." *Connick v. Myers*, 461 U.S. 138, 146 (1983). Speech does not lose its protection simply because it occurs in private conversation (*i.e.*, "is private rather than public"),

15

*Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415-16 (1979), nor does it lose such protection if it is mixed in nature ("not confined entirely to matters of public concern"), *Connick*, 461 U.S. 149-50.

Furthermore, the Connecticut Supreme Court has held that "Section 4 of article first of the Connecticut constitution . . . provide[s] at least as much protection of speech as the federal first amendment." *Cubilla v. Town of Montville*, No. KNLCV116010874S, 2014 WL 1565899, at *4 (Conn. Super. Ct. Mar. 18, 2014) (citing *State v. Linares*, 232 Conn. 345, 378-79 (1995)). As one Connecticut court concluded:

> [F]rom my review of the text and history of the Connecticut Constitution and the case law . . . it is my opinion that the free speech clauses of the Connecticut Constitution warrant an independent analysis and may, in certain cases, provide greater protection than that afforded under the first amendment." [*State v. Linares*, 32 Conn. App. 656, 683 (1993).] Quoting this language, the Supreme Court stated that "[t]his historical background indicates that the framers of our constitution contemplated vibrant public speech, and a minimum of governmental interference . . ."

*Matthews v. Dep't of Pub. Safety*, No. HHDCV116019959S, 2013 WL 3306435, at *25 (Conn. Super. Ct. May 31, 2013) (quoting *State v. Linares*, 232 Conn. 345, 386 (1995)).

With respect to § 31-51q, the inquiry into whether the speech was made "as an employee" or "as a citizen" is "subordinate to the larger issues of whether the speech addresses a matter of public concern and whether the employer has a legitimate interest in restricting the speech." *Matthews*, 2013 WL 3306435, at *31. Under this approach, "a court will first determine whether an employee's speech is on a matter of public concern, then determine whether the interests of the employee in making the speech outweigh the interests of the employer in operating efficiently and effectively." *Id.* In both inquiries, there is "an examination of the speaker's role, and the relationship between the speech and the speaker's employment duties." *Id.*, at *31.

b.    **Plaintiff's Claim**

In the case at bar, Plaintiff has alleged that Defendants Stamford Hospital and SAS subjected her to "discipline and discharge due to her speech regarding safety concerns."  Doc.  59-1, at  40 (¶ 157).  She asserts that speech based on a public concern regarding safety of patients constitutes an exercise of free expression," as guaranteed by Sections 3, 4 and 14 of Article First of the Constitution of the State of Connecticut."  *Id.* (¶ 158).  She alleges that "Stamford Hospital and SAS by virtue of their conduct violated Section 31-51q" and that "[a]s a result of the Defendants' conduct, the Plaintiff has and continues to suffer damages." *Id*. (¶¶ 160-61).

Although Plaintiff has generally incorporated by reference paragraphs 1 through 156 of her proposed Amended Complaint into this first Count, the language contained under the heading of Count One itself is sufficient to point the Court toward allegations to support the first element of her claim:  the speech to which Plaintiff refers concerned the "safety of patients."  *Id.* (¶ 157).  In particular, Plaintiff designates a prior section of her complaint as "Plaintiff's Speech Regarding Safety Issues."  *Id.*, at 11.  In that section, she alleges that she "expressed concerns [to Defendant Bowling] regarding hiring [of] inexperienced cardiac anesthesiologists and the potential for patient care to suffer in the absence of proper procedures and time set aside for mentoring and support." *Id.*, at 11 (¶ 27).  She alleges that "at that time, Stamford Hospital cardiac program had limited cases and was not set up to provide the support necessary for the junior anesthesiologists."  *Id.*  She thus expressed to Defendant Bowling that there was a  high "likelihood of an inexperienced graduate failing or having complications . . . in a community hospital environment" with "no in-house backup

during night and week-end call." *Id.*[12]

It is well established that "it is within the province of the trial court to determine, as a matter of law, which topics are considered to be of public concern." *McClain v. Pfizer, Inc.*, 692 F. Supp. 2d 229, 242 (D. Conn. 2010) (citing *Daley v. Aetna Life and Cas. Co.*, 249 Conn. 766 (1999).[13]  In particular, "[w]hether or not 'an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.'" *Dillon v. Suffolk Cty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 205 (E.D.N.Y. 2013) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir.2008)). Moreover, the inquiry should be "a practical one" that goes beyond mere "[f]ormal job descriptions." *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 202 (2d Cir. 2010) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006)); *see also Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) ("The inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule. Courts must examine the nature of the plaintiff's job

---

[12]  By way of explanation, Plaintiff based her concerns on the near collapse of the Stamford Hospital cardiac surgical program in September 2009 "due to poor surgical outcomes," which "led to the Chairman of Cardiac Surgery leaving Stamford Hospital." Doc. 59-1, at 11-12 (¶ 28). Columbia Presbyterian, a hospital affiliated with Stamford Hospital, sent its own surgeons to assist by supervising surgery. *Id.*  It was at that time that Dr. Craig Smith of Columbia Presbyterian "insisted on having Plaintiff, an experienced anesthesiologist, cover not only the cardiac operating room full time but also be involved in the care of the patients in the ICU." *Id.* at 12 (¶ 28).  It was at that time that "everyone [in the cardiology department] agreed that it would not be in the best interest of the newly started cardiac surgical program at Stamford Hospital to hire inexperienced cardiac anesthesiologists." *Id.*  Moreover, "the low volume of cases would not allow for a junior anesthesiologist to gain enough experience and solidify skills." *Id.*

[13]  Then, during the trial, "[t]he resolution of whether an employee's statements address such a topic [of public concern] is . . . within the province of the jury, to be determined by looking to the content, form and context of the particular statements in question." *Daley v. Aetna Life and Cas. Co.,* 249 Conn. 766, 782 (1999).

responsibilities, the nature of the speech, and the relationship between the two.").

In the case at bar, the danger to a patient created by the services of an inexperienced anesthesiologist implicates safety. When a patient undergoes surgery, his very life may be endangered, perhaps even ended, by the services of an inexperienced anesthesiologist.[14]

The safety of hospital patients has been repeatedly recognized by courts of this Circuit as a matter of public concern. *See, e.g.*, *DiMarco v. Rome Hosp. & Murphy Hosp.*, No. 88-CV-1258, 1991 WL 336000, at *8 (N.D.N.Y. July 1, 1991) ("[C]omplaints about patient care and the efficient operation of the Hospital would be a matter of public concern such that they would be constitutionally protected by the first amendment," as opposed to simply "caustic personal attacks on personnel that are vindictive and personal.") (internal quotation marks omitted); *Spring v. Cty. of Monroe*, N.Y., 59 F. Supp. 3d 559, 563 (W.D.N.Y. 2014) ("[T]he treatment of patients at a county hospital, particularly relating to hospital officials' handling of a patient's behavior that might affect the health and safety of other patients, is a matter of [public concern.")(collecting cases). Where "the overall thrust of [a physican's] speech relate[s] to matters of public concern," reflecting concern "for patients' well-being and for the general workings of the Hospital" – rather than simply complaints from "personal dissatisfaction," that speech relates to a matter of public concern. *DiMarco*, 1991 WL 336000, at *8. *See also Dillon.*, 917 F. Supp. 2d at 210 (finding matter of public concern where physician's speech related to concerns about "a systematic practice of inadequate treatment and widespread usage of fictitious treatments and omissions in the patients' charts").

---

[14] Plaintiff alleges in her proposed Second Amended Complaint that she "even showed [Bowling] an article from the New York Times discussing poor outcomes, including deaths, of patients at Long Island Jewish Medical Center in Queens" relating to the hiring of "inexperienced anesthesiologists." Doc. 59-1, at 12 (¶ 29).

Granted, Plaintiff's speech regarding inexperienced anesthesiologists may also have related to Plaintiff's employment as Director of Cardiac Anesthesiology. However, that context does not nullify the fact that her speech primarily related to safety. *See Connick*, 461 U.S. 149-50 (holding speech does not lose its constitutional protection because it is "not confined entirely to matters of public concern"); *see also Dillon*, 917 F. Supp. 2d at 209 (Although "Plaintiff's speech undeniably concerned the subject matter of her employment, namely the treatment of patients at the JMU . . . the Supreme Court has made clear that this alone is not dispositive. . . . [E]ven in light of the broader perspective that the Plaintiff's job duties included the general medical treatment of inmates in the [hospital], the Court finds that Dr. Dillon's speech was not made pursuant to those duties" where the complaints dealt with "systemic mistreatment and corruption" which affected patients with whom she had "no personal or job connection.").

The allegations in Plaintiff's complaint suggest that her speech related to a broad safety problem of inexperienced anesthesiologists' treatment of patients at Stamford Hospital. The Court thus finds that, at the pleading stage, Plaintiff has alleged the first element of a § 31-51q claim: speech relating to a matter of public concern. Speech regarding the use of inexperienced anesthesiologists in surgery bears on a safety issue to the public. Such speech is plausibly constitutionally protected by the First Amendment, as well as by section 4 of the Connecticut Constitution.

