# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SAMANTHA JANSSON,

          Plaintiff,

  v.

STAMFORD HEALTH, INC. d/b/a
STAMFORD HOSPITAL, STAMFORD
HOSPITAL, STAMFORD
ANESTHESIOLOGY SERVICES, P.C.,
VANTAGEPOINT LLC d/b/a
VANTAGEPOINT HEALTHCARE
ADVISORS, MICHAEL COADY, SHARON
KIELY, SAL MANCINO and THERESA
BOWLING,

          Defendants.

Civil Action No.
No. 3:16-cv-260 (CSH)

**MAY 7, 2018**

## RULING ON PLAINTIFF'S MOTION TO COMPEL AND REQUEST FOR IN CAMERA INSPECTION [DOC. 190]

**HAIGHT, Senior District Judge:**

Plaintiff Samantha Jansson, M.D., an anesthesiologist, commenced this civil rights action against a number of defendants, including Stamford Health, Inc. d/b/a Stamford Hospital ("Stamford Hospital") and Stamford Anesthesiology Services, P.C. ("SAS"). The litigation was generated by a notice of termination of employment SAS gave to Jansson in October 2014. The Court has had occasion to file a number of prior rulings in the case. Familiarity with them is assumed.

The case is now before the Court on a dispute involving pretrial discovery. Plaintiff has filed a motion [Doc. 190] to compel Stamford Hospital to produce a number of documents. Stamford Hospital resists production on the ground that these documents are protected by a privilege, of one

1

kind or another. In compliance with the local rules of practice, Stamford Hospital filed a privilege log purporting to explain and justify those claims of privilege. Plaintiff contends that the documents in question are not privileged as a matter of law, or their privileged status has not been satisfactorily demonstrated by Stamford Hospital, whose burden it is to do so.

This Ruling resolves the motion.

# I

There are two institutional Defendants in this action: Stamford Hospital (sometimes referred to as "Stamford Health"), and Stamford Anesthesiology Services, P.C. ("SAS"). These Defendants resist discovery of certain documents requested by Plaintiff Dr. Jansson. Defendants contend they are immunized from production by the attorney-client privilege, or by the attorney work product privilege.

The designation of the second principle has evolved over time. Fed. R. Civ. P. 26(b)(3) is captioned "Trial Preparation: Materials" and provides: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party . . . ." Rule 26(b)(5)(A), which was added in the 1993 Amendments to the Rule, mandates certain procedural steps whenever a party withholds information from discovery "by claiming that the information is privileged or subject to protection as trial-preparation material," thereby seeming to distinguish between "privileged" and "protected" information.

The Advisory Committee's Notes to the 1993 Amendments echo that distinction: "A party must notify other parties if it is withholding materials otherwise subject to disclosure under the rule or pursuant to a discovery request because it is asserting a claim of privilege or work product

protection."  The Notes substitute the synonymous phrase "work product" for the Rule's phrase "trial-preparation."  Moore's text discusses the "attorney-client privilege" as a creation of federal common law, and then turns to the "work product doctrine."  6 *Moore's Federal Practice* §§ 26.49, 26.70 (Matthew Bender 3d ed. 2009).

Notwithstanding these differences in phrasing, the Second Circuit has taken to referring to the "trial material" or "work product" concept as "the work product privilege."  *See, e.g., United States v. Constr. Prod. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996) (In addition to the attorney-client privilege, "Respondents also assert a work-product privilege."); *A. Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 146 (2d Cir. 1994) ("The attorney work product privilege protects" certain files).  In the discussion that follows, I will adopt the Second Circuit's parlance and characterize each concept, attorney-client and work product, as a *privilege*.

## II

The principles which guide the application of these privileges are well settled.  The leading treatise says:

> Discovery is not permitted as to privileged matters.  The reference in the discovery rules to privilege is to evidentiary privilege. . . .  Privilege, unlike relevance, is narrowly construed.  The burden of establishing that a privilege exists is on the party claiming the privilege.

 6 *Moore*, § 26.47[1][a].

Someone who claims an evidentiary privilege is in effect saying to the world: "I possess evidence about what is true in this case and who is right;  but this privilege gives me an exemption from having to testify about it."  The law allows certain privileges of that nature, but does not favor

them: hence the narrow construction noted by Professor Moore. In *United States v. Bryan*, 339 U.S. 323 (1950), Chief Justice Vinson cited iconic authority for that proposition:

> Certain exemptions from attending or, having attended, giving testimony are recognized by all courts. But every such exemption is grounded in a substantial individual interest which has been found, through centuries of experience, to outweigh the public interest in the search for truth. Dean Wigmore stated the proposition thus: "For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule."

339 U.S. at 331 (quoting Wigmore, *Evidence* § 2192)(3d ed.).

In *Branzburg v. Hayes*, 408 U.S. 665 (1972), where the Court refused to create a First Amendment testimonial privilege for newsmen subpoenaed before grand juries, a footnote in Justice White's majority opinion quotes the same passage from Wigmore:

> The creation of new testimonial privileges has been met with disfavor by commentators since such privileges obstruct the search for truth. Wigmore condemns such privileges as "so many derogations from a positive general rule (that everyone is obligated to testify when properly summoned)" and as "obstacle(s) to the administration of justice." 8 J. Wigmore, *Evidence* § 2192 (McNaughton rev. 1961). His criticism that "all privileges of exemption from this duty are exceptional, and are therefore to be discountenanced," *id.*, at § 2192, p. 73 (emphasis in original) has been frequently echoed.