With respect to the second element of adverse employer action, Plaintiff has alleged that Stamford Hospital and SAS took adverse action against her in response to her speech, namely by terminating her employment. Specifically, she alleges that she was subjected to "discipline and discharge due to her speed regarding safety concerns." Doc. 59-1, at 40 (¶ 157). In support of this

element, Plaintiff has alleged that her termination was preceded by months of contentious conversations she had with Defendant Bowling regarding recruitment of inexperienced anesthesiologists in 2012 and 2013. *Id.*, at 11 (¶¶ 27-30). In addition, on February 7, 2014, Plaintiff allegedly spoke with Defendant Kiely, Chief Medical Officer for Stamford Hospital, about this safety issue regarding inexperienced anesthesiologists. *Id.*, at 14 (¶ 34). After being informed by Plaintiff that "junior candidates were brought in without Plaintiff's knowledge or input[,] Defendant Kiely recommended a meeting with Defendants Bowling and Coady and Bill Feng, the Cardiac Surgeon who [was] also Coady's partner." *Id.* On or about February 28, 2014, that meeting occurred and Plaintiff allegedly "expressed concerns again about the safety of patients given that new [anesthesiology] graduates would not have the necessary experience to function without proper support and supervision, and . . . could not acquire nor maintain the requisite skill sets in a low volume program . . . ." *Id.*, at 15 (¶ 36). Plaintiff says that her "concerns regarding the safety and quality issues were not favorably received." *Id.*, (¶ 38).

Thereafter, on or about October 7, 2014, Plaintiff was terminated in a meeting with Bowling, Kiely, and Sue Prior, a VantagePoint consultant working for SAS. Plaintiff was advised that she "did not have sufficient experience in obstetrical, pediatric, and regional anesthesia anesthesiology in order to continue her employment." *Id.*, at 37 (¶ 144). Nonetheless, the two new anesthesiologists who had been hired by Stamford Hospital and SAS in 2014 "were inexperienced in all areas." *Id.*, at 38 (¶ 149). One had allegedly "been out of training for two years and the other had just completed residency." *Id.* Also, Plaintiff's direct replacement, Dr. Vlad Frenk, had allegedly been subjected to discipline for professional misconduct by the medical misconduct boards in New York, New Jersey, and Massachusetts. *Id.*, at 28-29 (¶ 150).

21

Plaintiff's termination, following a series of contentious discussions with Bowling and Kiely regarding the hiring of inexperienced anesthesiologists – and for the reported reason stated by others of her own inexperience in various types of anesthesia (after 31 years in anesthesiology) – is sufficient at the pleading stage to constitute the second element of her § 31-51q claim, "adverse action" by her employer.  Bowling and Kiely were two of the three officials present at the meeting when Plaintiff was terminated.  Both held positions of authority with their employers.  Reading the facts in the light most favorable to Plaintiff, she has alleged sufficient facts to establish the third element of her § 31-51q claim, termination in retaliation for her comments about the hiring of inexperienced anesthesiologists.

Finally, as to the fourth element of her § 31-51q claim, Plaintiff has alleged that her speech "did not substantially or materially interfere with her bona fide job performance or with her working relationship." Doc. 59-1, at 40 (¶ 157).  Because such an assertion necessarily alleges a negative (*i.e.*, the lack of existence of something), courts have held that it is the defendant's burden to prove its inaccuracy.  As one Connecticut court explained,

> "[I]f [plaintiff] were required to prove a lack of a substantial and material interference, he would be forced to prove a negative, which is a difficult if not impossible task. *See Arrowwood Indemnity Co. v. King*, 304 Conn. 179, 203 (2012) ("the task of proving a negative is an inherently difficult one . . ."). This would place the court in the peculiar position of requiring the plaintiff to plead either an extensive and exhaustive recitation of all events that may have involved interference or a boilerplate that would not give significant factual detail and would likely involve a legal conclusion. In contrast, by placing the burden on the defendant to plead a substantial and material interference as a special defense, the defendant is able to allege specific facts concerning any incidents of disruption because, as the employer, it has a wider and better knowledge of disruptive events. This creates a situation well suited for an affirmative defense, and, in light of the case law, interpretation of the statutory text and confines of logic, it makes more sense that it is the defendant's burden to prove a substantial and material interference."

*Matthews v. Dep't of Pub. Safety*, No. HHDCV116019959S, 2013 WL 3306435, at *10 (Conn. Super. Ct. May 31, 2013) (lateral citation omitted).

Moreover, when evaluating a claim for purposes of 12(b)(6) dismissal, the court must view the facts in the light most favorable to the plaintiff. In such circumstances, Plaintiff's allegations regarding the fourth element of § 31-51q suffice.

In sum, in Plaintiff's Count One, she has alleged sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Plaintiff will be granted leave to amend with respect to her claim under Conn. Gen. Stat. § 31-51q.

## 2.    Counts Three, Five, and Fourteen - Disability Discrimination under ADA

Three of Plaintiff's claims arise under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101. These claims are set forth in Counts Three, Five, and Fourteen of the proposed Amended Complaint.

### a.    Standard for ADA Claim

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and

privileges of employment."[15] 42 U.S.C. § 12112(a).  The ADA defines discrimination on the basis

of disability as, among other things, "limiting, segregating, or classifying a[n] . . . employee in a way

that adversely affects the opportunities or status of such applicant or employee because of the

disability of such . . . employee."  *Id*. § 12112(b)(1).  *See, e.g.*, *Shannon v. N.Y.C. Transit Auth.*, 332

F.3d 95, 99 (2d Cir.2003); *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426,

433 (E.D.N.Y. 2015).  An employer may also be liable under the ADA for failing to make

"reasonable accommodations to the known physical or mental limitations of an otherwise qualified

individual with a disability who is an . . .  employee," unless the employer is able to "demonstrate

that the accommodation would impose an undue hardship on the operation of [its] business."  *Id.*

§12112(5)(A).

For purposes of the statute, a disability is defined as "a physical or mental impairment that

substantially limits one or more major life activities of such individual," "a record of such an

impairment;" or "being regarded as having such an impairment."  42 U.S.C. § 12102(1)(A)-(C).

---

[15]   The statute includes as a "covered entity" an "employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). Moreover, an employer under the ADA is defined as follows:

> [A] person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

42 U.S.C.A. § 12111(5)(A).  Excluded from the term "employer" are "the United States,  a corporation wholly owned by the government of the United States, or an Indian tribe; or  a bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of Title 26."  *Id.* § 12111(5)(B)(i)-(ii).

Furthermore, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* ¶12102(2).

In order to make out a prima facie case for disability discrimination under the ADA, one must prove that:   (1) the employer is subject to the ADA; (2) the plaintiff was a person with a disability within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of her disability. *Shannon*, 332 F.3d at 99; *Vale*,  80 F. Supp. 3d at 433.  Moreover, as set forth *supra,* as to the second element, the plaintiff must show that he or she had a "physical or mental impairment that substantially limited one or more of his [or her] major life activities,"  42 U.S.C. § 12102(2)(A).

Under the ADA, a plaintiff may bring a claim for retaliation relating to his or her disability. 42 U.S.C. § 12203(a).   In order to establish a prima facie case for retaliation, the plaintiff must show that: "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  "Claims for retaliation are analyzed under the same burden-shifting framework established for Title VII cases."  *Id.* (citing  *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 148  (2d Cir. 2002)).

"Significantly, a claim of retaliation for protected conduct is a separate claim from a discrimination claim and does not depend on the success of the employee's disability claim." *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378 (E.D.N.Y. 2016) (citation and internal

quotation marks omitted).  Also of note, for purposes of retaliation, a "protected activity under the ADA may be the act of seeking reasonable accommodation for one's disability."  *See Muller v. Costello*, 187 F.3d 298, 311 (2d Cir.1999) (upholding district court's judgment upon jury's verdict, granting employee relief where employer retaliated against him for seeking to enforce his rights under the ADA).  *See also Daley v. Cablevision Sys. Corp.*, No. 16-991, 2017 WL 506977, at *1 (2d Cir. Feb. 6, 2017) (citing *Muller*, 187 F.3d at 311, for "concluding that seeking reasonable accommodation constitutes protected activity under the ADA and noting in parenthetical citation that an ADA "retaliation claim can be based on, inter alia, [a] request for reasonable accommodation").

Lastly, a plaintiff may bring an ADA interference claim under section 503(b) of the statute. Pursuant to that section, it is "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA]." 42 U.S.C. § 12203(b).  *See, e.g., Equal Employment Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*, No. 15-CV-01416 (VAB), 2016 WL 1449543, at *1 (D.Conn. April 12, 2016).

### b.    Plaintiff's Claims

In the case at bar, Plaintiff sets forth three variations of claims falling under the ADA against Stamford Hospital and SAS.  In Count Three, Plaintiff alleges that she is "an individual with disabilities as defined" by that statute and that Defendants discriminated against her "due to her disabilities or because she was perceived as having disabilities." Doc. 59-1, at 42 (¶ 158).  She further claims that, "[a]s a result of the Defendants' conduct, [she] has suffered damages." *Id*.

In Count Five, Plaintiff alleges that she "expressed  opposition to discrimination based on

26

her abilities," which resulted in her being subjected to "retaliatory discipline and termination" by Stamford Hospital and SAS. *Id.*, at 43 (¶ 157).

Finally, in Count Fourteen, Plaintiff alleges that Defendants Stamford Hospital and SAS each "interfered with the Plaintiff's relationship and opportunities with the other in violation of . . . ADA . . . due to their discriminatory and retaliatory motives." *Id.*, at 48 (¶ 157). In other words, Stamford Hospital and SAS each allegedly interfered with Plaintiff's opportunity to be treated fairly by the other under the ADA.

In each of the foregoing Counts, Plaintiff incorporates by reference 156 paragraphs of foregoing factual allegations, which she believes support all of her claims. Although not specifically delineated as supporting solely her ADA claims, allegations regarding three medical conditions are alleged in detail in Plaintiff's Second Amended Complaint.