408 U.S. at 690 n.29 (citing treatises and cases).

In *McMann v. Securities and Exchange Commission*, 87 F.2d 377 (2d Cir. 1937), which rejected an investor's effort to protect as privileged his broker's records subpoenaed by the SEC, Judge Learned Hand also cited Wigmore:

> [T]he duty to disclose in a court all pertinent information within one's control, testimonially or by the production of documents, is usually paramount over any private interest which may be affected. Wigmore, Secs. 2192, 2193. There are of course the traditional privileges touching communications made in certain confidential relations; but a broker's customer is not a client, a penitent, a patient or a spouse. Therefore, although we assume, as we do, that the conduct of investigations under these statutes is subject to the same testimonial privileges as judicial proceedings, it will not serve McMann; he must erect a new privilege ad hoc. The suppression of truth is a grievous necessity at best, more especially when as here the inquiry concerns the public interest; it can be justified at all only when the opposed private interest is supreme.

87 F.2d at 378.

Judge Friendly's opinion in *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), which involved a grand jury subpoena upon an accountant employed by attorneys, referred to the Wigmore proposition as one of two opposing principles, whose proper resolution in a given case requires careful factual analysis. Judge Friendly said:

> Decision under what circumstances, if any, the attorney-client privilege may include a communication to a nonlawyer by the lawyer's client is the resultant of two conflicting forces. One is the general teaching that "The investigation of truth and the enforcement of testimonial duty demand the restriction, not the expansion, of these privileges," 8 Wigmore, *Evidence* (McNaughton Rev. 1961), § 2192, p. 73. The other is the more particular lesson "That as, by reason of the complexity and difficulty of our law, litigation can only be properly conducted by professional men, it is absolutely necessary that a man should have recourse to the assistance of professional lawyers, and it is equally necessary that he should be able to place unrestricted and unbounded confidence in the professional agent, and that the communications he so makes to him should be kept secret." Jessel, M.R. in *Anderson v. Bank*, 2 Ch.D. 644, 649 (1876).

296 F.2d at 920-21 (ellipsis omitted).

In *Kovel,* the Second Circuit remanded the case to the district court for an evidentiary hearing

to ascertain the particular circumstances resulting in the communications in question. Judge Friendly's instruction in that respect may be regarded as stating the law of the Circuit: "What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer." *Id*. at 922.

### III

The requisite elements of the two privileges Defendants invoke in the case at bar are summarized in *United States v. Construction Products Research, Inc.*, 73 F.3d 464 (1996):

> To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice.
>
> Respondents also assert a work-product privilege. To invoke this privilege, a party generally must show that the documents were prepared principally or exclusively to assist in anticipated or ongoing litigation.

*Id*. at 473 (citations omitted).

Second Circuit cases place upon Defendants, who invoke these privileges, the burden, which is demanding, of showing they are entitled to do so. *See, e.g., von Bulow by Auersperg v. von Bulow*, 811 F.2d 136 (2d Cir. 1987):

> The law is clear in this circuit that a person claiming the attorney-client privilege has the burden of establishing all the essential elements thereof. That burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed.

*Id.* at 146 (citations and internal quotation marks omitted).

Explicit instructions exist with respect to the manner in which a claimant must establish the

right to invoke one of these evidentiary privileges. The sources of those instructions are Fed. R. Civ. P. 26(b), Local Civil Rule 26(e) of this Court, and Second Circuit opinions dealing with one or another aspect of the process.

Fed. R. Civ. P. 26(b)(5) prescribes the procedure for "claiming privilege or protecting trial-preparation materials" (or, in Second Circuit parlance, claiming either or both "privileges"). With respect to "Information Withheld," which is the subject matter of the present motions, Rule 26(b)(5) provides that when a party withholds discoverable information by claiming it is privileged or protected, "the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Thus the Rule states in mandatory terms a party's obligation to give prompt, specific and detailed notice of a claim of privilege.

The Advisory Committee's Notes to the 1993 Amendment identify paragraph (5) of Rule 26(b) as "a new provision," and go on to say that the party seeking to justify nondisclosure

> must also provide sufficient information to enable other parties to
> evaluate the applicability of the claimed privilege or protection.
> Although the person from whom the discovery is sought decides
> whether to claim a privilege or protection, the court ultimately
> decides whether, if this claim is challenged, the privilege or
> protection applies. Providing information pertinent to the
> applicability of the privilege or protection should reduce the need for
> in camera examination of the documents.

The clearly expressed intention in this commentary is that the notice of claimed privilege a party is mandated to give should be as specific, detailed and informative as the circumstances allow. A procedure intended to "reduce the need for in camera examination of the documents," a manifestly

worthwhile objective, perhaps appeals even more to trial judges than to trial lawyers.

Local Civil Rule 26(e), which recites its promulgation "[i]n accordance with Fed. R. Civ. P. 26(b)," provides that "when a claim of privilege or work product protection is asserted in response to a discovery request for documents," the party asserting the privilege "shall serve on all parties a privilege log containing the following information": (1) "[t]he type of document", (2) "[t]he general subject matter of the document", (3) "[t]he date of the document", (4) "[t]he author of the document", and (5) "[e]ach recipient of the document."[1]

Local Civil Rule 26(e) further provides that it "requires preparation of a privilege log with respect to all documents withheld on the basis of a claim of privilege or work product protection" *except* "written or electronic communications between a party and its trial counsel after commencement of the action and the work product material created after commencement of the action." Plaintiff Jansson commenced this action by filing her original complaint in the Connecticut Superior Court for the Judicial District of Fairfield at Fairfield on or about January 19, 2016. Defendants filed their Notice of Removal in this Court on February 17, 2016.