In paragraph 58, Plaintiff alleges that she has "severe mid-foot arthritis and swelling of her ankle," which causes her to experience "pain walking and standing" during the times relevant to this action. In the same paragraph, she states that she has had "degenerative changes in [her] mid[-]foot" which include "acute and chronic tendonitis, . . . bony spurring within calcaneus with changes of medial core plantar fasciitis and peritendinous inflammation." Doc. 59-1, at 19 (¶ 58). She states that such "chronic conditions" will "only worsen with time." *Id*. In addition, Plaintiff claims that she has had "prominent swelling and pain in her right ankle which made it difficult to walk and stand" and that an orthopaedic surgeon told her in 2012 that "mid-foot arthritis . . . had caused changes in the bones of her right foot." *Id.* At that time, "Plaintiff was prescribed an orthopaedic boot for the right foot for management of the symptoms and sent to a podiatrist who made custom orthotics for Plaintiff's shoes." *Id.* She was also "required to have physical therapy for her right

foot" and "advised by her physicians in 2012 to elevate her right foot as much as possible in order to manage the symptoms and decrease foot swelling and pain which would occur on an ongoing basis." *Id.* She admits that she sometimes elevated her foot on a stool (while sitting in the operating room to monitor patients) due to her "severe mid-foot arthritis and swelling of her ankle." *Id.*

A second disability which Plaintiff claims is relevant to her ADA counts is "partial hearing loss." *Id.*, at 20 (¶ 59). She alleges that given the noise level in the operating room from voices and equipment, she "sometimes finds it difficult to hear conversation" and so "speak[s] louder than she realize[s]." *Id.* Such hearing loss is allegedly "permanent." *Id.*

Finally, a third medical condition, relating to her radiation exposure levels from the equipment she encounters in her position, has led to her wearing a "lead gown and thyroid shield [and] to stand as far away as possible from the point of radiation emission and sit behind the clear lead mobile screen located in each cardiac catheterization lab procedure suite." *Id.*, at 20 (¶ 60).

As a result of these medical conditions, Plaintiff alleges that she was forced to attend a disciplinary meeting in the Stamford Hospital Administration Suite with Defendant Bowling (of SAS), Attorney Benjamin Albert (of VantgePoint, LLC), and Defendant Kiely (Chief Medical Officer of Stamford Hospital) on February 25, 2014. *Id.*, at 18 (¶ 51.). At that meeting, she was handed a disciplinary memorandum regarding her performance. *Id.* (¶ 52). She was then advised that she had "inappropriately engaged with patients when providing anesthesia care." *Id.* (¶ 57). The inappropriate behaviors included those stemming from her alleged disabilities in this action: "put[ting] her right foot up while sitting in the operating room," speaking "more loudly than necessary" in the catheterization lab, and not sitting "immediately adjacent to the patient's head" while working in the electrophysiology lab. *Id.*, at 18-19 (¶ 57). None of this conduct, however,

prevented Plaintiff from performing her duties as an anesthesiologist.

Plaintiff alleges that on February 25, 2014, upon receiving the disciplinary memorandum, she explained her allegedly problematic behavior with respect to her medical disabilities (mid-foot arthritis, partial hearing loss, and high exposure level to radiation). *Id.*, at 19 (¶ 58).   In response, Defendant Bowling of SAS became "openly annoyed by Plaintiff's explanations regarding her disabilities." *Id.,* at 21 (¶ 61).   Moreover, Attorney Albert informed Plaintiff that she would be required to have an evaluation and to participate in counseling by the Physicians Wellness Services Program, which was a program "established to treat 'disruptive' physicians and address performance issues related to depression, alcohol and drug abuse, and relationship problems." *Id.* (¶63). According to Plaintiff, the program lacks confidentiality so that "all discussions between the Program and the physician are reported back to Stamford Hospital and SAS." *Id.*

Thereafter, Plaintiff learned on May 27, 2014, that Sue Prior (a VantagePoint consultant) acted on behalf of Stamford Hospital and SAS to contact Stamford Hospital's Employee Health Department to disclose her disabilities and request  accommodations. *Id.*, at 25 (¶ 84) This disclosure and request went against Plaintiff's wishes and allegedly violated HIPAA. *Id.*   Ultimately, in a meeting with Bowling, Kiely, and Prior on October 7, 2014, Plaintiff was informed she was discharged. *Id.*, at 37-38 (¶¶ 142-51 ).

The Court finds that reading the facts in the light most favorable to Plaintiff, she has alleged plausible claims for discrimination, retaliation, and interference under the ADA for the disabilities of "mid-foot arthritis" and permanent partial hearing loss.  As to those two afflictions, Plaintiff has alleged that Stamford Hospital and SAS, as employers, became aware of her disabilities and treated her unfavorably due to them.  She alleges that on February 25, 2014, Defendant Bowling became

"openly annoyed by Plaintiff's explanations regarding her disabilities." *Id.*, at 21 (¶ 61). Also, at Plaintiff's meeting with Bowling, Albert, and Kiely regarding her disabilities, Plaintiff was given a disciplinary memorandum. Attorney Albert informed her that she would be "required to have an evaluation by and participate in counseling by the Physicians Wellness Services Program," which was established to treat "disruptive" physicians and address performance issues related to depression and substance abuse. *Id.* (¶ 63). Plaintiff alleges that on March 5, 2014, she wrote to Bowling and Albert to inform them of her concerns that "she was being subjected to criticisms and disciplinary actions regarding her performance and being attacked personally because of her disabilities and efforts to accommodate them." *Id.*, at 21-22 (¶65). Two days later, having been given no acknowledgment of her concerns, Plaintiff received an email from Defendant Coady (of Stamford Hospital) which copied Bowling and "falsely accus[ed] Plaintiff of routinely using her phone during surgical procedures and not being properly engaged." *Id.* (¶ 66). According to Plaintiff, this email showed that Coady, Chief of Cardiac Surgery at Stamford Hospital, was "partnering with Bowling[, a consultant of SAS,] to effectuate Plaintiff's termination." *Id.* (¶ 68).

As to Plaintiff's alleged disability regarding elevated levels of radiation exposure, the Court finds that Plaintiff has failed to allege that such a disability impairs or "substantially limits one or more major life activities" under the ADA, 42 U.S.C. § 12102(1)(A). Instead, Plaintiff has alleged that when she is in the operating room, she must wear a "lead gown and thyroid shield [and] to stand as far away as possible from the point of radiation emission and sit behind the clear lead mobile screen located in each cardiac catheterization lab procedure suite." Doc. 59-1, at 20 (¶ 60). Absent proof that location where one stands or sits in an operating room involves the impairment of a major life activity, 42 U.S.C. § 12102(1)(A)-(C), this disability does not appear to fall under the ADA.

Accordingly, this alleged "disability" of elevated radiation exposure level does not fulfill the requirements of the ADA as pled.

In sum, as to Counts Three and Five Plaintiff has alleged that her employers were Stamford Hospital and SAS (employers under the ADA); she had two disabilities within the meaning of the ADA (limiting "major life activities" – standing, walking, hearing), she was otherwise qualified to perform her functions as an anesthesiologist with minor accommodations (*e.g.*, elevating her foot, speaking loudly), and she suffered retaliation (*e.g.*, forced to attend disciplinary meeting; placement in an intrusive, un-needed "wellness" program; false accusations of cell phone misconduct), and an adverse employment action (discipline, as well as later discharge) because of her disabilities.

As to Count Fourteen, regarding interference, Plaintiff alleges that Coady, on behalf of Stamford Hospital, and Bowling, as officer of SAS, partnered together to interfere with her relationship and opportunities with each of her two employers, in violation of the ADA, due to discriminatory and retaliatory motives. As set forth *supra*, a plaintiff may bring an ADA interference claim under section 503(b) of the statute. Under that section, it is "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA]." 42 U.S.C. § 12203(b). Accepting Plaintiff's allegations as true, Plaintiff has alleged intimidating, coercive retaliatory conduct by Coady and Bowling as the result of her exercise of her rights under the ADA regarding her disabilities. As key officers in Stamford Hospital (Coady) and SAS (Bowling), their actions, when viewed together, may comprise plausible "interference" with Plaintiff's exercise of rights under the ADA.

3.    **Counts Four, Six, Eight, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen - CFEPA Claims**

a.    **Standard of Law**

Plaintiff brings no fewer than ten claims under the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-51, *et seq.* "Under the CFEPA it is a prohibited practice for an employer – except in the case of a bona fide occupational qualification or need – to refuse to hire or employ or to discharge from employment an individual because of the individual's physical disability."[16] *Beason v. United Techs. Corp.*, 337 F.3d 271, 276-77 (2d Cir. 2003) (citing Conn. Gen.Stat. § 46a–60(a)(1)). The CFEPA defines the term "[p]hysically disabled" as "refer [ring] to any individual who has any chronic physical handicap, infirmity or impairment." Conn. Gen.Stat. § 46a–51(15).

As set forth *supra*, the ADA similarly prohibits disability-based discrimination, but defines disability as "a physical or mental impairment" and requires that the impairment "substantially limit[ ] one or more of the major life activities of [the] individual." 42 U.S.C. § 12102(2)(A). When comparing claims arising under the CFEPA with those under the ADA, the Second Circuit has held that the CFEPA lacks the significant restrictive threshold found in the ADA that the physical

---

[16] The CFEPA states, in relevant part to this action:

It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . sex . . . or physical disability . . . .