**IV**

In *Auersperg* the Second Circuit condemned as insufficient a party's claim of the attorney-client privilege on the basis of "conclusory or ipse dixit assertions." 811 F.2d at 146. That is insufficient, in the court of appeals' view, because "a person claiming the attorney-client privilege has the burden of establishing all the essential elements thereof." *Id*. (citing *In re Horowitz*, 482 F.2d 72 (2d Cir. 1973), *cert. denied*, 414 U.S. 867 (1973)).

---

[1] The Rule contains comparable instructions with respect to "electronically stored information." The present motion in the case at bar deals only with documents.

The Second Circuit's later opinion in *United States v. Construction Products Research, Inc.*, 73 F.3d 464 (2d Cir. 1996), a civil case, describes the requisite contents of a privilege log sufficient to sustain a claim of privilege. The court of appeals began its analysis by saying: "To facilitate its determination of privilege, a court may require 'an adequately detailed privilege log in conjunction with evidentiary submissions to fill in any factual gaps.'" *Id.* at 473 (citing and quoting *Bowne of New York City v. AmBase Corp.,* 150 F.R.D. 465, 471 (S.D.N.Y. 1993)).[2] *Construction Products* specifies that to be "adequately detailed," a privilege log must include a description of the document in question in enough factual detail to enable the adverse party or reviewing court to understand why a particular privilege is being claimed, and the legal basis for the privilege's application (self-evident or supported by pertinent authority). The Second Circuit held that

> The privilege log should: identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure. Other required information, such as the relationship between . . . individuals not normally within the privileged relationship, is then typically supplied by affidavit or deposition testimony. Even under this approach, however, if the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege, his claim will be rejected.

73 F.3d at 473 (citing and quoting *Bowne,* 150 F.R.D. at 474).

The Second Circuit concluded that the privilege log submitted in *Construction Products* was deficient and failed to support the claims of privilege asserted, which were accordingly rejected. The court of appeals' reasoning is instructive in the present case, given the form of the log submitted by

---

[2]    This Court implements that practice in Local Civil Rule 26(e), which as noted in text, mandates the submission of a "privilege log" by a party asserting an evidentiary privilege (such as the attorney-client privilege).

Stamford Hospital.

The Second Circuit began its rejection of the claimed privilege by saying: "The log contains a cursory description of each document, the date, author, recipient, and 'comments.'" 73 F.3d at 473. That is a striking observation, since the comparable columns in Stamford Hospital's log bear the functionally identical captions of "date," "Email - To," "Email – CC," "Email – From," and "Description." The document descriptions in the *Construction Products* log were rejected as impermissibly "cursory" when (for example) a document listed as "Fax: Whistleblower" was accompanied by the comment "Self-explanatory." That did not suffice, the Second Circuit held:

> The descriptions and comments simply do not provide enough information to support the privilege claim, particularly in the glaring absence of any supporting affidavits or other documentation. [A] privilege log should provide a specific explanation of why the document is privileged.

*Id.* at 474 (citations and internal quotation marks omitted).

In *Construction Products*, the Second Circuit cited as authority, in addition to the district court's opinion in *Bowne*, its own earlier holding in *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, where the court of appeals rejected the invocation of the attorney-client privilege by Reynolds, a journalist, who sought to protect her notes and reports. Judge Timbers' opinion in *Auersperg* paraphrased the question put by Judge Friendly in *Kovel*: "[W]ere communications made to her, in confidence, in her capacity as an agent of an attorney for the purpose of obtaining legal advice from that attorney?" *Id.* at 146. The Second Circuit, answering in the negative, reasoned thus:

> We think not. Rather, instead of competent evidence, Reynolds makes blanket assertions seeking to invoke an attorney-client privilege. She has not given the name of any attorney for whom she served as agent. A letter from a von Bulow attorney merely acknowledges that she attended legal strategy and planning sessions for the criminal case,

but does not explicate any professional reasons for her attendance.

*Id*. at 147.

Moore's Federal Practice, 6 *Moore* § 26.47[1][a] at n.5, cites *Construction Products* for the proposition that the "burden of establishing attorney-client or work product privilege is on [the] party asserting privilege," and then cites *Aurora Loan Services, Inc. v. Posner, Posner & Associates, P.C.*, 499 F. Supp.2d 475, 479 (S.D.N.Y. 2007), for the proposition that a "privilege log that failed to identify which privilege was being asserted for specific documents did not meet [the] burden of establishing attorney-client privilege." In *Aurora*, the district court said: "The burden of establishing attorney-client or work product privilege is on the party asserting the privilege"*,* and added that "[f]ailure to furnish an adequate privilege log is grounds for rejecting a claim of attorney-client privilege." *Id.* at 479 ( citing *Construction Products,* 73 F.3d at 473).

## V

I am concerned on this motion with two Defendants: Stamford Hospital and SAS. Both Defendants invoke the benefits of the attorney-client and work product privileges. Stamford Hospital filed a privilege log in this case. Defendant SAS has not filed a privilege log. Local Civil Rule 26(e) mandates the service of a privilege log by a party in support of *any* claim of privilege or protection. If, as the cases hold, the inadequacy of a privilege log results in rejection of a claim of privilege, a party's failure to submit any log at all requires rejection of the claim *a fortiori*.