Conn. Gen. Stat. § 46a-60(a)(1). Plaintiff includes sex discrimination solely in her CFEPA claim in Count Six.

disability in question "substantially limit a major life activity." *Beason*, 337 F.3d at 277. Accordingly, "Connecticut and federal laws do not provide coextensive disability discrimination coverage." *Id.*

In addition, "[c]laims under the CFEPA are analyzed using the same burden shifting framework set forth by the Supreme Court in *McDonnell Douglas* for use in Title VII, ADA, and ADEA cases." *Berube v. Great Atl. & Pac. Tea Co.*, No. 3:06-CV-00197 (VLB), 2010 WL 3021522, at *9 (D. Conn. July 29, 2010). *See also DeAngelo v. Yellowbook, Inc.*, 105 F. Supp. 3d 166, 180 (D. Conn. 2015) (same); *Hopkins v. New England Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 256 (D. Conn. 2013) ("The only relevant difference between the analysis a court undertakes in regards to ADA and CFEPA claims is in defining physical disability" because "CFEPA's definition of physical disability is broader than the ADA's") (citing *Beason*, 337 F.3d at 277-278).

Lastly, as Plaintiff has alleged, a plaintiff may bring an "aiding and abetting" claim as to the CFEPA. In particular, the CFEPA provides that it "shall be a discriminatory practice in violation of this section . . . [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so . . . ." Conn. Gen. Stat.§ 46a-60 (a)(5).

### b.    Plaintiff's Claims

As set forth in Part II.C.3.a., *supra,* in Counts Four and Six*,* Plaintiff has alleged acts of discrimination, retaliation and ultimately discharge as the result of her physical disabilities. *Beason*, 337 F.3d at 176-77; Conn. Gen. Stat. § 46a-60(a)(1). Moreover, all three disabilities she describes are allegedly physical handicaps, infirmities, and impairments. *Id.* § 46a-51(15). Unlike the ADA, the CFEPA lacks a requirement that a disability "substantially limit a major life activity." Therefore,

33

all three of Plaintiff's alleged handicaps, impairments, or disabilities (severe mid-foot arthritis, permanent partial hearing loss, and elevated radiation level) may fall under the CFEPA. Plaintiff's claims in Counts Four and Six – disability discrimination and retaliation by Stamford Hospital and SAS – are "plausible," in that they may rely on many, if not all, of the facts that are alleged in reference to the disabilities in her ADA claims.

In Count Six, Plaintiff also alleges retaliation for expressing opposition to disability discrimination and sex discrimination under the CFEPA. With respect to opposition to disability discrimination, Plaintiff has alleged that on February 25, 2014, in a disciplinary meeting with Bowling (of SAS), VantagePoint (Albert), and Stamford Hospital (Kiely), Plaintiff explained the reasons she put her foot up in the operating room (severe mid-foot arthritis), spoke loudly in the operating room (partial hearing loss), and sat behind the lead mobile screen in the cardiac catheterization lab procedure suite (elevated radiation exposure). Doc. 59-1, at 19-21. Defendant Bowling became "openly annoyed by Plaintiff's explanations regarding her disabilities." *Id.*, at 21 (¶ 61). Then, Attorney Albert informed Plaintiff that she would be required to participate in the Physicians' Wellness Program for "disruptive," depressed, and/or substance-abusing individuals. *Id.*, at 21 (¶ 63). Within months, at a meeting once again with Bowling and Kiely, Plaintiff was discharged. In sum, because of Plaintiff's disabilities, she suffered adverse employment action (discipline, as well as later discharge). Given these allegations, at the pleading stage, this claim is not futile.

With respect to Plaintiff's expressed concern regarding sex discrimination, the claim also states a claim upon which relief may be granted. *See* Part II.C.4.b.2., *infra* (based on allegations detailed in Court's discussion of Plaintiff's Title VII retaliation claim in Count Two). As described

below, Plaintiff may establish a prima facie case of retaliation for complaining of sex discrimination

with a temporal relationship between voicing her concerns about sex discrimination, and then

discipline and ultimately discharge by her employers.

Regarding the "aiding and abetting" claims in Counts Eight to Thirteen, these claims are

made against particular defendants (VantagePoint, Coady, Kiely, Mancino, Bowling, Stamford

Hospital, and SAS, respectively) who allegedly "aided, abetted, incited, compelled and coerced the

discriminatory and retaliatory conduct [of the other defendants] based on Plaintiff's disabilities in

violation of the CFEPA."  These Counts, however, fail to allege sufficient particularized facts to

support them or to point toward specific paragraphs in the preceding portions of the Amended

Complaint that encompass such factual allegations.

As in prior Counts, Plaintiff has simply incorporated by reference the 156 paragraphs in her

broad, introductory "Statement of Claims." Unlike the prior Counts, in which the Court was able to

discern headings and clear language to relate factual allegations to particular claims, these "aiding

and abetting claims" have no clear factual corollaries so remain vague.  Instead of alleging

supporting facts, Plaintiff sets forth the elements of the claims in conclusory fashion.  Such

conclusory allegations fail to put Defendants on sufficient notice of the claims.  Plaintiff's

"formulaic recitation" of the statutory language, unsupported by sufficient factual allegations, "will

not do" to establish a plausible claim of "aiding and abetting.*" Pawlow v. Dep't of Emergency Servs.

& Pub. Prot.*, 172 F. Supp. 3d 568, 572 (D. Conn. 2016) (quoting *Iqbal*, 556 U.S. at 678).  In sum,

there is no sufficient "factual content . . . to draw the reasonable inference that the [Defendants are]

liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  *See also, e.g.*,  *Brandon v. City of N.Y.*,

705 F. Supp. 2d 261, 269 (S.D.N.Y. 2010).

35

As courts of this Circuit have repeatedly held, "general allegations, without supporting facts *other than a clause incorporating an entire complaint by reference*, are insufficient to withstand even a motion to dismiss because they do not give fair notice of what the claim is and the grounds upon which its rests." *Moore v. City of N.Y.*, No. 08-CV-2449 (RRM) LB, 2011 WL 795103, at *7 (E.D.N.Y. Feb. 28, 2011) (emphasis added) (citations and internal quotation marks omitted). *See also Brandon*, 705 F. Supp. 2d at 268-69 ("Such general allegations, without supporting facts other than a clause incorporating an entire complaint by reference, are insufficient to withstand even a motion to dismiss because they do not give 'fair notice of what the claim is and the grounds upon which it rests.'") (quoting *Leibowitz v. Cornell Univ.*, 445 F.3d 586, 591 (2d Cir. 2006)); *Lastra v. Barnes and Noble Bookstore*, No. 11 Civ. 2173, 2012 WL 12876, at *7 (S.D.N.Y. Jan. 3, 2012) ("The Complaint, in providing a lengthy list without facts supporting each of the proffered claims, fails to give fair notice to the Defendants.").[17]

As in *Moore*, "Plaintiff briefly states each cause of action in a conclusory manner," and inserts a clause incorporating by reference all prior allegations in the complaint." 2011 WL 795103, at *7. It is not discernable which incorporated allegations apply to the particular "aiding and abetting" CFEPA claims; and it is not up to the Court or to the Defendants to speculate which

---

[17] *See also* Rule 8(a)(2), Fed. R. Civ. P., which dictates that "[a] pleading that states a claim for relief must contain: . . . a short and plain statement of the claim showing that the pleader is entitled to relief." *See also, e.g., Davis v. Connecticut Cmty. Bank, N.A.*, 937 F. Supp. 2d 217, 237 (D.Conn.2013) ("Although Plaintiffs suggest they have satisfied Rule 8's notice pleading requirement by incorporating by reference their prior allegations into their CUTPA claim, it is well established that '[s]uch general allegations, without supporting facts other than a clause incorporating an entire complaint by reference, are insufficient to withstand even a motion to dismiss because they do not give fair notice of what the claim is and the grounds upon which it rests.'") (quoting *Moore*, 2011 WL 795103, at *7).

particular allegations might support Plaintiff's specific claims.[18] Rather, Plaintiff must plead with sufficient detail to give rise to a plausible claim.

Because Counts Eight to Thirteen incorporate all 156 paragraphs of factual allegations by reference, they could not withstand a Rule 12(b)(6) motion to dismiss in their present form. They are thus "futile" and cannot be allowed to proceed as alleged. The motion to amend will be denied as to these counts, as drafted.

As to Plaintiff's "interference" claim against Stamford Hospital and SAS under the CFEPA in Count Fourteen, the Court finds no such recognized separate "interference" claim. Under the CFEPA, the only provision referencing "interference" is the one that defines sexual harassment as conduct by an employer which "has the purpose or effect of substantially *interfering* with an individual's work performance." Conn. Gen. Stat. § 46a-60(a)(8) (emphasis added). There are no allegations under Count Fourteen regarding interference with Plaintiff's work performance. Instead, Plaintiff has alleged throughout her complaint that her performance during her employment was nothing less than satisfactory.[19] The Court therefore finds that the CFEPA "interference" claim, as alleged in Count Fourteen, fails to state a plausible claim.

Finally, with respect to Plaintiff's CFEPA claim in Count Fifteen, alleging sex discrimination by Stamford Hospital and SAS, that claim also fails to contain sufficient factual allegations to give

---

[18] *Cf. Harasz v. Katz*, No. 3:15-CV-1528, 2017 WL 870393, at *22 (D. Conn. Mar. 3, 2017) ("Although the individual counts do not contain or repeat all of the allegations in the Amended Complaint they do include additional detail on the claims and it is discernable what incorporated allegations apply to the claims based on this detail.).