In consequence, the failure of SAS to file a privilege log bars it from asserting the attorney-client and work product privileges, unless circumstances exist which excuse the failure. Proclamation in briefs of counsel of a client's entitlement to a privilege count for nothing. In the case

at bar, SAS (supported by Stamford Hospital) contends that the common defense rule (also referred to as a joint defense agreement) involving those two parties extends to SAS the benefits of a privilege Stamford Hospital described in the Hospital's privilege log.

The legal adequacy of Stamford Hospital's privilege log under the cited cases is considered in Part VI of this Ruling. The existence and effect of a common defense rule as between Stamford Hospital and SAS are considered in Part VII.

## VI

In January 2017, Stamford Hospital "produced a privilege log, as well as a supplemental privilege log, to Plaintiff." Declaration of Defendant's counsel [Doc. 194-2] at ¶ 3. The Hospital's privilege logs asserted privileges with respect to hundreds of separate documents, most of them emails. Plaintiff contends that a significant number of logged documents are not privileged.

The resulting disputes have generated several broadside exchanges of affidavits and briefs of counsel, some shedding more heat than light. The privilege logs themselves do not presently form part of the Court record. Their contents may be extrapolated from other sources in the record. It seems that the disputes relating to privilege are confined to the contents of the first privilege log, which consists of emails exchanged between individuals involved in the underlying events. The affidavit of Plaintiff's counsel [Doc. 190-1] says at ¶ 3 that Stamford Hospital has "labeled eight-hundred and twenty-six (826) documents on its Privilege Log as falling within the attorney-client privilege." The brief for Defendant [Doc. 194] invokes the work product privilege as well as the attorney-client privilege. Plaintiff's counsel does not challenge these assertions of privilege *in toto*; rather, ¶ 3 of her declaration states further: "Plaintiff has concerns regarding the claim of privilege with respect to two-hundred and ninety-three (293) of the documents identified on the Privilege

12

Log."

Plaintiff's concerns gave rise to an exchange of emails between counsel in May and June of 2017, a portion finding its way into the record as Exhibit 2 to Defendant's counsel's declaration dated January 16, 2018 [Doc. 194-2].  On May 23, 2017, Plaintiff's counsel (Heena Kapadia) emailed to Defendant's counsel (Justin Theriault):  "Of the 826 documents that have been marked as privileged, we have concerns regarding 294.  Please see the attached list." Kapadia explained some of those concerns and concluded: "Please take a look at the attached list and let me know if it would be useful to discuss further and whether you will consider modifying your client's position on any of the times listed."  Theriault responded in an email to Kapadia on June 29, 2017, saying that "I have taken the time to review the documents relating to the nearly 300 objections you have raised," and giving generalized explanations of some of the claimed privileges.  Theriault also attached to his email  "a five-page document that provided further information as to approximately 94 of those items."[3] In point of fact, the attachment [Doc. 194-2, pages 11-15] lists 91 items, with some details furnished as to each in a column captioned "Description."  These items are divided into a number of groups, under captions intended to reflect the nature of the privilege asserted.

The Hospital did not withdraw any of its privilege claims as the result of this exchange.  The stage was thus set for the present motion by Plaintiff to compel production.  Defendant collected the disputed items in a 22-page color-coded document [Doc. 194-1] which divides the 293 (plus or minus) disputed emails into four different groups, for whose privileged status Defendant's brief [Doc. 194] argues, group by group.  Plaintiff's briefs contend that Defendant's claims of privilege are all

---

[3]  Theriault's e-mail says that while Kapadia's earlier e-mail referred to "294" problematic items, the correct number is 293 (the number described as at issue on Plaintiff's subsequent motion to compel production).

invalid and should be rejected on the present record, without the necessity of any *in camera* inspection by the Court.

The parties' submissions on this motion seem to agree that the pages presented as Doc. 194-1 are copies of or replicate exactly the pages of Stamford Hospital's first privilege log, offered to support claims of privilege with respect to hundreds of e-mails. I accept that proposition for the purpose of the following discussion.

The deficiencies of Stamford Hospital's privilege log are immediately apparent. The log's descriptions of the listed documents are almost entirely devoid of information sufficient to "provide a specific explanation of why the document is privileged" of the sort the Second Circuit required in *Construction Products;* on the contrary, these references are paradigmatic examples of the "conclusory or ipse dixit assertions" the Second Circuit condemned in *Auersperg*.

Consider, for example, the many emails listed in the blue-coded "Group 1" of Defendant's Doc. 194-1. Stamford Hospital's brief at 8 accurately characterizes those emails as "communications on Stamford Health's privilege log that, although Stamford Health was not a party to, involved communications amongst representatives of co-defendant SAS and former co-defendant VantagePoint."[4] It is counterintuitive that Stamford Hospital would claim attorney-client or attorney work product privilege with respect to an email neither sent nor received by nor copied to Stamford Health or its own attorneys. The Hospital seeks to justify a privilege running to it by contending that "the privilege is intact with respect to those communications because of the common interest amongst Stamford Health and the parties to those communications, whether or not Stamford Health

---

[4] VantagePoint is a human resources consulting company which SAS had retained to advise with respect to SAS's organization and business practices. Plaintiff has named VantagePoint as a party defendant in the action.

was a party to the messages themselves." *Id.* Whether the common defense or joint defense agreement doctrine has a legitimate office to perform in this case is considered in Point VII, *supra*. Assuming *arguendo* that the doctrine applies, Stamford Hospital's descriptions of these communications are in any event entirely inadequate for a privilege log. For example, many of the emails are between Theresa Bowling, M.D., the head of SAS and the chair of the Hospital's anesthesiology department, and Susan Prior, an executive at VantagePoint, whose description consists entirely of the phrase "Communication regarding Jansson." That unrevealing label does not pass muster under Second Circuit authority. It is precisely the sort of "conclusory or ipse dixit assertion" of privilege that *Auersperg* condemns and *Construction Products* rejects.