[19] *See, e.g.,* Doc. 59-1, at 37 (¶ 146) ("Plaintiff was more than qualified to care for any patient undergoing any procedure that would be scheduled at Stamford Hospital. Plaintiff was skilled in the performance of spinal and epidural anesthesia, as well as the performance of axillary and femoral compartment nerve blocks.").

rise to a plausible claim.  In that Count, Plaintiff simply alleges that "Stamford Hospital and SAS discriminated against [her] due to her sex in violation of CFEPA;"  Doc. 59-1, at 49 (¶ 157), and "as a result of [their] conduct," she "has and continues to suffer damages," *id.*    As in Counts Eight to Thirteen, discussed *supra*, Plaintiff simply incorporates all 156 paragraphs of her general factual allegations by reference, without delineating any specific paragraphs or facts that apply to her claim. As drafted, this claim makes conclusory, threadbare allegations which fail to allege a plausible claims.  This claim is thus futile.

### 4.   Counts Two, Fourteen, and Sixteen - Title VII Claims

#### a.   Standard of Law

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer . . .  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(a).   A plaintiff may establish a prima facie case of discrimination under Title VII by pleading the elements of the test announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That test requires that a plaintiff show that "(1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination."  *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.1999).  *See also Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000);  *Hill v. Rayboy Brauestein*, 467 F. Supp. 2d 336, 350 (S.D.N.Y. 2006).

As articulated by the Second Circuit, with respect to retaliation, under the burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), if the  plaintiff is

successful in establishing the requisite *prima facie* case of discrimination (based on membership in a protected class), *Graham*, 230 F.3d at 38, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal, *McDonnell Douglas*, 411 U.S. at 802. Once the defendant proffers such a reason, the burden returns to the plaintiff to show that the reason is a pretext and the real reason for the adverse action was discrimination. *Id.* at 804.

In addition, a plaintiff may state a claim for a hostile work environment in violation of Title VII if she pleads facts that would tend to show that the complained of conduct: (1) "is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's sex." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)(quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)). Such a "hostile work environment" claim must be based on the totality of circumstances, including such factors as "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Patane*, 508 F.3d at 113 (quoting *Harris v. Forklist Sys., Inc.*, 510 U.S. 17, 23 (1993)) (internal quotation marks omitted).

In addition, the Second Circuit has recognized a narrowly limited "interference" theory under Title VII: "where an employer has delegated one of its core duties to a third party" (*e.g.*, administration of a retirement plan). *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 377 (2d Cir. 2006) (discussing *Spirt v. Teachers Ins. and Annuity Ass'n*, 691 F.2d 1054 (2d Cir.1982)). Under such circumstances, if delegated a core employer duty, the third party can incur liability under Title VII. *Id.* In *Gulino*, the Court of Appeals explained that "[i]n so holding [in *Spirt*], this Court

reasoned that 'exempting plans not actually administered by an employer would seriously impair the effectiveness of Title VII.'" 460 F.3d at 361 (quoting *Spirt,* 691 F.2d at 1063).

### b.    Plaintiff's Claims

Plaintiff has alleged three separate claims against Stamford Hospital and SAS arising under Title VII:  "a pattern and practice" of discrimination (which this Court construes as a "hostile work environment") with retaliatory adverse actions (Count Two), interference by each employer with the other (Count Fourteen); and discrimination based on her gender (Count Sixteen). The Court must determine whether each states a plausible claim for relief or  would be subject to dismissal.

### 1.    Count Two - Hostile Work Environment under Title VII (Stamford Hospital and SAS)

First, in Count Two, Plaintiff alleges that "Defendant Stamford Hospital engages in a pattern and practice of taking adverse employment actions against female employees who make any complaint against Defendant Coady;" and "Defendant  SAS  participated in the retaliatory adverse employment  actions."   Doc. 59-1,  at 41 (¶ 157).  Moreover, Plaintiff states that "Defendants retaliated against [her] for expressing opposition to discriminatory conduct based on sex" and such "conduct was willful."  Plaintiff concludes that "[a]s a result, the Plaintiff has suffered damages." *Id.* (¶ 159).  Plaintiff further specifies that "Defendants terminated [her] employment in violation of Title VII of the Civil Rights Act of 1964, as [a]mended, 42 U.S.C. § 2000e, *et seq.*"  *Id.* (¶ 160).

With respect to Count Two, a plaintiff may not maintain a claim of "pattern or practice" discrimination as an individual. "Pattern-or-practice disparate treatment claims focus on allegations of widespread acts of intentional discrimination against [multiple] individuals." *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001), *abrogated on other grounds*, *Walmart*

*Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). *See also, e.g. United States v. City of N.Y.*, 717 F.3d 72, 83 (2d Cir. 2013) ("The principal difference between individual and pattern-or-practice discriminatory treatment claims is that, although both require an intent to discriminate, an individual claim requires an intent to discriminate against one person, and a pattern-or-practice claim requires that "[the] discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice," and that the discrimination was directed at a class of victims.") (citations omitted); *Henderson v. City of New York*, 818 F. Supp. 2d 573, 578 (E.D.N.Y. 2011) ("pattern-or-practice" disparate treatment claims "are typically brought as class actions" and "[e]very circuit court to have considered the issue has held that individual plaintiffs cannot bring pattern-or-practice claims.").[20] District courts in this Circuit "have routinely held that 'an individual cannot maintain a private, non-class, pattern-or-practice claim.'" *Cummings v. Bookhaven Sci. Assocs., LLC*, No. 11-CV-1299 (DRH) (ETB), 2011 WL 6371753, at *12 (E.D.N.Y. Dec. 20, 2011) (citing *United States v. City of New York*, 631 F. Supp. 2d 419, 427 (S.D.N.Y. 2009)) (collecting cases).

Nonetheless, at the pleading stage, when determining whether an action states a viable claim, a court may review the factual allegations of the complaint to determine the nature of the claim that is being pled. *See, e.g., Sabilia v. Richmond*, No. 11-739, 2011 WL 7091353, at *26 (S.D.N.Y. Oct. 26, 2011) (holding that even though "plaintiffs did not label these allegations as a breach-of-contract claim [this] is not fatal to their pleading, since we must look to the factual allegations of the

---

[20]    *See also Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) ("Title VII disparate treatment claims are of two types: (1) individual claims, which follow the familiar McDonnell Douglas burden-shifting framework, and (2) pattern-or-practice claims, which focus on allegations of widespread discrimination and generally follow the Teamsters burden-shifting framework.") (citing *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 158 n.3 (2d Cir. 2001)).

complaint as defining the nature of the claim rather [than] depend upon the legal labels affixed to those factual allegations") (citation omitted). *See also, e.g.*, *Simonton v. Runyon*, 232 F.3d 33, 36-37 (2d Cir. 2000) ("[G]enerally a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories and statutory basis supporting the claim.") (citation and internal quotation marks omitted); *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997) ("Under the liberal pleading principles established by Rule 8 of the Federal Rules of Civil Procedure, in ruling on a 12(b)(6) motion the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") (citation and internal quotation marks omitted).

If the Court construes the claim as a Title VII "hostile work environment" claim, the allegations state a prima facie claim. "In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) ( citing *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)).

In Count Two, Plaintiff broadly incorporates by reference the preceding 156 paragraphs containing her statement of facts. However, language in certain of these preceding paragraphs suggests that they pertain specifically to this claim. For example, Plaintiff states in paragraph 70 that she has observed that "[s]ince Defendant Coady's arrival at Stamford Hospital in March of 2010," he, acting as Chief of Cardiac Surgery, has "engage[d] in a pattern and practice of harassment, discrimination, and retaliation against women that is simply outrageous." Doc. 59-1, at 22 (¶ 70).

As examples of this behavior, she alleges that Coady "has made fun of female employees because of their religion, their ethnicity or race and their orthopedic disabilities;" "has mocked a woman who was fighting breast cancer and accused her of shaving her hair off during chemotherapy in order to get attention;" "regularly makes fun of women with Stamford Hospital senior administrative responsibilities[,] joking that all they know is how to 'dress up' and 'go shopping;'" "swears at women in the operating room;" "stated on more than one occasion that he is going to get this woman or that woman 'fired and that they won't even know he was responsible;'" called one woman a "fat Puerto Rican;" "was openly abusive to a pregnant employee," calling her "slow" and "ineffective," and making her stand for hours; and "referred to Plaintiff as a 'fucking cunt'" and "called her a 'fucking bitch' when he didn't approve of changes in the anesthesia on-call schedule." *Id.,* at 26 (¶ 88). Plaintiff also alleges that Stamford Hospital was aware of Defendant Coady's discriminatory practices and was, in fact, "in a lawsuit with a 'Julia Mumm,'" who had "complained to Stamford Hospital HR regarding Dr. Coady's outrageous conduct," such as "referr[ing] to Plaintiff and other women as 'cunts.'" *Id.*, at 27 (¶¶ 91-93). "Nonetheless, Stamford Hospital HR protected Defendant Coady and swept Plaintiff's complaint [as well as those of others, such as Mumm], under the rug."[21] *Id.*, at 27 (¶¶ 93). Reading these allegations in the light most favorable to Plaintiff, they support her claims that Coady created a hostile work environment toward women, including Plaintiff, and Stamford Hospital was aware of the situation but did nothing to prevent Coady's behavior.

The United States Supreme Court has articulated that under Title VII, "[t]he phrase 'terms,

---

[21] *See also* Doc. 59-1, at 34 (¶ 129) ("Defendant Mancino[, Director of Human Resources for Stamford Hospital,] repeatedly defended Defendant Coady's bad language and behavior directed to women by suggesting that it was acceptable due to the 'stressful' nature of the job."); *id.*, at 35 (¶ 133) (Mancino "defended Defendant Coady and acted as if his behavior should be excused.").

conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)) (some internal quotation marks omitted).  "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' [*Meritor*,] 477 U.S. at 65, that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 67) (lateral citation omitted).