The briefs for Stamford Hospital are problematic because Defendant is *en effet* asking the Court to disregard this line of Second Circuit authority. Consider, as another example, the 74 emails color-coded yellow and falling within Group 2 of the Hospital's email privilege log. Defendant's brief [Doc. 194] introduces that group by saying at 12: "Certain of the communications addressed by Plaintiff's Motion to Compel involved only Stamford Hospital employees and did not directly involve an attorney." Nonetheless, the brief argues: "As to such communications, a privilege was asserted when the conversation was an intra-corporate discussion of privileged communications and advice sought or received from counsel," *id.*, a circumstance which in Defendant's counsel's submission brings each e-mail in the group within the attorney-client privilege. Moreover, Plaintiff and the Court are expected to take counsel's word for it. The brief (unimpeded by modesty) asserts: "Stamford Hospital respectfully submits that *in camera* inspection of the 74 emails falling within 'Group 2' is unnecessary and that its representations about the nature and content of these communications should suffice." *Id.* The careful reader will have noticed that the "representations"

in question are not evidentiary declarations of a Hospital employee or officer with knowledge of the facts, in an affidavit or deposition; rather, they are assertions by an advocate in a brief. I mean no disrespect of able counsel for this Defendant by the observation that trial courts do not regard briefs of counsel as an acceptable source of facts in the resolution of disputed factual issues. In this circuit, trial judges look to privilege logs for the identification and evaluation of privileged documents, not to briefs of counsel.

The differences, which can be dramatic, are illustrated by document control # 5701440. The brief of counsel [Doc. 194] at 13-14 and n.12 places that document within a subgroup of "emails amongst Stamford Hospital management and/or senior staff concerning attorney guidance or information sent to attorneys for advice." All the privilege log tells us about this email is that it was sent on August 1, 2013 by "Maria Mecca" to "Sharon Kiely" and its entire description is "Communications re: Jansson contract." The failure of this entry in the Hospital's privilege log to convey the information about the email in question required by Second Circuit cases is manifest. Moreover, it is a failure prevalent throughout the log.

That is a dispositive factor on the present motion. A party's right to assert and succeed upon of a claim of privilege is conditioned upon its filing "an adequately detailed privilege log," as the Second Circuit used that phrase in *Construction Products*. Stamford Hospital's privilege log is deficient in that regard, and the deficiency is not curable by what counsel says in a brief – "ipse dixit" is the phrase that comes to mind.

The inadequacies of Stamford Hospital's presentation are illustrated by the earliest document identified in the Hospital's privilege log. As noted *supra*, the log recites that on August 1, 2013, Maria Mecca sent an email to Sharon Kiely whose contents are described as "Communications re:

Jansson contract."  Neither of those individuals was an attorney.   Stamford Hospital argues in its

brief [Doc. 194] at 13-14 that "[e]ach and every communication identified in this category [Group

2] implicates the attorney-client privilege attendant in either a communication from an attorney

providing legal advice or a response to an attorney's request for information for the purpose of legal

defense," and accordingly  "fall clearly within the scope of attorney-client privilege and/or work

product and are thus protected from disclosure."

It is difficult to imagine how this particular email, sent on August 1, *2013*,  qualifies as

attorney's work-product, a privilege confined to documents "prepared in anticipation of litigation or

for trial," Fed. R. Civ. P. 26(b)(3)(A), where Plaintiff's employment was not terminated until October

*2014*, she filed her regulatory complaints in November *2014*, and filed this action in state court (later

removed) in January *2016*.  As for the more broadly conceived attorney-client privilege, the terse and

uninformative description of this  email in the privilege log leaves an adverse party and trial court

alike unable to form any impression as to whether the obtaining or providing of *legal advice* is

revealed by the email to a degree sufficient to trigger the privilege.  The attorney-client privilege can

be extended to this particular email (and to many others in like circumstances) only if one accepts

uncritically the generally worded *ipse dixit* benedictions that run like a leitmotiv  through counsel's

brief.  That indulgence is foreclosed by the established law of this circuit.

## VII

Stamford Hospital and SAS make much in their briefs of the common defense rule, as a

source of support for the evidentiary privileges each party claims.  The issue arises in this case

because both institutional Defendants  – the Hospital and SAS  – were involved in the events

culminating in October 2014 in Dr. Jansson's termination of employment by SAS with the approval

of Stamford Hospital (as alleged in Plaintiff's complaint).

Second Circuit cases recognize the "common interest" rule, a designation the court prefers to the near-synonymous phrase "joint defense" agreement. In *United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989), a criminal case, the Second Circuit said:

> The joint defense privilege, more properly identified as the "common interest" rule, . . . has been described as an extension of the attorney client privilege. It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected.

*Id.* at 243 (citations and some internal quotation marks omitted).