In the case at bar, when viewed most favorably to Plaintiff, Coady's alleged conduct went beyond merely offensive, and instead affected the conditions of employment for female employees, implicating Title VII.  That alleged  conduct was sufficient to create an environment that a reasonable person would perceive as "hostile" or "abusive" to employees based on their gender, offending Title VII's broad rule of workplace equality.  Defendant Mancino was informed of such conduct by Plaintiff and he allegedly dismissed and excused it.  Doc. 59-1, at 34  (¶¶ 128-30).  In addition, "Plaintiff reported to Defendant Bowling [of SAS]  Plaintiff's concerns regarding Defendant Coady's language and treatment of Plaintiff and other  female  employees." *Id.*, at 23 (¶ 71).  No action was taken.  At the pleading stage, the Court finds that such a hostile work environment claim against Stamford Hospital and SAS states a plausible claim.

### 2.    Count Two - Retaliation (Stamford Hospital and SAS)

In Count Two, regarding retaliation for speaking out against sex discrimination, Plaintiff alleges that she met with Stamford Hospital's HR representative, Evena Williams, on March 7, 2014, to express her concerns that Coady had directed a false statement about her regarding cell phone use

in the operation room and also to express "concerns regarding Defendant Coady's inappropriate behavior with women in general." *Id.*, at 27 (¶ 90). Following a much-delayed, allegedly cursory investigation into Coady's false statement, in May of 2014 Williams sent a letter to Plaintiff, concluding that there was "insufficient proof " that Defendant Coady had falsely accused Plaintiff of cell phone misuse in the operating room.[22] *Id.*, at 19 (¶ 103). According to Plaintiff, "Stamford Hospital protected Defendant Coady and refused to acknowledge that he had directed a false accusation to Plaintiff and once again subjected a female employee to harassment." *Id.* (¶ 104).

In April of 2014, Plaintiff alleges that she "was subjected to ongoing harassment from Dr. Bowling in the form of text messages, emails, and phone calls during which she demanded Plaintiff sign the document [to relinquish her Medical Staff privileges should she ever be terminated by SAS] and stated that the directive for Plaintiff's signature originated from Defendant Kiely, Chief Medical Officer at Stamford Hospital." *Id.*, at 30 (¶107-08). Thereafter, Bowling removed Plaintiff as the call schedule coordinator and "chastised Plaintiff for not responding to an email during the day when Defendant Bowling knew Plaintiff was in the operating room the entire work day." *Id.*, at 31 (¶ 112).

On August 26, 2014, Plaintiff allegedly endured a "demotion" when she was informed by Bowling that she was reassigned to the Catheterization Lab because Coady, about whom Plaintiff had complained, "wanted Dr. Margo Denham to do his case" of cardiac surgery. *Id.*, at 34 ( ¶ 126).

Finally, on or about September 5, 2014, Plaintiff met with Sal Mancino of Stamford Hospital's HR Department. *Id.*, at 34 (¶ 128). "In the discussions regarding Dr. Coady's general inappropriate behavior directed to women, Defendant Mancino repeatedly defended Defendant

---

[22] Plaintiff alleges that Coady falsely accused her of "routinely using her phone during surgical procedures and not being properly engaged." Doc. 59-1, at 22 (¶ 66).

Coady's bad language and behavior directed to women by suggesting that it was acceptable due to the 'stressful' nature of the job." *Id.* (¶ 129). Mancino also "defended Coady in every respect and made every attempt to dismiss Plaintiff's concerns and put Defendant Coady in the best light possible." *Id.* (¶ 130).

Finally, on October 7, 2014, Plaintiff was terminated in a meeting with both employers. The meeting included Bowling (of SAS), Kiely (of Stamford Hospital), and Prior (VantagePoint).

In Count Two, the form of retaliation to which Plaintiff refers is termination of her employment by Stamford Hospital and SAS. *Id.*, at 41 (¶ 160). The Second Circuit has noted that, for purposes of Title VII, an adverse employment action generally includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citation and internal quotation marks omitted). In the instant case, Plaintiff alleges that "Defendants retaliated against [her] for expressing opposition to discriminatory conduct based on sex" and such "conduct was willful." Doc. 59-1, at 41 (¶ 157). She thereafter states that "Defendants terminated [her] employment in violation of Title VII." *Id.* (¶ 160).

Plaintiff's allegations regarding this claim include, *inter alia*, Coady's pervasive sex-based comments and discrimination, SAS's failure to properly investigate Coady's misconduct after being informed by Plaintiff and others of this problem, and Stamford Hospital's HR representative Mancino's support of Coady despite misconduct. As to SAS, Plaintiff alleges during this period when she was reporting Coady's misconduct to Williams, Bowling, and finally Mancino, Bowling required her to agree to relinquish her Medical Staff privileges should she be terminated by SAS,

removed her as the call schedule coordinator, and chastised her for not responding to email when she was clearly working in the operating room that day. Such alleged retaliatory acts occurred following various complaints she made to SAS and Stamford Hospital regarding Coady's sexually discriminatory conduct.

Plaintiff's allegations suggest that on October 7, 2014, approximately one month after she was demoted to the Catheterization Lab by Bowling, at Coady's request (August 26, 2014), and one month after she met with Mancino (September 5, 2014), Plaintiff was terminated in a meeting with Bowling (of SAS), Kiely (of Stamford Hospital), and Prior (VantagePoint). At that meeting, Plaintiff was allegedly advised that "the reason for Plaintiff's termination [was] that she did not have sufficient experience in obstetrical, pediatric, and regional anesthesia anesthesiology in order to continue with her employment." Doc. 59-1, at 37 (¶ 144). Plaintiff alleges, however, that such a reason was a pretext because she was "more than qualified to care for any patient undergoing any procedure that would be scheduled at Stamford Hospital." *Id.* (¶ 146). She also points to the deficiencies of inexperienced or potentially incompetent anesthesiologists who were then employed by Stamford Hospital. *Id.* (¶¶ 149-51).

The main fact that Plaintiff presents to prove that her termination was in retaliation for opposing sex discrimination is temporal proximity: (1) the timing of the termination meeting, following months of repeated reports she made to Williams, Bowling, and finally Mancino regarding Coady's inappropriate conduct toward women and (2) one month after her meeting with Mancino, Director of Stamford Hospital's Human Resources, in which he dismissed her complaints about

Coady's discriminatory conduct.[23]

The Second Circuit has articulated that "a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir.2001) (internal quotation marks and alterations omitted). "Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 111 (2d Cir. 2010) (citing *Gorman-Bakos*, 252 F.3d at 555). Accordingly, Plaintiff may establish a prima facie case of retaliation for complaining of sex discrimination with a temporal relationship of a few months. *See, e.g., Gorzynski*, 596 F.3d at 111 (At the pleading stage, to state a prima facie case, a complaint lodged within "two months of [plaintiff's] firing," is sufficient to allege a causal connection between the complaint about discrimination and termination). Interpreting the facts in the light most favorable to Plaintiff, Count Two states a factually plausible claim.

---

[23] For example, Plaintiff alleges that on March 7, 2014, she copied Bowling on an email she wrote to Coady, stating "I have watched you for years, discriminate against women and harass them, and engage in inappropriate conduct directed to them. I have somehow become the next victim in a long line of women you have hurt." Doc. 59-1, at 23 (¶ 72).

Also, on March 7, 2014, Plaintiff "expressed her concerns regarding Defendant Coady's inappropriate behavior with women in general." *Id.*, at 27 (¶ 90). Three days later, Bowling allegedly threatened Plaintiff that if she would not participate in the Physicians Wellness Services Program, her employment would be terminated. *Id.*, at 24 (¶ 75). For weeks following, "Plaintiff was repeatedly harassed by Defendant Bowling" about participating in that program. On August 24, 2014, Plaintiff was demoted by Bowling to the Catheterization Lab (at Coady's request). *Id.*, at 34 (¶ 126).

### 3.    Count Fourteen - Interference under Title VII (Stamford Hospital and SAS)

In Count Fourteen, Plaintiff alleges that Defendants Stamford Hospital and SAS interfered with her "relationship and opportunities with the other" in violation of Title VII. *Id.* at 48 (¶ 157). This Count fails to state a plausible claim because Plaintiff has alleged that Defendants Stamford Hospital and SAS were both her employers at all relevant times. *Id.*, at 9 (¶ 20). Therefore, neither is technically a third party who interfered with her Title VII rights. Rather, each is an employer covered directly under Title VII.

As set forth *supra*, the Second Circuit has recognized a carefully limited "interference" theory under Title VII: "where an employer has delegated one of its core duties to a third party" (*e.g.*, administration of a retirement plan). *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 377 (2d Cir. 2006) (discussing *Spirt v. Teachers Ins. and Annuity Ass'n*, 691 F.2d 1054 (2d Cir.1982)). Here, an employer has not delegated a core duty to a third party. Rather, two employers have each hired Plaintiff and allegedly engaged in sex discrimination in direct violation of Title VII. Consequently, a Title VII interference claim is not appropriate in this case.

Furthermore, even if one of the two named employers in the action were actually a third party for purposes of "interference," Plaintiff has failed to specify what specific actions constituted "interference" and/or the core employer tasks that, for example, Stamford Hospital designated to SAS (or vice versa), thereby making SAS subject to liability for interference. Plaintiff just incorporates by reference the same 156 paragraphs upon which she relies to support all Counts. Therefore, and in any event, this Count has not been pled with sufficient specificity to survive a motion to dismiss.