The Second Circuit considered the proper application of the common interest rule in a subsequent criminal case, *United States v. Weissman*, 195 F.3d 96 (2d Cir. 1999). Weissman was the chief financial officer of Empire Blue Cross/Blue Shield ("Empire"). During the course of an investigation of Empire by a United States Senate committee, Weissman falsified information given to the committee, with the consequence that "[o]n June 2, 1993, evidence of probable personal wrongdoing by Weissman began to surface and the investigation began to focus on him." 195 F.3d at 98. Empire was represented by counsel. Weissman retained separate counsel to protect his interests. On June 16 and again on June 17, 1993, Weissman, his attorney, and Empire's attorney met and discussed the situation. "At this June 16th meeting, Weissman made damaging admissions regarding his own conduct." *Id*.

Weissman was subsequently indicted, tried and convicted on charges of obstruction of justice and perjury. The government sought at trial to prove Weissman's inculpatory admissions at the June

16 and June 17 meetings through the testimony of the Empire attorneys who attended them. Weissman contended that this testimony was barred by the attorney-client privilege created by a joint defense agreement he had with Empire.

The district court conducted a pre-trial evidentiary hearing and held that the events of the meeting on June 17 were protected by a joint defense agreement, but Weissman could not claim an attorney-client privilege in respect of the events of the previous day, June 16, because he "failed to prove by a preponderance of the evidence that a joint defense agreement was explicitly agreed to at the June 16 meeting." 22 F. Supp. 2d 187, 190 (S.D.N.Y. 1998). The Second Circuit affirmed on that point: "We hold that the district court did not abuse its discretion when it found that Weissman failed to demonstrate the existence of an explicit JDA [joint defense agreement] during the June 16th meeting." 195 F.3d at 99.

The Second Circuit began its analysis in *Weissman* by saying: "The burden is on Weissman to demonstrate the existence of a JDA that would have precluded admission in evidence of Weissman's June 16th revelations of wrongdoing," and continued: "a claim resting on the common interest rule requires a showing that 'the communication in question was given in confidence and that the client reasonably understood it to be so given.'" *Id.* (citing and quoting *Schwimmer*, 892 F.2d at 244). The Second Circuit's reasoning in *Weissman* as to why the events of the June 16 meeting did not make that showing is instructive:

> The district court properly rejected Weissman's argument that there was an implied JDA in place during the June 16th meeting because of the parties' cooperative efforts that preceded that meeting. As the court observed, prior to Weissman's June 16th revelations, Empire had no reason to know of his wrongdoing. "Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected."

> *Schwimmer*, 892 F.2d at 243 (citations omitted). Preventing the disclosure of Weissman's wrongdoing was not an ongoing enterprise that Empire intended to further. The course of conduct among Weissman and the attorneys prior to June 16th was one of cooperation. Information was shared and strategy developed in concert, but Empire did not yet know of Weissman's unlawful conduct. The cooperative effort was to respond to the PSI's investigation, not to cover up Weissman's wrongdoing. *Privileges should be narrowly construed and expansions cautiously extended*. Some form of joint strategy is necessary to establish a JDA, *rather than merely the impression of one side* as in this case.

*Id.* at 99-100 (citations omitted and emphases added).

While *Schwimmer* and *Weissman* are Second Circuit criminal cases, they are routinely cited in civil cases by this and other district courts in the circuit as authority with respect to the existence *vel non* of the joint defense privilege or common interest rule. *See, e.g., In re Priceline.com, Inc. Sec. Litig.,* No. 3:00-CV-1884 (AVC), 2007 WL 274534, at *2 (D. Conn. Jan. 26, 2007) (Covello, *J.*); *A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 3:07-CV-929 (WWE), 2013 WL 6044333, at *10 (D. Conn. Nov. 14, 2013) (Fitzsimmons, *M.J.*); *Noval Williams Films LLC v. Branca*, No. 14 Civ. 4711, 2016 WL 7238960, at *2 (S.D.N.Y. Dec. 14, 2016) (Crotty, *J.*); *Cendant Corp. v. Shelton*, No. 3:06-CV-854, 2007 WL 2460701, at *2 (D. Conn. 2007) (Thompson, *J.*); *Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 415 (S.D.N.Y. 2004) (Scheindlin, *J.*); *Sony Elecs., Inc. v. Soundview Techs., Inc.*, 217 F.R.D. 104, 108 (D. Conn. 2002) (Margolis, *M.J.*); and *Bank of Am., N.A. v. Terra Nova Ins. Co., Ltd.*, 211 F. Supp. 2d 493, 496 (S.D.N.Y. 2002) (Gorenstein, *M.J.*).

A typical judicial expression appears in *Denney*, where Judge Scheindlin said:

> The party asserting the common interest rule bears the burden of showing that there was an agreement, though not necessarily in writing, embodying a cooperative and common enterprise towards an

> identical legal strategy. A claim resting on the common interest rule requires a showing that the communication in question was given in confidence and that the client reasonably understood it to be so given. Some form of joint strategy is necessary to establish a joint defense agreement, rather than merely the impression of one side.

362 F. Supp.2d at 415 (internal quotation marks and brackets omitted). For these propositions, the district court in *Denney* cited *Schwimmer* and *Weissman*, *id.* at 415 nn.42 and 44, and went on to explain why the proponent of the common interest bar to discovery was not entitled to claim it:

> In order to invoke the common interest doctrine, it is not enough merely to show, as the doctrine's name might suggest, that BDO and Jenkens had interests in common. Nor is it sufficient to show that they shared concerns about potential litigation. BDO must show a cooperative and common enterprise towards an identical legal strategy. That is, BDO must show some agreement, whether formal or informal, written or unwritten, to pursue a joint legal defense. To do so, BDO must show some *meeting of the minds* between the parties. In addition, BDO must show that the particular communication at issue was disclosed in connection with the joint legal defense.