4.    **Count Sixteen - Discrimination under Title VII (Stamford Hospital and SAS)**

In Count Sixteen, Plaintiff fails to specify the form of discrimination and the  adverse employment action taken against her by defendants, merely stating that "Stamford Hospital and SAS discriminated against Plaintiff due to her sex in violation of Title VII" and due to this "conduct, Plaintiff has and continues to suffer damages." *Id.,* at 49 (¶ 157-58).  Such a broad allegation of discrimination is simply too vague and conclusory, lacking in factual support, to state a plausible claim.[24]  For the reasons set forth in Part II.C.3.b., *supra*, general allegations incorporated by reference will not suffice.  As drafted, Count Sixteen  is futile.

In sum, Plaintiff's Title VII claim in Count Two against Stamford Hospital and SAS, alleging facts to support the existence of a hostile work environment based on sex and retaliatory discharge, may be pled in an amended complaint.  However, Count Fourteen, alleging interference between the two employers, fails to state a claim against a third party for interfering with Plaintiff's rights vis-à-vis her employer under Title VII.  Count Fourteen is futile –  factually deficient to plead a plausible Title VII discrimination claim under *Iqbal*.  Moreover, Count Sixteen may not proceed because it fails to plead sufficient factual matter to establish sex-based discrimination by Defendants Stamford Hospital and SAS with respect to any particular conduct. This Count may also be duplicative of Count Two.

5.    **Count Seven - Violation of FMLA**

a.    **Standard of Law**

The Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*.,  provides

---

[24] Such a claim may also be viewed as redundant of the claims set forth in Count Two.

employees with distinct rights to take leave under certain medical circumstances.  First, it "generally requires covered employers to grant employees who have worked for twelve months (or 1250 hours in twelve months) up to twelve weeks'  leave during any twelve month period for, *inter alia*, a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000) (quoting 29 U.S.C. § 2612(a)(1)(D)). The FMLA also allows an eligible employee to take "a total of 12 workweeks of leave during  any 12-month period  . . . [i]n order to care for . . . a son [or] daughter . . . of the employee, if such . . . son [or] daughter . . . has a serious health condition . . . ."[25] 29 U.S.C. § 2612(a)(1)(C).  Second, the FMLA "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking of leave pursuant to the FMLA." *Hale*, 219  F.3d at 68 (citing 29 U.S.C. § 2614(a)(1)).

"To prove interference with either of these rights, a plaintiff must establish five elements: (1) that [he] is an eligible employee under the FMLA; (2) that defendant is an employer as defined in the FMLA; (3) that [he] was entitled to leave under the FMLA; (4) that [he] gave notice to the defendant of [his] intention to take leave and (5) that [he] was denied benefits to which [he] was entitled under FMLA." *Robertson v. Amtrak/Nat'l R.R. Passenger Corp*., 400 F. Supp. 2d 612, 626 (S.D.N.Y. 2005) (quoting *Geromanos v. Columbia Univ.*,322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004)).

Alternatively, if one brings a retaliation claim, alleging that an employer has retaliated for an employee's  exercise of FMLA rights, the Second Circuit employs the *McDonnell Douglas*

---

[25]    Under the FMLA, the term "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care" in a medical facility or "continuing treatment by a health care provider."  29 U.S.C. § 2611 (11)(A)-(B).

burden-shifting analysis.[26]  *See Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004) *(per curiam)* ("it would be appropriate to apply the *McDonnell Douglas* analysis to claims of retaliation – where the employer's intent is material – but not to assertions of interference – where the question is simply whether the employer in some manner impeded the employee's exercise of his or her right") (citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)).

Specifically, to plead an FMLA retaliation claim, one must establish: "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168.  *See also Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (applying FMLA retaliation elements set forth in *Potenza*).[27]

b.    **Plaintiff's Claim**

In Count Seven of her proposed Amended Complaint, Plaintiff sets forth a claim against Defendant Stamford Hospital for retaliation with respect to her rights under the FMLA.  In that claim, she alleges that Stamford Hospital "retaliated against [her] for taking a medical leave of one day due to her daughter's medical condition" and  such  "conduct  was willful."  Doc. 59-1, at  44

---

[26]  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[27]  If the plaintiff successfully meets the initial burden of alleging the four elements, the burden shifts back to the employer to state a legitimate non-discriminatory reason for its action. Then, if the defendant is able to provide such a reason, the burden returns to the plaintiff to prove that the defendant's articulated reason for its action is "pretextual" so that the only real reason was retaliation for plaintiff's exercise of rights protected under the FMLA. *See, e.g., Stevens v. Coach U.S.A.*, 386 F. Supp. 2d 55, 61 (D. Conn. 2005); *Kuo v. Computer Assocs. Int'l, Inc.*, No. 05-CV-3295 (DRH) (JO), 2007 WL 2874845, at *5 (E.D.N.Y. Sept. 27, 2007).

(¶ 15).  She concludes that this alleged "conduct constitutes a violation" of the FMLA.  *Id.*

Also, in this FMLA Count,  Plaintiff "incorporates by reference" the 156 paragraphs contained in the "Introduction," "Jurisdiction," and "Statement of Claims" sections preceding her actual claims.  *Id.,*  at 44 (¶¶ 1-156).  Although general allegations do not suffice, Plaintiff's allegations in two particular portions of her complaint, entitled "Plaintiff's FMLA Leave" and "Retaliation for Taking a Day Off,"  clearly address this FMLA claim.  *Id.*, at 31-34 (¶¶ 114-27). The Court will therefore review these paragraphs in reference to this claim.

With respect to "FMLA Leave," Plaintiff alleges that she worked on Monday, August 18, 2014.  Doc. 59-1, at 31 (¶ 115).  "In order to be with her daughter while she was ill and because of her own emotional and physical exhaustion, Plaintiff took a day off on Tuesday, August 19, 2014," which she asserts was "the first sick day [she] had taken during her entire tenure [of eight years] with Stamford Hospital."  *Id.*   In particular, at 5 a.m. on August 19, 2014, Plaintiff phoned the hospital and spoke to her co-worker, anesthesiologist Richard Margolis, and "advised him that she was not well enough to come to work."  *Id.*,  at 32  (¶¶ 116).  Plaintiff alleged that Dr. Margolis told her that Dr. Amy Crane, another anesthesiologist, would cover for her, which she did.  *Id.*  Moreover, Plaintiff  alleges that she returned to work the following day, Wednesday, August 20, 2014.   *Id.* (¶ 118).  Plaintiff's  total absence was one shift and was, in her words, because "she was not well enough to come to work." *Id.* (¶ 111.)

The Court finds that Plaintiff has failed to plead a plausible claim for retaliation in violation of the FMLA.  First, Plaintiff failed to allege that Stamford Hospital was an "employer" under the FMLA – "engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the

current or preceding calendar year."[28]  29 U.S.C. § 2611 (4)(A).

Second, Plaintiff has failed to allege facts to show that  she fulfilled the notice requirement under the FMLA – to provide her employer, Stamford Hospital,  with proper notice of her need for FMLA leave.  In its 2009 regulations, the United States Department of Labor addressed the required content of such notice. *See* 29  C.F.R. § 825.303 ("Employee notice requirements for unforeseeable FMLA leave").  Under those regulations, if the need for the leave was unforeseeable – such as a sudden illness of a family member, "An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  29 C.F.R. § 825.303 (b) ("Content of notice").  Moreover, "if the leave is for a family member," the notice must state "that the condition renders the family member unable to perform daily activities."  If this is a first-time request for FMLA leave, the employee need not "mention the FMLA;" however, "calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act."  *Id.*

In the case at bar, Plaintiff alleges that she essentially called in sick for one day by calling Dr. Margolis.   She informed him that "she was not well enough to come to work."  Doc. 59-1,  at 32 (¶ 116).   There was no indication that she mentioned a need for FMLA leave,  specified a leave

---

[28]  Apart from this requirement regarding number of employees and hours worked, it seems likely that Stamford Hospital was an "employer" under the FMLA requirement that the employee taking the leave was employed "for at least 12 months" and provided "at least 1,250 hours of service . . . during the previous 12-month period."  29 U.S.C. § 2611 (2)(A).  After all, Plaintiff was employed by Stamford Hospital for eight years and worked full time as Director of Cardiac Anesthesiology.  Doc. 59-1, at 11-12 (¶¶ 27-28).  "From September 1, 2009 until September, 2014, Plaintiff covered the vast majority of cardiac surgical cases, cardiac catheterization lab (CL) procedures, and electrophysiology cases" and " also covered more than 80% of nighttime and weekend on-call cardiac OR responsibilities for Stamford Hospital."  *Id.*, at 10 (¶ 24).

period, or that she gave sufficient factual information about her daughter's illness for an employer to infer that "the FMLA may apply to th[is] leave request." *Id.*  She thus never gave Stamford Hospital notice that this day off, or the facts precipitating it, suggested a need for FMLA leave. Plaintiff herself refers to this time off as a "sick day" in her proposed Amended Complaint. *Id.*, at 31 (¶ 115).