*Id.* at 415-16 (emphasis in original).

Similarly, in *Noval Williams Films*, the district court stated:

> The common interest rule is an extension of the attorney-client privilege and applies to "those communications made in the course of an ongoing common enterprise and intended to further the enterprise." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). It "protect[s] the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Id.* The common interest rule does not apply where a strategy is merely "the impression of one side"; the strategy must be joint. *See United States v. Weissman*, 195 F.3d 96, 100 (2d Cir. 1999).

2016 WL 7238960, at *2.

In *Bank of America*, the district court said:

21

> [T]he "common interest" doctrine or "joint defense" privilege is an exception to the general rule that the attorney-client privilege is waived when a protected communication is disclosed to a third party. . . . [T]he doctrine applies where parties are represented by separate counsel but engaged in a common legal enterprise. The key consideration is that the nature of the parties' common interest be identical, not similar, and be legal, not solely commercial.

211 F. Supp. 2d at 496 (citations, internal quotation marks, and hyphen omitted).

These analyses of what a party must show to block discovery by invoking the common interest rule or joint defense privilege are useful because they demonstrate the extent to which Stamford Hospital fails to do so.

The subject seems to have come up as the result of a suggestion by counsel for Plaintiff that communications between Stamford Hospital employees or representatives and employees or representatives of SAS and/or VantagePoint waived any attorney-client privilege Stamford Hospital might otherwise have had with respect to those communications because they were made known to a third party. Stamford Hospital's brief [Doc. 194] responds to that suggestion at 15: "Plaintiff claims the privilege is inapplicable to communications in Group 3 because SAS and/or VantagePoint were on [*sic*] these communications. However, their participation in those communications did not destroy the privilege because the parties were subject to a joint privilege. A joint privilege applies when the parties to a communication are discussing privileged information and have an identity of legal interests."

The Hospital's motion papers list 65 separate communications (color coded red) as falling within "Group 3," described by the brief 's caption as "Emails Protected by Joint Privilege." The entry for each email identifies the sender, the recipient, anyone who received a copy, and a "description" of the email. These descriptions are terse: examples are "communication regarding

attorney advice"; "discussion of privileged information"; "communication regarding Jansson"; "discussion of communications between counsel"; and "communication regarding Jansson complaint."

All 65 emails in this category were sent in the year 2014, the earliest one on March 12 and the latest on October 26. With respect to the timing of Plaintiff Jansson's conduct, she has asserted federal Title VII and ADA claims against Stamford Hospital and SAS. Jansson alleges that she filed a complaint based on those claims with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC") on or about November 1, 2014. She received a release of jurisdiction from the CHRO on January 4, 2016, and from the EEOC on December 1, 2015. Second Amended Complaint [Doc. 218], at ¶ 159.

Stamford Hospital's brief on this motion "invoke[s] this joint privilege in three circumstances." Doc. 194, at 16. "The first instance," the brief states, "involves a number of email chains" that "begin with privileged communications between outside counsel for Stamford Hospital[5] and outside counsel for SAS concerning the handling of a particular task as it related to Plaintiff." *Id.* Those emails "were then shared by SAS's outside counsel with Dr. Bowling (acting on behalf of SAS) and Susan Prior (President of VantagePoint) in a manner that was also privileged." *Id.* There is no discernible basis for the brief's conclusory characterization of these emails as "privileged" unless they somehow fit within a joint defense agreement (which is where the Hospital's brief places them).

"The second instance," the brief continues, "was an email communication taking place

---

[5]    The brief uses the name "Stamford Health," which is the same entity as "Stamford Hospital," the name used in this Ruling.

between former defendants Stamford [Hospital]'s then Chair of Anesthesia, Dr. Bowling, and its Chief of Cardiac Surgery, Dr. Michael Coady, on the day after SAS had informed Plaintiff that her employment would be terminating upon the expiration of her employment agreement."[6] *Id.*, at 17. The Hospital's brief continues: "The communication involved advice that was to be sought and/or received from Stamford Hospital's outside legal counsel. And, as discussed above, a joint privilege existed between Stamford Hospital and SAS concerning issues involving Plaintiff's employment." *Id.* In the last-quoted sentence, the Hospital seems to be saying that a joint defense agreement between itself and SAS pre-existed the notice of Plaintiff's termination on October 7, 2014, since (according to the brief) "at that time, Drs. Bowling and Coady [both parties defendant in the action] were cognizant of imminent litigation," Plaintiff having "retained legal counsel and . . . made complaints about both parties to the communication that suggested an intent to commence a legal action." *Id.* The phrase "both parties" is a reference to Stamford Hospital and SAS. The main thrust of the Hospital's claimed "joint privilege" is that the common interest involved is between itself and co-defendant SAS.