Simply calling in sick does not trigger the FMLA's protection.  An employee must give the employer sufficient notice of the need for FMLA leave.  *See, e.g., Basso v. Potter*, 596 F. Supp. 2d 324, 338 (D. Conn. 2009) ("[T]he FMLA does not require an employer to be clairvoyant.") (internal citations and quotations omitted). *See also Festerman v. Cnty. of Wayne*, 611 F. App'x 310, 315 (6th Cir. 2015) ("merely 'calling in sick' is insufficient to trigger any obligation of the employer under the FMLA"); *Brown v. Kansas City Freightliner Sales, Inc.*, 617 F.3d 995, 997-98 (8th Cir. 2010) (plaintiff's calling in sick and stating that she would not be reporting to work did not trigger employer's obligations under the FMLA), *cert. den.*, 562 U.S. 1217 (2011) ; *de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008) ("Calling in sick without providing additional information does not provide sufficient notice under the FMLA").  Plaintiff's statement that "she was not well enough to come to work" is "calling in sick." That communication was insufficient to differentiate the absence from an ordinary sick day so did not trigger Stamford Hospital's obligations under the FMLA.

Third, regarding notice, Plaintiff's allegations do not suggest that she conveyed her request for a sick day to a supervisory or administrative official at Stamford Hospital.  Instead, she phoned a fellow anesthesiologist, Dr. Margolis, who called another anesthesiologist, Dr. Crane. Doc. 59-1, at 32 (¶ 116).  In light of Plaintiff's position as "Director of Cardiac Anesthesiology," *id.*, at 9

(¶¶ 16-17), it is likely that these anesthesiologists were her subordinates.    Thus, even if her request for a sick day had indicated a need for FMLA leave, that request was not officially conveyed to create notice to Stamford Hospital.

Fourth, even if Plaintiff had otherwise pled a proper case for FMLA retaliation, she failed to allege facts to suggest that either her condition or the illness of her daughter fulfilled the requirements for a "serious health condition" under the FMLA.    Under the FMLA, the term "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care" in a medical facility or "continuing treatment by a health care provider." 29 U.S.C. § 2611 (11)(A)-(B).    *See also* 29 C.F.R. § 825.113.    Plaintiff has not alleged that she herself required "inpatient treatment" or "continuing treatment by a health provider."    With respect to her daughter, Plaintiff alleges that she "was emergently admitted to Stamford Hospital on Saturday evening, August 16, 2014, for stabilization and diagnostic test performance."    Doc. 59-1, at 31 (¶ 114).    Plaintiff does not, however,  explain whether her daughter had returned home and/or had received a diagnosis of a serious illness by August 19, 2014, the date of  Plaintiff's "sick day."[29] Such facts are insufficient to allege that the sick day Plaintiff required was due to a "serious health condition" under the FMLA.

Plaintiff simply alleges that she called in sick because she wanted "to be with her daughter while she was ill and because of her own emotional and physical exhaustion."    Doc. 59-1, at   31 (¶ 115).    "[B]ecause FMLA leave applies only to a 'serious health condition' or 'chronic serious

---

[29]  In her Amended Complaint, Plaintiff alleges that on August 14, 2014, her daughter "began to experience neurological symptoms including what appeared to be seizure activity."  Doc. 59-1, at 31 (¶ 114).  Plaintiff never, however, provided a diagnosis, length of illness, or history of medical care to support a claim under the FMLA.

health condition' as defined under 29 C.F.R.  § 825.114, an employee's reference to being sick 'does not suggest to the employer that the medical condition  might be serious or that the FMLA otherwise could be applicable.'" *Basso*, 596 F. Supp. 2d at 338-39 (quoting *Phillips v. Quebecor World Rai Inc.,* 450 F.3d 308, 312 (7th Cir. 2006)).

Because Plaintiff's allegations fail to show that she exercised rights protected under the FMLA, she has failed to plead a plausible retaliation claim under the FMLA. The Court thus concludes that Plaintiff's Count Seven for violation of the FMLA is insufficiently pled in its present form.  It is futile.

## III.  **CONCLUSION**

For the foregoing reasons, pursuant to Rule 15(a)(2), Fed. R. Civ. P., Plaintiff's Second Motion to Amend Complaint [Doc. 59] is GRANTED IN PART and DENIED IN PART.  Plaintiff may file her proposed  "Amended Complaint," consistent with the terms of this Ruling, as to the following Counts:

- **Count One -** CFEPA claim (Conn. Gen. Stat. § 31-51q)  alleging that Defendants Stamford Hospital and SAS subjected her to discipline and discharge due to speech regarding safety concerns;

- **Count Two -** Title VII claim (42 U.S.C. § 2000e, *et seq.)*  against Stamford Hospital and SAS, alleging facts to support a claim for (1) a "hostile  work environment" and (2) retaliation for Plaintiff speaking out against sex discrimination;

- **Counts Three and Five -** ADA claims (42 U.S.C. § 12101) against Stamford Hospital and SAS, alleging discrimination and retaliation due to Plaintiff's two "disabilities" (*i.e.,* severe mid-foot arthritis and partial permanent deafness, which limit "major life activities" of

walking, standing, and hearing, respectively), and speech in opposition to discrimination based on her disabilities, under the ADA;

- **<u>Counts Four and Six</u>** - CFEPA claim (Conn. Gen. Stat. § 46a-60, *et seq.*) against Stamford Hospital and SAS for disability discrimination and retaliation due to Plaintiff's expressed opposition to disability and sex discrimination;[30] and

- **<u>Count Fourteen</u>** - ADA claim (42 U.S.C. § 12101) alleging interference by Stamford Hospital and SAS with Plaintiff's relationship and opportunities with each of her two employers due to discriminatory and retaliatory motives.

Plaintiff may **not**, however, include the following Counts (as drafted), in her "Amended Complaint," which were insufficiently pled and/or failed to state a claim:

- **<u>Count Seven</u>** - FMLA claim (29 U.S.C. § 2617 et seq.) against Stamford Hospital for allegedly retaliating against Plaintiff for taking a medical leave of one day due to her daughter's medical condition;

- **<u>Counts Eight to Thirteen</u>** - CFEPA claims (Conn. Gen. Stat. § 46a-60(a)(a)) against VantagePoint, Coady, Kiely, Mancino, Bowling, Stamford Hospital, and SAS, respectively, alleging that each "aided, abetted, incited, compelled and coerced the discriminatory and retaliatory conduct [of the other defendants] based on Plaintiff's disabilities and sex in

---

[30]  In addition to Plaintiff's severe mid-foot arthritis and permanent partial hearing loss, Plaintiff's CFEPA counts may also include the third disability she alleged, an elevated radiation level, which requires her to wear a lead gown and thyroid shield and to sit behind the clear lead mobile screen in the cardiac catheterization lab procedure suite. Doc. 59-1, at 20 (¶ 60). An elevated radiation level is an impairment to one's physical health.

violation of the CFEPA;"[31]

- **Count Fourteen** - CFEPA claim (Conn. Gen. Stat. § 46a-60, *et seq.*) alleging interference by Stamford Hospital and SAS with her relationship and opportunities under CFEPA (each with the other); and Title VII claim (42 U.S.C. § 2000e, *et seq.*), alleging interference between Stamford Hospital and SAS for interfering with Plaintiff's rights vis-à-vis each other under Title VII;

- **Count Fifteen** - CFEPA claim (Conn. Gen. Stat. § 46a-60, *et seq.*) alleging sex discrimination by Stamford Hospital and SAS; and

- **Count Sixteen** - Title VII claim (42 U.S.C. § 2000e, *et seq.*) against Stamford Hospital and SAS alleging sex discrimination.

Accordingly, the Plaintiff must file and serve her Amended Complaint, in compliance with the instructions set forth in this Ruling, on or before Friday, **April 28, 2017**. Upon service and filing of the Amended Complaint, that pleading will become the operative complaint in this action and will alter and/or omit certain pending claims. The Court, therefore, DENIES, WITHOUT PREJUDICE TO REINSTATEMENT, Defendants' Motions to Dismiss [Doc. 25 and 26], which addressed the prior Complaint, as well as the parties' discovery motions [Doc. 66, 92, 98, 99, 106, 122, 128, 131, 134, 135, and 137].[32] The parties are directed to reassess the need for all of these motions in light of the Amended Complaint. To the extent that they wish to reinstate any of the

---

[31] In Count Eight, Plaintiff also includes an allegation against VantagePoint regarding retaliation "for voicing her concerns of discrimination in violation of the CFEPA." Doc. 59-1, at 44 (¶ 157).

[32] Discovery issues are inextricably linked to the nature of the pending claims; and the Amended Complaint will not contain the claims in the original complaint that failed to state plausible claims.

discovery motions, each party is directed to file an omnibus motion, containing all outstanding discovery concerns and/or issues to be decided by the Court. The Court will then schedule a hearing on all discovery matters in this case.[33]

In addition, on or before Friday, **May 12, 2017**, the parties are directed to file a joint amended Rule 26(f) Report, reflecting the state of present discovery and proposing any revised case deadlines they believe are necessary in light of this Ruling.

Lastly, because Plaintiff's proposed claims against defendants **VantagePoint, LLC, Michael Coady, Sharon Kiely, Sal Mancino,** and **Theresa Bowling** fail to state plausible claims, these defendants will be effectively dismissed from the action upon the filing of the Amended Complaint, which will not include these claims. The Clerk is directed to terminate these defendants as parties upon Plaintiff's filing of the Amended Complaint.

The foregoing is SO ORDERED.

Dated: New Haven, Connecticut
          April 5, 2017

                              */s/Charles S. Haight, Jr.*
                              CHARLES S. HAIGHT, JR.
                              Senior United States District Judge

---

[33]  The parties' "Joint Motion for Status Conference, or in the Alternative, A Referral of Pending Discovery Motions to Magistrate Judge" [Doc. 136] is DENIED as moot in light of the Court's Ruling herein. However, once the parties determine which, if any, discovery disputes remain with respect to the Amended Complaint, the Court will, as stated herein, hold a hearing to resolve the issues contained in their omnibus discovery motions or refer them to a Magistrate Judge.