The third subset of the Group 3 "Joint Privilege" emails is "a set of email strings that involved former defendant Salvatore Mancino, Director of Human Resources, conveying a request from Stamford Health's outside counsel for certain information to Dr. Bowling and a representative of VantagePoint, Attorney Benjamin Albert, for the express purpose of preparing for potential claims or litigation concerning Plaintiff." *Id.* This email chain includes a redacted portion that is "a request

---

[6] The Second Amended Complaint alleges at ¶¶ 142-43 that Plaintiff received notice of her termination of employment by SAS at a meeting on October 7, 2014. The employment agreement obligated Plaintiff to work for three additional months after that notice of termination. Plaintiff filed her complaint with the CHRO and EEOC during the beginning of November 2014.

for information that states specifically that it originated from Stamford Hospital's outside attorney, and specifically contemplated later discussion between the outside attorneys for Stamford Hospital and SAS as to the subject matter." *Id*. at 18.

Stamford Hospital's burden on this aspect of the case is to demonstrate the existence of a joint defense agreement with SAS which would justify application of the common interest rule, thereby protecting from discovery the email communications in question. The Hospital's effort in that regard is confined to a brief of counsel, unaccompanied and unsupported by affidavits or other forms of admissible evidence. No written joint defense agreement is submitted.

The most that can legitimately be derived from counsel's brief is that Stamford Hospital and SAS, confronted by an increasingly dissatisfied and resentful Dr. Jansson, had "interests in common" (dealing with Jansson) and "shared concerns about potential litigation" (which proved to be well founded when Jansson sued them both). *Denney* explicitly holds that those showings are not sufficient to establish a common interest or joint defense agreement, a conclusion mandated by *Weissman*, where the Second Circuit held: "Some form of joint strategy is necessary to establish a JDA [joint defense agreeement], rather than merely the impression of one side." 195 F.3d at 100. "The strategy must be joint," *Noval Williams Films LLC,* 2016 WL 7238960, at *2, proved by "some agreement, whether formal or informal, written or unwritten, to pursue a joint legal defense," which requires the proponent of the privilege to "show some *meeting of the minds* between the parties," *Denney*, 362 F. Supp. 2d at 415-16 (emphasis in original).

The brief for Stamford Hospital on this motion reflects the impression of that party and its counsel that the common interest rule should apply to this case. Under the cited cases, that impression falls well short of establishing that the rule does in fact apply. Facts justifying

25

application of the rule must be proven, and a brief of counsel is not equal to that task. The meeting of the minds of the parties in this case must be between Stamford Hospital and SAS. That requires, at the very least, affidavits from the attorneys and lay representatives of both those parties which show that at a specific time or times, "a joint defense or strategy has been decided upon and undertaken by the parties and their respective counsel." *Schwimmer*, 892 F.2d at 243. Depending on what such affidavits say, an evidentiary hearing may or may not be necessary; in *Weissman*, the testimony of the defendant, his attorney, and separate counsel for his employer was necessary to create a record enabling the court to decide that a joint defense agreement did not exist at one meeting but had come into existence at a meeting on the following day. The governing principle is that a joint defense agreement is demonstrated by proof, not proclamation.

On the present record in this case, Stamford Hospital has not shown that a common interest or joint defense privilege operates to protect any of the emails in question from discovery. Production of the emails in question will be compelled, subject to the further provisions of this Ruling.

## VIII

## <u>Conclusion and Order</u>

For the reasons stated, neither of these Defendants, Stamford Hospital and SAS, has carried its burden of establishing that a recognized privilege protects or may protect from disclosure any of the emails identified in the submissions on Plaintiff's motion to compel production.

The failure of Stamford Hospital to demonstrate the existence and effect of a privilege stems principally from the inadequacies of the privilege log submitted by the Hospital, which does not comply with the requirements delineated by Second Circuit authority.

The failure of SAS to demonstrate the protection of a privilege arises from its violation of Local Civil Rule 26(e), which mandates the service of a privilege log by any party asserting an evidentiary privilege of this nature. SAS's interests are implicated by this dispute, because a number of the communications identified in Stamford Hospital's submissions were between the Hospital and SAS. Indeed, counsel for SAS have submitted a brief in response to Plaintiff's motion to compel. The SAS brief is largely derivative from and repetitive of Stamford Hospital's brief.

On the present state of the record, Plaintiff Jansson would be entitled to an Order compelling production of every document referred to in her motion to compel. The Court has in mind, however, that the attorney-client privilege exists for the benefit of the client, not the attorney. When the issue arises in litigation, a party's failure to demonstrate its entitlement to the protection of a privilege is most likely ascribable to the attorney, not the client, but the client suffers the prejudice of a disclosure that should not have been made.

Given those realities and circumstances, the Court makes this Order:

1.    Plaintiff's motion [Doc. 190] to compel the production of documents is PROVISIONALLY GRANTED.

2.    On or before **June 1, 2018**, Defendants Stamford Hospital and Stamford Anesthesiology Services, P.C. may, if so advised, submit additional papers in support of a claim that certain particular documents forming the subject matter of the motion are protected by an evidentiary privilege. The cited cases require that a showing of privilege must be made as to each document. It will not suffice to lay the foundation for the attorney-client privilege or its variation, the joint defense privilege, and then simply sweep a collection of communications within that label. If such additional submissions are made, the Court will enter a further scheduling order for the submission

of responsive papers by Plaintiff.

3.  If  Defendants do not file the additional papers contemplated by ¶ 2 of this Order, by the date therein directed, the Court's provisional granting of Plaintiff's motion to compel will become *absolute*, and  Defendants will be required to produce the documents in question to Plaintiff at that time.

It is SO ORDERED.

Dated:  New Haven, Connecticut
         May 7, 2018

                         */s/Charles  S. Haight, Jr.*
                         CHARLES S. HAIGHT, JR.
                         Senior United States District Judge